**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PLANNED PARENTHOOD OF             )
GREATER NEW YORK                  )
26 Bleecker Street                )
New York, NY 10012                )
                                  )
PLANNED PARENTHOOD GREAT          )
NORTHWEST, HAWAI'I, ALASKA,       )
INDIANA AND KENTUCKY              )
2001 E Madison Street             )
Seattle, WA 98122                 )
                                  )
PLANNED PARENTHOOD OF THE         )
HEARTLAND, INC.                   )
818 5th Avenue                    )
Des Moines, IA 50309              )
                                  )
PLANNED PARENTHOOD               )
CALIFORNIA CENTRAL COAST          )
518 Garden Street                 )
Santa Barbara, CA 93101           )
                                  )
PLANNED PARENTHOOD MAR            )
MONTE                             )
1691 The Alameda                  )
San Jose, CA 95126                )
                                  )
                 Plaintiffs,      )
                                  )
v.                                )  **Case No. 25-1334**
                                  )
U.S. DEPARTMENT OF HEALTH AND     )
HUMAN  SERVICES,                  )
200 Independence Avenue SW        )
Washington, DC 20201              )
                                  )
ROBERT F. KENNEDY, JR., in his    )
official capacity as Secretary of the U.S.  )
Department of Health and Human    )
Services,                         )
200 Independence Avenue SW        )
Washington, DC 20201              )
                                  )
                                  )

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This case seeks to stop the upending of a successful landmark bipartisan public-health initiative Congress launched and continuously funded since 2010—a national evidence-based Teen Pregnancy Prevention Program (TPP Program), with over $100 million invested annually in projects that have benefitted over 1.4 million youth since its creation.[1] Relying on evidence-based policy, the TPP Program "funds diverse organizations working to give adolescents, and the adults supporting them, the knowledge and tools needed to improve sexual and reproductive health outcomes and promote positive experiences, relationships, and environments . . ." in order to help youth thrive.[2]

2.      This case concerns TPP's "Tier 1" programs, which comprise approximately three quarters of TPP grant funding allocated by Congress for this purpose.  Congress has specified that Tier 1 funds must be used to implement "medically accurate and age appropriate programs to reduce teen pregnancy," specifically by "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors" and that meet criteria set forth by the Department of Health and Human Services (HHS) through its TPP Evidence Review Protocol.[3]

---

[1] U.S. Dep't of Health & Hum. Servs., Office of Population Affairs, Teen Pregnancy Prevention Program Overview (Sept. 2020), https://bit.ly/4jUOVg5; U.S. Dep't of Health & Hum. Servs., Office of Population Affairs, National Teen Pregnancy Prevention Month Toolkit (2021), https://bit.ly/3YVYZ02.

[2] U.S. Dep't of Health & Hum. Servs., Office of Population Affairs, Teen Pregnancy Prevention Program, https://bit.ly/44cxZx1.

[3] U.S. Dep't of Health & Hum. Servs., Office of Population Affairs, Teen Pregnancy Prevention Grant Recipients, https://bit.ly/3Gtqms3; U.S. Dep't of Health & Hum. Servs., Office of

3.     Plaintiffs are nonprofit organizations that are a part of the FY 2023 Tier 1 Cohort, each approved in June 2023 by HHS to implement five-year projects serving communities and populations with the greatest unmet needs and highest existing adolescent health disparities, with great success so far. Defendants now seek to impose on these projects new requirements, unrelated to program efficacy, which are at best impossibly vague and at worst undermine the very principles that undergird the program and conflict with historical congressional mandates. If these new requirements are not vacated and enjoined, Plaintiffs will be forced out of the program, disrupting years of progress for this public health initiative. As a result, vulnerable communities will go without critical public health programming designed to reduce and prevent unintended teen pregnancy, sexually transmitted infections, and associated adverse health, education, and social outcomes.

4.     Consistent with Congress's mandate, HHS selected Plaintiffs to implement projects, beginning on July 1, 2023, that "improve sexual and reproductive health outcomes, promote positive youth development, and advance health equity for adolescents, their families, and communities through the replication of medically accurate and age-appropriate evidence-based teen pregnancy prevention programs (EBPs)."[4] Plaintiffs selected evidence-based programs to implement from a list curated by HHS based on the agency's criteria established in HHS' Teen Pregnancy Prevention Evidence Review (TPPER) protocol, a "systematic process for reviewing evaluation studies against a rigorous standard to identify programs with evidence of

Population Affairs, Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER), https://bit.ly/3Ez5TSi (quoting 2010 Consolidated Appropriations Act).
[4] U.S. Dep't of Health and Hum. Servs., Notice of Funding Opportunity: Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services (FY 2023 NOFO), attached as Exhibit 1.

effectiveness in reducing teen pregnancy, STIs, or associated sexual risk behaviors." The TPP

program requires grantees to ensure fidelity[5] to those models by "replicating" the evidence-based

approaches as closely to the approved curriculum as possible.[6]

5.      Although approved for a five-year performance period, Tier 1 grantees must

submit annually a non-competing continuation application consisting of "a progress report for

the current budget year, and work plan, budget and budget justification for the upcoming year."[7]

For the second year of the projects, HHS awarded Tier 1 funds for a budget period of July 1,

2024 until June 30, 2025. In order to continue receiving funds for the project's third budget year,

grantees were required to submit a non-compete continuation application to the agency by April

15, 2025.

6.      Shortly before the submission deadline, on March 31, 2025, HHS distributed, via

email, new requirements that are deeply inconsistent with the rigorous, evidence-based TPP

Program, and which are at odds with existing grantees' implementation of already-approved

evidence-based programs.  Roughly two weeks before the  application deadline, this notice, titled

*Guidance for Preparing a Non-Competing Continuation (NCC) Award Application* (the "NCC

Notice") (attached as Exhibit 2), set forth substantial and onerous new requirements for FY 2023

Tier 1 Cohort organizations seeking continuation of funding for the forthcoming budget year

beginning on July 1, 2025. In particular, the NCC Notice requires grantees to demonstrate

"alignment with current Presidential Executive Orders," and then expressly identifies several

---

[5] Ex. 1 at 8-9 ("Fidelity refers to the degree to which an implementer adheres to the core components of an evidence-based program.)
[6] Anita P. Barbee, et al., How to ensure fidelity in implementing an evidence based teen pregnancy prevention curriculum, Children and Youth Services Review, Volume 129 (2021).
[7] Ex. 1 at 56.

Executive Orders as examples of those that "may be of most relevance to the work of the TPP program," including:

    a.  Executive Order 14168: "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government";

    b.  Executive Order 14190: "Ending Radical Indoctrination in K-12 Schooling";

    c.  Executive Order 14187: "Protecting Children From Chemical and Surgical Mutilation";

    d.  Executive Order 14151: "Ending Radical and Wasteful Government DEI Programs and Preferencing";

    e.  Executive Order 14173: "Ending Illegal Discrimination and Restoring Merit-Based Opportunity".[8]

    7.    The NCC Notice fails to provide any context or clarifying information regarding how grantees should comply with this new requirement to "align" with all current Executive Orders, including the over 139 Executive Orders that have been issued since January 20, 2025. For example, it does not explain what "alignment" means, much less what "alignment" with any of these 139+ Executive Orders entails; whether full compliance, partial consistency, or mere consideration is required; how to reconcile potentially conflicting directives within these Executive Orders; or the standards or criteria Office of Population Affairs (OPA) will use to evaluate "alignment." Critically, this Notice failed to provide specifics as to how to "align" TPP Programs, which require fidelity to existing evidence-based programming, with Executive

---

[8] Ex. 2 at 4-5.

Orders that are wholly inapplicable or conflict with the purpose and historical statutory mandates of the program.

8.    The new Executive Order alignment requirements subvert the very purpose of the TPP Program. They seek to insert eleventh-hour requirements into long-standing, rigorously evaluated, evidence-based programs, which the grantees, by Congressional design, have little latitude to modify. In many cases, the Executive Order requirements appear to directly contradict the content in the evidence-based programs; would seem to require program facilitators to avoid certain words or concepts; require modifying program materials in a manner that would undermine their scientific accuracy and effectiveness; would necessitate skipping entire chapters or modules in the curriculum; and go against the stated mission (and statutory requirements) of the Program itself.

9.    The new requirements are impossibly vague, and to the extent they impose discernable standards at all, those standards would require funding recipients to violate the basic statutory requirements of the TPP program.  As a result, funding recipients cannot comply with the terms governing their awards – which require fidelity to the evidence-based programs – and cannot fulfill the program's mandate from Congress: to implement "medically accurate" programs that  "replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."[9]

---

[9] Pub. L. 118-47, 138 Stat. 460, 671-72 (2024); Pub. L. 117-328, 136 Stat. 4459, 4876-77 (2022); Pub. L. 117-103, 136 Stat. 49, 464 (2022); Pub. L. 116-260, 134 Stat. 1182, 1587 (2020); Pub. L. 116-94, 133 Stat. 2534, 2605 (2019); Pub. L. 115-245, 132 Stat. 2981, 3087 (2018); Pub. L. 115-31, 131 Stat. 87, 536 (2017); Pub. L. 114-113, 129 Stat. 2242, 2617 (2015); Pub. L. 113-76, 128 Stat. 5, 380 (2014); Pub. L. 113-6, 127 Stat. 198, 413-14 (2013) (carrying forward prior

10.    HHS's disruptive action has left the future of the Tier 1 Teen Pregnancy Prevention Program uncertain. The notice is unconstitutionally vague. Agencies must give regulated parties fair warning of what is required or prohibited so they are not left to guess at its meaning or be subject to arbitrary action. Instead, the HHS notice inserts unlawful new requirements and then further provides no discernable criteria for even assessing compliance with those unlawful requirements, plunging grantees into a legal minefield where any misstep can trigger the termination of critical funds.

11.    The notice also conflicts outright with the program's statutory mission. Tier 1 grantees must "replicat[e]" "medically accurate" effective, evidence-based program models with fidelity across multiple settings. By mandating content at odds with the core curricula that make these models successful, the notice nullifies the replication requirement that both Congress and HHS established.

12.    Finally, the notice violates the most basic requirements of reasoned decisionmaking set forth in the APA. The agency never evaluated grantees' reliance interests in existing curricula, the concrete costs of overhauling or removing core curriculum, or the feasibility of reconciling evidence-based fidelity with the Executive Orders' mandates. There is no reasoned basis for concluding that alignment with the Executive Orders will advance teen pregnancy prevention or any public-health objective, and there is no evidence that HHS determined that there was.

---

year's provisos); Pub. L. 112-74, 125 Stat. 786, 1080 (2011); Pub. L. 112-10, 125 Stat. 38, 161-62 (2011); Pub. L. 111-117, 123 Stat. 3034, 3253 (2009).

13.     Accordingly, Plaintiffs Planned Parenthood of Greater New York ("PPGNY"), Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana and Kentucky ("PPGNHAIK"), Planned Parenthood of the Heartland ("PPH"), Planned Parenthood California Central Coast ("PPCCC"), and Planned Parenthood Mar Monte ("PPMM") (collectively, "Plaintiffs"), by and through their undersigned attorneys, now bring this suit against HHS, and HHS Secretary Robert F. Kennedy, Jr. ("Kennedy") (collectively "Defendants").

14.     Plaintiffs seek a preliminary and permanent injunction, and a stay of implementation and vacatur, of the NCC Notice. The Court should set aside the new "alignment" requirements, and order HHS to allow Tier 1 grantees in the TPP Program to submit amended Non-Competing Continuation applications without the new Executive Order "alignment" requirements and without delaying continuation funding awards.[10]

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 704-06.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one

---

[10] The Order should also require HHS to allow grantees who were *unable* to participate or submit because of the NCC Notice's unlawful "alignment" requirements to submit an application within the same time frame afforded to others under the same terms of evaluation.

defendant resides in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

17.    **Planned Parenthood of Greater New York (PPGNY)** is a not-for-profit corporation organized under the laws of New York. PPGNY provides high-quality, affordable, evidence-based sexual and reproductive health care through nineteen health centers in New York. PPGNY's TPP grant funds the Project Supporting Teens' Access and Rights (STAR), which advances health equity and improves the sexual and reproductive health outcomes of youth in New York City by replicating age-appropriate, medically accurate, and evidence-based education programs across a network of partners across the city. PPGNY has been a grantee in the TPP Program since 2010. PPGNY was awarded a five-year grant in June 2023. PPGNY timely submitted a Year 3 NCC application on April 15, 2025.

18.    **Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana and Kentucky (PPGNHAIK)** is a not-for-profit corporation organized under the laws of Washington. PPGNHAIK provides high-quality, affordable reproductive health care through thirty-three health centers in Alaska, Hawai'i, Idaho, Indiana, Kentucky, and western Washington. PPGNHAIK's mission includes providing evidence-based teen pregnancy prevention programs in the communities it serves. PPGNHAIK's TPP grant supports the Kalihi Youth Sexual Health Project which works to improve sexual and reproductive health outcomes, promotes positive youth development, and advances health equity for Native Hawaiian/Native American Pacific Islander (NHNAPI) and LGBTQ+ youth and their families by replicating to scale evidence-based programs in the Kalihi neighborhood of Honolulu, Oahu, Hawai'i.

PPGNHAIK has been a grantee in the TPP Program since its inception in 2010. PPGNHAIK was awarded a five-year grant in June 2023. PPNHAIK timely submitted a Year 3 NCC application on April 15, 2025.

19.    **Planned Parenthood of the Heartland (PPH)** is a not-for-profit organization organized under the laws of Minnesota. Covering  Iowa, and Nebraska PPH provides high-quality health care to nearly 93,000 people and health education to more than 58,000 people each year through our affiliated organizations in the region. PPH's TPP grant supports the Community-Responsive, Youth-Driven Comprehensive Sexual and Reproductive Health Interventions to Achieve Optimal Health for BIPOC and LGBTQIA2S+ Adolescents in Western Iowa and Eastern Nebraska, focused on implementing evidence-based programs in each community served; mobilizing parents, adults and communities through health fairs and trainings; and providing continuous quality improvement by measuring outcomes.[11] PPH has been a grantee in the TPP Program since 2015. PPH was awarded a five-year grant in June 2023. PPH timely submitted a Year 3 NCC application on April 15, 2025.

20.    **Planned Parenthood California Central Coast (PPCCC)** is a not-for-profit corporation organized under the laws of California. PPCCC provides high-quality, affordable reproductive health care through six health centers in California. PPCCC's mission is to improve its communities' sexual and reproductive health outcomes through healthcare, education, and advocacy. PPCCC's TPP grant supports the Central Coast Comprehensive Sex Education Collaborative (CSEC), which is a systems-based teen pregnancy prevention initiative with

---

[11] BIPOC stands for Black & Indigenous People of Color.  LGBTQIA2S+ stands for Lesbian, Gay, Bisexual, Transgender, Questioning, Intersex, Asexual and Two Spirits.

overarching goals of improving sexual and reproductive health outcomes, promoting positive youth development and empowerment, and advancing health equity and inclusivity for adolescents, their families, and communities through replication of medically accurate and age-appropriate evidence-based TPP programs in diverse and historically underserved areas. PPCCC has been a grantee in the TPP Program since 2023. PPCCC was awarded a five-year grant in June 2023. PPCCC timely submitted a Year 3 NCC application on April 15, 2025.

21.     **Planned Parenthood Mar Monte (PPMM)** is a not-for-profit corporation organized under the laws of California. PPMM invests in communities by providing health care and education through thirty-five health centers in mid-California and Nevada. PPMM provides medical and education services to over 300,000 people annually. PPMM's TPP grant supports its Sex Ed Equity (S.E.E.) project, which is designed to increase access to comprehensive sex education by considering the disparities, stigma, and access barriers for youth in certain settings: clinics, outreach and after-school sites operated by community-based organizations, detention centers (e.g., juvenile justice facilities), and schools, including charter and court-operated schools. PPMM has been a grantee in the TPP Program since 2023. PPMM was awarded a five-year grant in June 2023. PPMM did not submit a Year 3 NCC application.

22.     **Defendant HHS** is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1).  HHS is the federal agency responsible for awarding and administering funds under the TPP Program. Since 2019, the Office of Population Affairs, within the Department of Health and Human Services, has administered the TPP Program.

23. **Defendant Robert F. Kennedy, Jr.** is Secretary of HHS and is sued in his official capacity.

## BACKGROUND

### The TPP Program from 2010 to 2024

24. Teenage pregnancy has long been a public health concern in the United States. Despite a substantial decline over the past two decades, the rate of unintended adolescent pregnancy in the United States remains higher than that of comparable high-income countries, with persistent racial, ethnic, and geographic disparities.[12]

25. Unintended teenage pregnancy, childbirth, and in some cases, parenthood, can have significant and determinative short- and long-term impact on the health and quality of a young person's life and can be associated with adverse health, social, and economic challenges.[13]

26. As a result, public health organizations, including the Centers for Disease Control and Prevention, agree that reducing unintended teenage pregnancy is in the best interest of not only teenagers, but society as a whole.[14]

27. In 2009, Congress mandated the creation of the TPP Program to fund a wide array of evidence-based, scientifically rigorous approaches to combating unintended teen pregnancy.[15] Congress established the TPP Program "to create evidence-based social policy initiatives to improve policymaking and program outcomes" by "designing new initiatives to build rigorous

---

[12] Congressional Research Service, *Adolescent Pregnancy: Federal Prevention Programs*, https:// www.congress.gov/crs-product/R45183.

[13] Congressional Research Service, *Adolescent Pregnancy: Federal Prevention Programs*, https:// www.congress.gov/crs-product/R45183.

[14] Congressional Research Service, *Adolescent Pregnancy: Federal Prevention Programs*, https:// www.congress.gov/crs-product/R45183.

[15] Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

data, rather than treating evaluation as an afterthought, and using the evidence that emerges for action."[16]

28.    Congress also directed the creation of the Office of Adolescent Health (OAH), which was responsible for implementing and administering the TPP Program until June 2019, when it was subsumed under OPA in the Office of the Assistant Secretary for Health (OASH).

29.    Consistent with those objectives, when Congress initially appropriated $110 million in funds to the TPP Program in FY 2010, it directed that such funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age-appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants."[17]

30.    From 2010 through today, Congress has continuously funded the TPP Program at approximately the same levels in the same manner and with the same statutory requirements. Congress provided $101 million for the program for FY 2024.    Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, 138 Stat. 460, 671-72 (2024). This program competitively awards grants to public and private entities to implement a variety of evidence-based or innovative models that seek to influence adolescent sexual behavior. Such models focus on sexual abstinence or information about the use of contraception, among other approaches.

---

[16] Evelyn M. Kappeler & Amy Feldman Farb, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, 54 J. Adolescent Health S3, S3 (2014).
[17] Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

31.     The TPP program funds two types of grants.  The first type, known as "Tier 1" grants, *replicate* models that HHS has *already* determined to be proven effective in reducing unintended teen pregnancy or impacting associated sexual risk behaviors and consequences through a systemic review of rigorous evaluation studies of these programs. After federal administration costs, 75% of available TPP funds are reserved for Tier 1 grants.

32.     The remaining 25% of TPP program funds are awarded to "Tier 2" research and demonstration grants. These Tier 2 grants are focused on programs that are designed to develop, replicate, and refine additional evidence-based models and innovative strategies for reducing unintended teenage pregnancy rates.

33.     As explained above, Tier 1 grantees are statutorily required to replicate, with fidelity, established evidence-based programs. Those programs are identified by HHS, through the agency's Teen Pregnancy Prevention Evidence Review (TPPER) process. TPPER determines whether a program is effective in serving the required TPP goals: reducing teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors.

34.     The TPPER was initially active from 2010 to 2019, and identified teen pregnancy prevention models that were shown to be effective based on studies from the prior 30 years. After a pause in activity during President Trump's first administration, in FY 2022 Congress appropriated funds to restart the review and HHS issued a call for new studies to be submitted for review. The latest findings were released in 2023.[18]

---

[18] HHS, OPA, OASH, "Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER)," July 5, 2023, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review; Forrester, et. al., *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review: October 2016-May 2022*, at 1 (April 2023), available at http://bit.ly/4jX33FF.

35.    HHS's TPPER uses a systematic process to review studies and evaluations of teen pregnancy prevention programs/models to identify those that show evidence of "at least one favorable, statistically significant impact on at least one outcome of interest reflecting sexual behavior (for example, whether teens have ever had sex) or reproductive health (for example, teens' sexual activity, number of sexual partners, contraceptive use, STIs or HIV, or pregnancy)."[19] Despite the connection to the TPP program, the review is intended to more broadly inform the adolescent pregnancy prevention field.

36.    TPPER currently identifies 52 programs that meet the review criteria for evidence of effectiveness.[20] Each of Plaintiffs' TPP Program projects implements and replicates, with fidelity, at least one of these evidence-based programs that HHS has identified[21] as effective.

**The TPP Program Application and Award Process**

37.    Tier 1 funding recipients, like Plaintiffs in this case, receive funding for their projects through two distinct processes: a competitive award cycle, in which they propose and are selected to replicate evidence-based programs up to a five-year period, and an annual non-competitive continuing award process in which funding recipients apply to HHS to receive a one-year  continuing award of funds as part of the five-year project period.  The procedures governing this practice are codified in HHS's regulations.

---

[19] HHS, OPA, OASH, "Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER)," July 5, 2023, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review.

[20] *Id.*

[21] HHS has removed the Teen Pregnancy Prevention Evidence review website, which listed the HHS-approved evidence based programs. However, the list of eligible evidence-based programs is available on the Reproductive Health National Training Center's website. *See* https://rhntc.org/resources/evidence-based-teen-pregnancy-prevention-programs-glance.

38.    HHS regulations governing the award of grants and cooperative agreements by HHS and its agencies are primarily codified at 45 C.F.R. Part 75. This Part includes 45 C.F.R. § 52.6(c), which allows HHS to notice an award for a "project period," during which HHS intends to support the project "without requiring the project to recompete for funds."

39.    Consistent with 45 C.F.R. Part 75, the TPP Program competitive grantmaking process necessarily begins with a notice of funding opportunity (NOFO), i.e., a public announcement in which OPA declares its intention to award funds and outlines the program goals and objectives and conditions for applying. An organization interested in applying for an award must submit an electronic application to OPA through www.grants.gov. In addition to providing a project narrative and budget narrative and justification, the application must include several forms (SF-424 Application for Federal Assistance, SF-424A Budget Information for Non-Construction Programs, SF-LLL Disclosure of Lobbying Activities) and a Project Abstract Summary.    *See, e.g.*, HHS, OASH, OPA, Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services, Funding Opportunity Announcement and Application Instructions, AH-TP1-23-001, 2023 (FY 2023 NOFO), attached as Exhibit 1, at 20-22.

40.    The TPP Program has awarded funds to multiple cohorts of Tier 1 grantees since FY 2010. Historically, HHS has issued these awards to multi-year projects. The fourth (and most recent) cohort of Tier 1 awards covers the period of FY 2023-2028, contingent on the future availability of funds.

41.    This current cohort of Tier 1 grantees were selected based on a FY 2023 funding opportunity titled "Advancing Equity in Adolescent Health through Evidence-Based Teen

Pregnancy Prevention Program and Services." *Id.* at 1. In particular, this NOFO solicited applications for projects "to serve communities and populations with the greatest needs and facing significant disparities to advance equity in adolescent health through the replication of evidence-based teen pregnancy prevention programs (EBPs) and services."

42.    In justifying the need for programs that "advance equity in adolescent health," HHS highlighted the "significant disparities in adolescent sexual health outcomes by race, ethnicity, geography, and among those that have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[22]

43.    One of the eight expectations for the projects required that programs "[f]ocus on Areas of Greatest Need and Facing Significant Disparities" and "serv[e] youth who are . . . disproportionally affected by unintended teen pregnancies (including rapid repeat pregnancy) and STIs due to factors such as: race; ethnicity; geography; and/or otherwise historically underserved or marginalized. This includes those that have been adversely affected by persistent poverty and inequality (e.g., youth experiencing homelessness, youth in foster care, youth in juvenile justice, LGBTQI+ youth, youth with disabilities, expectant and/or parenting teens, etc.)."[23]

44.    Projects were required to select EBPs that were "a good fit, demonstrating clear alignment between the selected EBPs, project goals and desired outcomes, needs of the community/population, and the capacity/readiness of the implementation site(s) and implementing organization(s)."[24]

---

[22] Ex. 1 at 5.
[23] Ex. 1 at 6-7.
[24] Ex. 1 at 8.

45.    In the FY 2023 NOFO, HHS defined "evidence-based approaches" as those "that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."[25] HHS further emphasized the importance of grantees using materials accompanying the evidence-based programs that are "age appropriate, medically accurate, culturally and linguistically appropriate, trauma-informed, and inclusive of all youth."[26]

46.    In evaluating submissions in response to the FY 2023 NOFO, project applications were assessed by federal staff and an independent review panel according to criteria laid out in the FY 2023 NOFO: (1) focus on areas of greatest need and disparities; (2) selection and implementation of evidence-based teen pregnancy prevention programs to scale; (3) proposed approach; (4) organizational capability and experience; (5) collaboration and partnerships; (6) project management; and (7) work plan and budget. Ex. 1 at 44-36. Of those criteria, the NOFO assigns greatest weight to the focus on areas of greatest need and disparities. *See id.*

47.    Per the FY 2023 NOFO, for each year of the approved performance period grantees would "be required to submit a noncompeting continuation application, which includes a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." Ex. 1 at 56. "Specific guidance [would be provided annually by OASH and OPA] via Grant Solutions well in advance of the application due date. OASH [then] will award continuation funding based on availability of funds, satisfactory progress of the project, grants

---

[25] HHS, OASH, OPA, Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services, Funding Opportunity Announcement and Application Instructions, AH-TP1-23-001, 2023.

[26] *Id.*

management compliance, including timely reporting, and continued best interests of the government." *Id.*; *see also* U.S. Dep't of Health & Hum. Servs., *HHS Grants Policy Statement* at 21 (effective Apr. 16, 2025), https://bit.ly/3RFgeir.

48.    In the FY 2023 Tier 1 cohort, 53 grantees in 25 states and Puerto Rico were awarded more than $68.5 million to replicate and scale evidence-based TPP programs that had been proven effective to improve sexual and reproductive health outcomes and promote positive youth development. In its announcement, HHS emphasized that through this cohort of grantees, the agency sought "to advance equity in adolescent health by supporting projects that serve communities and populations with the greatest needs and facing significant disparities" with a "focus on reaching communities and populations that are disproportionately affected by unintended teen pregnancy and STIs." Grantees served 140,935 youth in FY 2023.[27]

49.    Plaintiffs are current recipients of these Tier 1 grants, and all of their programs replicate the evidence-based models identified by TPPER with minimal adaptations (e.g., changing names). By utilizing those models, these grants scale up effective evidence-based programs that HHS pre-approved and selected because they have been proven through rigorous evaluation to reduce unintended teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors.

### Plaintiffs' Tier 1 Programs

50.    Plaintiffs Planned Parenthood of Greater New York ("PPGNY"), Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana and Kentucky ("PPGNHAIK"), Planned Parenthood of the Heartland ("PPH"), Planned Parenthood of California Central Coast

---

[27] https://www.congress.gov/crs-product/IF10877.

("PPCCC"), and Planned Parenthood Mar Monte ("PPMM") are all Tier 1 funding recipients under the FY 2023 NOFO.  For the last two years since their five-year awards were made, each has worked diligently to "replicate" "medically accurate" evidence-based programs suitable to the unique populations that they serve.

51.    **PPGNY.**  Plaintiff Planned Parenthood of Greater New York (PPGNY) operates a Tier 1 program with annual funding of approximately $1,091,185. Through Supporting Teens' Access and Rights (STAR), PPGNY works to advance health equity and to improve the sexual and reproductive health outcomes of youth in New York City. In addition to training for youth-serving professionals, the project replicates age-appropriate, medically accurate and evidence-based education programs across a network of PPGNY's partners in 15 community districts throughout New York City and includes a parent-to-parent peer education component for parents, guardians, and other adults in young people's lives. Programming is offered in three settings: middle and high schools, after school and out-of-school time programs offered by community-based organizations, and residential facilities serving youth experiencing homelessness.

52.    In compliance with the terms of the FY 2023 NOFO, within the setting types above, STAR intended to target the following: all youth aged 10-24; youth who identify as LGBTQ+; youth who are English language learners; and youth with intellectual and developmental disabilities. This determination was based on clear evidence demonstrating that, within New York City, these groups faced significant disparities in access to high-quality, fact-based sexual and reproductive health education placing them at increased risk for adverse health outcomes. For example, among the 15 community districts prioritized through Project STAR, 13 have teen birth rates higher than or roughly equal to the national rate. Across the

targeted community districts, chlamydia rates are higher than the national average for young people ages 15-24 and for people of all ages. Project STAR also focused on youth populations that are at greater risk of unintended pregnancies, births, and increased STI rates–including youth who identify as LGBTQ+, youth who are English language learners, and youth with intellectual and developmental disabilities–that are overrepresented in the targeted community districts.

53.    Throughout the course of its project, PPGNY has implemented the following evidence-based programs selected from HHS' TPPER as part of this project: Making Proud Choices!, Be Proud Be Responsible!, Project AIM, and Positive Prevention Plus. Based on studies cited in the TPPER, these evidence-based programs were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the populations identified by PPGNY. Presently, PPGNY offers three evidence-based programs: Making Proud Choices!, Be Proud! Be Responsible!, and Project AIM. PPGNY is also preparing to implement Positive Prevention Plus for Youth with Disabilities, which is scheduled to be piloted by the end of this grant year. By the end of the five-year grant period, STAR is projected to reach 6,376 youth throughout New York City by engaging youth, caregivers, and the community in equitable, safe, supportive, and inclusive environments.

54.    **PPGNHAIK.**  Plaintiff Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana and Kentucky (PPGNHAIK) operates a Tier 1 program with annual funding of approximately $487,013.  PPGHNAIK's project is titled "Kalihi Youth Sexual Health" (KYSH), which works in partnership with stakeholders (e.g., youth, parents and caregivers, and community members) to improve sexual and reproductive health outcomes, promote positive youth development, and advance health equity for Native Hawaiian/Native American Pacific

Islander (NHNAPI) and LGBTQ+ high school-age youth and their families by replicating to scale evidence-based programs in the Kalihi neighborhood of Honolulu, Oahu, Hawai'i.

55.     In compliance with the terms of the FY 2023 NOFO, PPGNHAIK designed a project serving the populations in Hawai'i that were most disproportionately affected by unintended teen pregnancy and STI rates and demonstrated the greatest needs for teen pregnancy prevention programs. Based on this information, it determined that although the State of Hawai'i's teen birth rate is lower than the national average, NHNAPI and LGBTQ+ youth in Kalihi experienced teen birth and HIV/STI incidence rates two-to four-times higher than the national average, with many factors contributing to these health disparities. Within these historically underserved communities, adolescent health disparities are impacted by factors such as lack of access to evidence-based programs, NHNAPI and LGBTQ+ discrimination in the health care system, high rates of poverty and uninsured/underinsured families, and cultural differences within the NHNAPI population that influence attitudes toward sexuality.

56.     PPGNHAIK has implemented the following evidence-based programs selected from HHS's TPPER as part of this project: IN-Clued, Positive Prevention Plus, and Linking Families and Teens. Based on studies cited in the TPPER, these evidence-based programs were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the populations identified by PPGNHAIK.  By the end of the five-year grant period, the KYSH project is projected to reach 1,935 youth and 113 parents/caregivers.

57.     **PPH**. Plaintiff Planned Parenthood of the Heartland (PPH) operates a Tier 1 program with annual funding of approximately $773,619 for a project titled "Community-Responsive, Youth-Driven Comprehensive Sexual and Reproductive Health

Interventions to Achieve Optimal Health for BIPOC and LGBTQIA2S+ Adolescents in Western Iowa and Eastern Nebraska" ("PPH TPP Project"), which was designed to implement evidence-based programs in each community served, to mobilize parents, adults, and communities through health fairs and training, and to provide continuous quality improvement by measuring outcomes. This project's goal aimed to increase Black, Indigenous, and People of Color (BIPOC) and LGBTQIA2S+ communities' access to inclusive sexual reproductive health education information and resources in specific counties in Iowa and Nebraska as well as the Ponca and Winnebago Tribes of Nebraska.

58. In compliance with the terms of the FY 2023 NOFO, PPH designed a project based on census and other public health data which demonstrated that disparities in unintended teen birth and STI rates persisted both geographically and demographically in Iowa and Nebraska, particularly within populations that the census identified as "American Indian/Alaskan Native", "Black/African American", and "Latinx/Hispanic" teens. For BIPOC youth within Woodbury, Pottawattamie, and Douglas Counties, the health disparities were even more pronounced than the national rates. For example, for American Indian/Alaskan Native youth, birth rates within Woodbury County, IA and Douglas County, NE were 4.5 times and 2 times higher than the national birth rate. Black/African American teens have an average of over 1.5 times higher than the national birth rate across known counties, and Latinx/Hispanic teens have an average birth rate that is over twice that of the national rate. Adolescents identifying as LGBTQIA2S+ similarly had higher rates of unintended pregnancy than their heterosexual counterparts. Similarly, young people in these identified counties had significantly higher rates of STIs than the national rate, in large part as a result of historical and systemic barriers to health

care and education stemming from numerous social and economic factors. Nonetheless, sex education available to young people within these communities lacked in critical sexual health education topics and inclusiveness; consequently, by failing to acknowledge the nuances and unique challenges faced by youth from these communities, sex education programs available within many of these communities were ineffective. Based on this information, it was clear that there was a (1) high and unmet demand for sexual and reproductive health and positive youth development within these populations and (2) need for culturally responsive sexual and reproductive health education to change the trajectory of health outcomes for BIPOC and LGBTQIA2S+ youth in these Iowan and Nebraskan counties.

59.     Throughout the course of its project, PPH has implemented the following evidence-based programs selected from HHS' TPPER as part of this project: Making Proud Choices, Get Real, Safer Choices, Draw the Line, FLASH (high school), and Plan A. Based on studies cited in the TPPER, these evidence-based programs were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the populations identified by PPH. Programming is offered in colleges/universities, community-based organizations, juvenile justice facilities, public schools, and substance abuse treatment centers. By the end of its five-year grant period, this project is projected to have impacted approximately 2,100 youth.

60.     **PPCCC.** Plaintiff Planned Parenthood California Central Coast (PPCCC) operates a Tier 1 program with annual funding of approximately $798,636. Through Central Coast Comprehensive Sex Education Collaborative (CSEC), PPCCC designed a project to implement a systems-based teen pregnancy prevention initiative with overarching goals of improving sexual and reproductive health outcomes, promoting positive youth development and

empowerment, and advancing health equity and inclusivity for adolescents, their families, and communities through replication of medically accurate and age-appropriate evidence-based teen pregnancy prevention programs in diverse and historically underserved areas across educational, community-based, and healthcare settings. PPCCC's school-based programs must comply with the California Healthy Youth Act, which requires comprehensive sex ed to cover and be inclusive of all sexual orientations, gender identity and expressions.

61.    In compliance with the terms of the FY 2023 NOFO, PPCCC identified Latinx and LGBTQIA+ adolescents and their families as the target population of this program. Based on public health information and statistical data, PPCCC identified these populations as experiencing significantly disproportionately higher rates of unintended teen pregnancy and STIs.

62.    PPCCC has implemented the following evidence-based programs selected from HHS' TPPER as part of this project: IN-Clued, Linking Families and Teens, and Plan A. Based on studies cited in the TPPER, these evidence-based programs were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the populations identified by PPCC, particularly Latinx and LGBTQIA+ youth.

63.    Through CSEC, PPCCC community health educators were trained and provided services to underserved areas of the tri-county Central Coast region, delivering evidence-based curricula that targets Latinx adolescents and teens and their families and LGBTQIA+ youth and their families with an integrated lens of positive youth development. PPCCC has developed partnerships to connect with difficult-to-reach populations, including farmworker families and populations in need of bilingual educational programming.

64.    By the end of the five-year grant period, CSEC is projected to reach 2,900 individuals–including youth, caregivers, and health care professionals..

65.    **PPMM.**  Plaintiff Planned Parenthood Mar Monte (PPMM) operates a Tier 1 program with annual funding of $985,867. PPMM's Sex Ed Equity (S.E.E.) Project is a critically resourced initiative designed to increase access to comprehensive sex education by considering the disparities, stigma, and access barriers for youth in certain settings: clinics, outreach and after-school sites operated by partnering with a wide tapestry of committed organizations to provide evidence-based programs as both primary interventions, and refresher programs in various settings: community-based organizations, juvenile justice and clinic settings, and schools, including charter and court-operated schools in Kern and Tulare counties in California and Washoe County, Nevada, targeting BIPOC youth, primarily those who are Black and Latinx.

66.    In compliance with the terms of the 2023 NOFO, PPMM designed its project based on public health information which demonstrated that these BIPOC adolescents, primarily those that are Black or Latine/x, experienced pregnancy and STI rates higher than the national average, which is compounded by stigma and structural barriers to accessing basic health and sex education as well as barriers to accessing community resources. In particular, adolescent birth rates in the counties it intended to serve within these identified populations were more than three times the national average, and at times, higher than the California statewide data for some of these groups. Likewise, evidence demonstrated that STI rates within the counties it identified were higher than state and national rates.

67.    PPMM's project focused on addressing critical unmet sex education and health care linkages for youth, especially youth of color in geographic areas where PPMM offered

services and has forged strong community partnerships. Moreover, the S.E.E. Project took into account persistent disparities as they layered onto geography and focused on four settings: (a) clinics, (b) outreach and after-school sites operated by community-based organizations (CBOs), (c) juvenile justice centers, and (d) schools, including charter schools and court-operated schools. Programs taught in California schools, at minimum, must comply with the California Healthy Youth Act, which requires comprehensive sex ed to cover and be inclusive of all sexual orientations, gender identity and expressions.

68.    PPMM has supported partners to implement the following evidence-based programs selected from HHS' TPPER as part of this project: Positive Prevention Plus, Making Proud Choices, Sexual Health and Adolescent Risk Prevention, Power Through Choices, Plan A, Linking Families and Teens. Partners have implemented Making Proud Choices, Sexual Health and Adolescent Risk Prevention, Power Through Choices, Plan A, Linking Families and Teens. Based on studies cited in the TPPER, these evidence-based programs were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the populations identified by PPMM.

69.    On March 6, 2025, PPMM was approved to expand the scope of its project to include a new geographic region: youth, parents, and caregivers in Kings County, California, where it had identified a crucial need to implement its programming based on rates of unintended pregnancies and STIs.

70.    By the end of the five-year grant period, the S.E.E. Project is projected to reach an estimated 10,100 individuals.

**DEFENDANTS' UNLAWFUL ACTIONS**

**New Requirements Imposed on the TPP Program
To Align With Executive Orders**

71.     For year one of the projects, grantees were awarded funding for a budget period of July 1, 2023 until June 30, 2024. For year two of the projects, grantees were awarded funding for a budget period of July 1, 2024 until June 30, 2025. In order to receive continued funding for the upcoming budget year for their approved period of performance, grantees were required to annually submit a noncompeting continuation application.

72.     In January 2025, OPA distributed guidance for preparing the year three non-compete continuation award application to Tier 1 Recipients. These applications were due on April 15, 2025 at 6:00 PM. *See* Ex. 4. That same month, OPA distributed another version of the guidance with minor updates.

73.     On March 31, 2025, a little more than two weeks before they were due, OPA emailed recipients of TPP Tier 1 Program funding the NCC Notice (*see* Exhibit 2), which issued new requirements for recipients' non-compete continuation application. This Notice's contents and requirements were starkly different from the prior versions distributed in January, but did not modify the April 15, 2025 6:00 PM EST deadline for submission of the application.  *See* Ex. 2.

74.     The NCC Notice indicated that it "prescribes the content, information, and requirements for the OPA NCC award application" and "should be used in conjunction with the [FY 2023 NOFO]," which "provides information and guidance for recipients for the entire project period." Ex. 2 at 3.

75.     The NCC Notice directs TPP funding recipients to "[p]rovide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders."  Ex. 2 at 5.  Specifically, the notice states that "[s]uccessful applications will include the following information in the project narrative: 1. Description of changes made to align with Executive Orders, if applicable[.]  2.  Summary of proposed changes in scope[.]  3. Findings from needs and resource assessment."  Ex. 2 at 5.

76.     Under the NCC Notice, "[e]xamples of changes that recipients may make to align their projects include, but are not limited to, selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc."  Ex. 2 at 5.  The NCC Notice provides no further information on what changes TPP funding recipients must make to "align" their HHS-approved evidence-based programs with the President's Executive Orders.

77.     The NCC Notice instructs that "[r]ecipients should review and be aware of *all* current Presidential Executive Orders."  Ex. 2 at 4 (emphasis added). It also identifies five such orders as "of most relevance to the work of the TPP Program": Executive Order 14151, Executive Order 14168, Executive Order 14173, Executive Order 14187, and Executive Order 14190.  Ex. 2 at 4-5.

78.     In addition to these instructions, the NCC Notice revised Table 1, titled "Overall OPA Expectations for TPP23 Grantees," and removed one of the prior Tier 1 expectations: "Ensure Equitable, Safe, Supportive, and Inclusive Environments."[28]  The "TPP23 Tier 1 Expectations" Table also contained a hyperlink to a chart containing "Updated guidance on

---

[28] *Compare* Ex. 2 at 6-7 (superseding Notice)*, with* Ex. 4 at 6-7 (original notice).

NOFO Expectations" that "reflect alignment with Presidential Executive Orders." *See* Ex. 2 at 7 (linking to a document called "Advancing Equity through Replication of EBPs and Services, attached as Exhibit 3. This document provided an overview of the various Tier 1 Expectations that remained applicable to the NCC application.

79.    Under the expectation "Focus on Areas of Greatest Need," OPA indicated that grantees should "[f]ocus project on a community(ies) and population(s) that are is [sic] disproportionally affected by unintended teen pregnancy and STIs[]" and "[h]ave a defined community(ies), with clear geographic boundaries and a clearly identified population of focus[.]"

80.    Addressing the expectation that they "[r]eplicate to [s]cale [e]vidence-[b]ased [t]een [p]regnancy [p]revention [p]rograms with [f]idelity and [q]uality," grantees were instructed to "[e]nsure selected EBPs are a good fit for the needs of the community and population(s) of focus," "[i]mplement EBPs with fidelity and quality," and indicated that "[m]inor adaptations may be made to the program if they improve the fit and relevancy of the program to the community and population of focus" with OPA advance review and approval of proposed adaptations. Likewise, grantees were instructed to "[i]mplement several EBPs to align with the needs of the community and population of focus. EBPs should: Lay the foundation for developmentally appropriate behavioral skills related to improving sexual and reproductive health outcomes and promoting positive youth development[.]"

81.    Notably, in addressing the "materials review" expectation, grantees were directed to "[e]nsure all materials used and information disseminated within the project and in the replication of the EBPs are": "[a]ge appropriate," "[m]edically accurate," "[c]ulturally and

linguistically appropriate," and "[t]rauma informed." Grantees were also instructed to "[c]ontinuously assess materials, at least annually to ensure" they meet these expectations.

82.    The NCC Notice also imposed a new requirement in the section titled "Appendices" directing Tier 1 Grantees "to submit program materials to OPA for review. Recipients are expected to align program materials with Presidential Executive Orders."[29]

83.    Addressing the process by which the applications would be reviewed, the NCC Notice further indicated that NCC award applications would be reviewed for the following: "NOFO expectations are being met, *to the extent aligned with Presidential Executive Orders*; Budget and budget narrative is detailed, reasonable, adequate, cost efficient, and clearly aligned with the proposed work plan; and Compliance with grant terms and conditions."[30] (emphasis added). The NCC Notice failed to explain how any of its stated "expectations" could be reconciled with the Presidential Executive Orders, much less what it means for those conflicting expectations to "align" with them. And no further information was provided as to the weight that any of these factors would be given in determining whether to approve a noncompete continuation of funding application.

**The Executive Orders Identified in the NCC Notice**

84.    As explained above, the NCC Notice instructs that "[r]ecipients should review and be aware of *all* current Presidential Executive Orders" Ex. 2 at 4 (emphasis added). But it also identifies five specific orders as "of most relevance to the work of the TPP Program":

---

[29] Ex. 2 at 15.
[30] Ex 2. at 3.

Executive Order 14151, Executive Order 14168, Executive Order 14173, Executive Order 14187, and Executive Order 14190.  Ex. 2 at 5.

85.    Review of those Executive Orders shows that it is impossible to discern how funding recipients are supposed to align their programs with those orders and, to the extent alignment could be achieved, it would likely conflict with the TPP Program's statutory requirements.  The Executive Orders are not directed primarily to private parties, but rather to government agencies directing actions to be taken to reform operations *at* those agencies.  That the orders impose no obligation on private parties makes it impossible to determine what aspects of these orders are even applicable to private TPP Program funding recipients.  Additionally, it appears that some of these Executive Orders (and countless others) have been challenged and declared unlawful – making it even harder to determine not only *how* to align with the President's Executive Orders, but which are currently in effect.  Requiring funding recipients to not only track down and read over a hundred Executive Orders, but also track down the status of pending litigation as to many of them is an insurmountable challenge.

86.    **Executive Order 14151.**  On January 20, 2025, President Trump issued Executive Order 14151, titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*.  90 Fed. Reg. 8,339 (Jan. 29, 2025).

87.    In its operative provisions, Order 14151 directs the Director of the Office of Management and Budget to "to coordinate the termination of all discriminatory programs, including illegal DEI."  It further directs all agency heads to "terminate, to the maximum extent allowed by law, DEI offices, programs, and positions, as well as "'equity-related' grants or

contracts."  The Order does not define "illegal DEI" or what it means for a grant to be "equity-related."

88.    Order 14151 does not mention teen pregnancy or sex education.  Nor does it identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the Order.

89.    Public reporting reflects that the government has deemed grant-funded programming to amount to prohibited DEI for "including words like 'trauma,' barriers,' 'equity,' and 'excluded.'"[31]

90.    **Executive Order 14168.**    On January 20, 2025, President Trump issued Executive Order 14168, titled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*.  90 Fed. Reg. 8,615 (Jan. 30, 2025).

91.    Order 14168 states that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality."  It then defines "female" and "male" based on whether an individual belongs, "at conception, to the sex that produces the large reproductive cell" or "the small reproductive cell."  It further defines "gender ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa," which "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."

---

[31] Carolyn Johnson, Scott Dance, and Joel Achenbach, *Here Are the Words Putting Science in the Crosshairs of Trump's Orders*, Wash. Post (Feb. 4, 2025), https://www.washingtonpost.com/ science/2025/02/04/national-science-foundation-trump-executive-orders-words/.

92.     Order 14168 also instructs the Secretary of HHS to "provide guidance expanding on the sex-based definitions set forth in th[e] order."   On February 19, 2025, HHS adopted guidance pursuant to the Order, largely repeating its language and adopting the definitions the Order set out.  The guidance provides that "[a] person's sex is unchangeable and determined by objective biology" and that "[r]ecognizing the immutable and biological nature of sex is essential to ensure the protection of women's health, safety, private spaces, sports, and opportunities."[32] According to the guidance, "[s]ex is a person's immutable biological classification as either male or female." "Female is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)." "Male is a person of the sex characterized by a reproductive system with the biological function of producing sperm." "Woman is an adult human female." "Girl is a minor human female." "Man is an adult human male." "Boy is a minor human male." "Mother is a female parent." "Father is a male parent."[33]

93.     In its operative provisions, Order 14168 directs agencies to adopt the definitions set forth in the Order and to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."   It further directs agencies to "assess grant conditions and grant preferences and ensure grant funds do not promote gender ideology."

94.     Neither Order 14168 nor HHS's corresponding notice mention teen pregnancy or sex education. No further guidance was issued by OASH or OPA in relation to the HHS Order

---

[32] Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Feb. 19, 2025), http://bit.ly/44eLQmz.
[33] *Id.*

14168 guidance. Nor do they identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the Order.

95.    **Executive Order 14173.**    On January 21, 2025, President Trump issued Executive Order 14173, titled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*.  90 Fed. Reg. 8,633 (Jan. 31, 2025).

96.    In its operative provisions, Order 14173 directs that "[t]he head of each agency shall include in every contract or grant award … [a] term requiring that the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions" and "[a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

97.    Neither Order 14168 nor HHS's implementing guidance mention teen pregnancy or sex education.  Nor do they identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the Order.

98.    The government has publicly taken the position that merely "tout[ing] [one's] commitment to diversity, equity, and inclusion" may, in its view, warrant investigation for unlawful discrimination.[34]

99.    **Executive Order 14187.**    On January 28, 2025, President Trump issued Executive Order 14187, titled *Protecting Children from Chemical and Surgical Mutilation*. 90 Fed. Reg. 8,771 (Feb. 3, 2025).

---

[34] *See* Equal Employment Opportunity Commission, *Letter to Reed Smith* (Mar. 17, 2025), https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf.

100.    In its operative provisions, Order 14187 directs agency heads to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."

101.    Order 14187 does not mention teen pregnancy or sex education.  Nor does it identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the Order.

102.    **Executive Order 14190.**    On January 29, 2025, President Trump issued Executive Order 14190, titled *Ending Radical Indoctrination in K-12 Schooling*.  90 Fed. Reg. 8,853 (Feb. 3, 2025).

103.    In its operative provisions, Order 14190 directs agencies to develop recommendations to "eliminat[e] Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology."  It further directs that such recommendations shall contain and analyze "[a]ll Federal funding sources and streams, including grants or contracts, that directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology" and shall outline a "process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used … to directly or indirectly support or subsidize the social transition of a minor student."

104.    Order 14190 does not mention teen pregnancy or sex education.  Nor does it identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the Order.

105.  **Other Executive Orders.**  Since his inauguration, President Trump has issued more than 200 executive actions, including executive orders, proclamations, and memos.  None mentions teen pregnancy or sex education.  Nor does any identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the President's Executive Orders.

## HARMS SUFFERED BY PLAINTIFFS

**The NCC Notice Will Irreparably Harm The Plaintiffs and Other TPP Funding Recipients**

106.  Plaintiffs, their community partners, and the communities that they serve will be irreparably harmed by the unlawful NCC Notice. Plaintiffs are two years into five-year projects to which they have committed significant resources, time, and capacity-building efforts, many of which engage the efforts and resources of other community-based groups, organizations, and stakeholders with whom they may subaward or contract with to provide specific services. These projects have been carefully developed based on public health data to focus on communities and populations with the greatest needs and facing significant health disparities within the communities that Plaintiffs serve.

107.  Plaintiffs and other TPP funding recipients critically rely on TPP Program Awards to provide educational services. Through the use of these funds, Plaintiffs fund critical staff within their organizations that implement their respective TPP Projects and expand each organization's general capacity to deliver quality and trusted services within many communities. Plaintiffs structured and expanded their respective education departments' staffing in order to implement their TPP-approved projects over the span of five years.

108.    Absent the award of further funds by the agency, all funding for Plaintiffs' five-year projects, and associated expenses including staff, will end on June 30, 2025, which is when the present budget year concludes. In accordance with the terms of the grant, these funds are primarily used to fund personnel (including salaries and wages), certain benefits for these employees, cost of travel, supplies, and equipment associated with the project, and contracts or subawards for goods and services, including third-party contracts with subrecipient organizations that may assist with implementing an evidence-based program in a specific setting.  For many Plaintiffs and TPP recipients, these projects are central to their education departments' work and sustainability. Because numerous staff members within these departments are funded primarily by the Tier 1 grants, Plaintiffs will have no choice but to lay off most or all of their staff members within these departments absent the continuation of funding.

109.    The NCC Notice disadvantages Plaintiffs and others committed to replicating evidence-based teen pregnancy prevention programs that address the highest unmet needs within their communities. Defendants' actions force Plaintiffs' into an impossible choice: (a) submit an application that certifies compliance based on a guess about how to satisfy a vague and onerous directive, even if it is impossible to know whether alignment is achieved and particularly while replicating with fidelity an evidence-based teen pregnancy prevention program that focuses on the communities with the highest needs; or (b) face exclusion from the program by declining to modify their program, in order to avoid eliminating essential elements of their projects and to ensure that their projects continue implementing evidence-based programs with fidelity in the populations they are designed to serve. Though the details of impact differ for each Plaintiff, the

illegality of Defendants' actions and the significance of the harm caused by these actions is consistent amongst them.

110.    Each of the Plaintiffs in this case is substantially harmed by the NCC Notice, and each is harmed by the NCC Notice's vague directive to "align[]" its Tier 1 program with the Administration's over 100 newly-issued Executive Orders.

111.    All Plaintiffs but one submitted an application.  All Plaintiff-applicants asserted that the NCC Notice is unlawful, that the applications were being completed under protest, and that the applications were being submitted without complete alignment with the Executive Orders.  As set forth below, some Plaintiffs submitted applications stating that no meaningful changes had been made to the programs to "align" with the Executive Orders.  Others noted the lack of clarity about the requirement to "align" with Executive Orders, but explained their attempts to make some changes in response to the NCC Notice and declined to make any further changes. One Plaintiff, in light of the nature of its program and the communities it served, was unable to identify any changes it could make and documentation that it could submit, even under protest, without abandoning all of the essential components of its project and organizational mission.

112.    **PPGNY.**  PPGNY is directly harmed by the new requirements in the NCC Notice.

113.    Upon receiving the NCC Notice, PPGNY faced considerable hardships and challenges. It was required to devote significant resources, including critical staff time that had previously been intended to provide other services, in an effort to respond to unclear instructions on a short timeline. PPGNY found itself in the difficult position of attempting to understand vague instructions to "align" its programming while continuing to remain committed to the

continued replication of comprehensive, medically accurate, evidence-based sexual education programs, with fidelity, that are age appropriate to communities with the highest needs.

114.    PPGNY was placed in an impossible position: walk away from the TPP program or speculate how to revise its project to "align" with the Executive Orders and risk undermining the impact of its project and violating the statutory requirements of the TPP Program. PPGNY determined it would, under protest,[35] submit an application that clarifies its target populations to identify setting or site types, names, and locations, non-material changes that would not meaningfully impact PPGNY's ability to continue Project STAR with fidelity.

115.    PPGNY determined it could make no further changes without betraying its internal mission and values, ignoring the purpose and requirements of the TPP Program, and

---

[35] PPGNY included the following in its application: "Planned Parenthood of Greater New York, Inc. Supporting Teens' Access and Rights (PPGNY Project STAR) asserts that the applicable executive orders, memoranda, and corresponding guidance issued after January 20, 2025, by the Executive Office of the President, the Department of Health and Human Services, and the Office of Population Affairs are unlawful and unconstitutional on their face and/or as applied here. The corresponding terms of the Guidance are arbitrary, capricious, not in accordance with the law, the U.S. Constitution, and in excess of statutory authority. Based on the guidance provided, it is unclear to PPGNY Project STAR what conduct is prescribed by this requirement, and therefore PPGNY Project STAR cannot and will not make modifications in order to comply with terms and conditions that exceed the lawful authority of the issuing agency.

Accordingly, PPGNY Project STAR is completing the Non-Competing Continuation Award Application that includes these unlawful terms and conditions under protest, and in no way certifying alignment with the new "EO requirements" promulgated in the March 2025 update received on March 31, 2025. Applicant's certification as to SH 424B, including paragraph 18, is subject to the caveats set forth in this disclaimer. Notwithstanding the completion of the Application under protest, PPGNY Project STAR reserves the right to assert claims against the issuing agency and others acting in concert therewith, including but not limited to claims arising under federal laws and regulations, including the United States Constitution and the federal Administrative Procedure Act."

disregarding the requirement to provide effective evidence-based programming, with fidelity, to the communities within New York City with the highest unmet needs.

116.    For example, if PPGNY overhauled its TPP Program to cease all services that could be considered by OPA to constitute "DEI"-related activities, despite being lawful, or to cease all activities that acknowledged and/or discussed challenges, myths, and stigmas unique to the experiences of members of the LGBTQIA+ community (should OPA consider this to "promote gender ideology"), those changes would defeat the purpose of the Project STAR project, and the Teen Pregnancy Prevention Program as a whole: to ensure that evidence-based programming is effective within the communities it serves. For example, in the absence of any specificity and clarity, it remains unclear whether "alignment" with the Executive Orders would require Project STAR to bar program staff from answering youth-initiated questions related to fundamental topics such as whether transgender, non-binary, or gender non-conforming adolescents, even those who wish to delay or abstain from sexual activity until later in life, should practice risk-reduction skills such as using contraception in circumstances when they are not concerned about the risk of unintended pregnancy.

117.    The removal of references to LGBTQIA+ identities, equity, diversity, and trauma-informed practices would materially compromise the program's mandate to advance equity in adolescent health. Removal of such references would diminish its relevance to the communities it is designed to serve, erode the original intention of this funding, and significantly impair its ability to achieve the intended public health outcomes across the 15 New York City Community Districts with significant health disparities. These changes would also directly impact PPGNY's community partners, including schools, residential sites, community-based organizations,

parents, and service providers, who rely on it to deliver medically accurate, current, and high-quality sexual and reproductive health education. It would also undermine the quality and scope of curricula it offers and the trust it has built with partner organizations, communities, youth and their families to provide critical and inclusive health information and supportive services.

118.   PPGNY faces a loss of over $3.2 million over the span of three years, with an estimated $1,091,185 per year, which will have a significant operational impact on PPGNY's ability to continue funding critical staffing positions that allow it to provide various educational programming services. These capacity reductions will impede its ability to sustain and deliver high-quality sexual and reproductive health education for youth, serve as a reliable resource for the community, connect young people and families to essential care services, and provide critical support to schools, community-based organizations, and residential sites that rely on these services.

119.   Eliminating such roles will also have ripple effects within other areas of PPGNY's work and reputation, as the abrupt termination of services will result in the erosion of trust by community members who rely on these services and the inevitable termination of strategic partnerships that allow PPGNY to provide services to communities that are under-resourced and underserved by other public health programs.

120.   Critically, the loss of this funding will acutely impact youth in New York City who will be denied services and resources through this program. Already experiencing numerous health disparities, the termination of services to these communities will only contribute to the historic exclusion and neglect of the unique needs of many of these communities–factors that

indisputably have contributed to the disproportionate rates of unintended teen pregnancy and STI rates within these groups.  In effect, the termination of TPP funds, and the resulting abrupt termination of these programs, will force PPGNY to become a part of the very problem it aimed to solve through the creation of Project STAR.

121.  **PPGNHAIK.** In response to the NCC Notice, and under protest,[36] PPGNHAIK submitted an application with minor changes to its KYSH Project.  First, it updated its target population from "Native Hawaiian/Other Pacific Islander" to "Native Hawaiian/Native American Pacific Islander (NHNAPI)."    Second, PPGNHAIK removed the "INclued" curriculum from this project, as INclued was unexpectedly and inexplicably removed from the list of evidence-based programs available to Tier 1 grantees that were identified by HHS's TPPER process. In its place, PPGNHAIK expanded the provision of another evidence-based program that it was already implementing. PPGNHAIK indicated that it intended to continue

---

[36] PPGNHAIK included the following in its application: "PPGNHAIK asserts that the applicable executive orders, memoranda, and corresponding guidance issued after January 20, 2025, by the Executive Office of the President, the Department of Health and Human Services, and the Office of Population Affairs are unlawful and unconstitutional on their face and/or as applied here. The corresponding terms of the Guidance are arbitrary, capricious, not in accordance with the law, the U.S. Constitution, and in excess of statutory authority. Based on the guidance provided, it is unclear to PPGNHAIK what conduct is prescribed by this requirement, and therefore PPGNHAIK cannot and will not make modifications in order to comply with terms and conditions that exceed the lawful authority of the issuing agency. Accordingly, PPGNHAIK is completing the Non-Competing Continuation Award Application that includes these unlawful terms and conditions under protest and in no way certifying alignment with the new "EO requirements." Applicant's certification as to SF 424B, including paragraph 18, is subject to the caveats set forth in this disclaimer. Notwithstanding the completion of the Application under protest, PPGNHAIK reserves the right to assert claims against the issuing agency and others acting in concert therewith, including but not limited to claims arising under federal laws and regulations, including the United States Constitution and the federal Administrative Procedure Act."

implementing two other evidence-based programs: Positive Prevention Plus and Linking Families and Teens.

122.    Upon reviewing the NCC Notice, PPGNHAIK faced considerable hardships and challenges. It was required to devote significant resources, including critical staff time that had previously been intended to provide other services, in an effort to respond to unclear instructions on a short timeline. The instructions to "align" programs with the Executive Orders was an impossible task that seemed to directly conflict with the purpose of the TPP Program, to provide, with fidelity, evidence-based programming to the communities with the highest unmet needs.

123.    PPGNHAIK determined that it could not attempt to "align" its programs with the Executive Orders without undermining its project goal and the underlying purpose of the TPP Program: to replicate evidence-based programs with fidelity and quality to ensure that the project remained effective in improving sexual and reproductive health outcomes in the populations with highest unmet needs in Hawai'i. Thus, PPGNHAIK faces termination of its five-year project three years early, which will have significant ramifications for the organization, its partners, and the communities it serves.

124.    PPGNHAIK determined that modification to its program, in an effort to "align" the programs with the Executive Orders, would violate PPGNHAIK's internal mission and core principles by requiring it to abandon its commitment to provide evidence-based, medically accurate, and age appropriate sexual and reproductive health programming that is comprehensive, inclusive, and stigma-free to all communities: particularly those experiencing the most acute health disparities.

125.    The loss of TPPP funding of an estimated $1.46 million anticipated over the span of three years, with an estimated $487,000 per year, will have significant operational impact and will require PPGNHAIK to lay off multiple staff members whose positions are funded by this grant, and to cease providing educational services within O'ahu due to capacity issues in maintaining other educational programs in light of reductions in staff.

126.    Likewise, ending PPGNHAIK's project will impact the organization's partnerships with local stakeholders, community-based organizations, and community members that the organization has devoted countless resources and time developing to further the effectiveness of the TPP Program. This decision will negate all that KYSH has achieved in its efforts to address health disparities

127.    By ceasing its programming, PPGNHAIK will also suffer reputational damage with the communities it serves, particularly the historically underserved communities in the Kahili neighborhood. Given the historical context and existing systemic barriers that contribute to adolescent health disparities within NHNAPI communities, PPGNHAIK's termination of services will likely be perceived as exacerbating the pre-existing factors that contributed to the very problem that KYSH aimed to solve. This would have a ripple effect on PPGNHAIK's ability to partner with other community organizations due to an irreparable erosion of trust.

128.    It is also not in the best interest of young people in O'ahu for PPGNHAIK to compromise the substance of KYSH in an effort to "align" with the Executive Orders. If forced to abandon the KYSH project, youth in O'ahu, particularly those of NHNAPI and LGBTQ+ identities, that have and will benefit from the provision of this programming will be deprived of

these services. In turn, this will contribute to and exacerbate the many existing health disparities already experienced by these communities.

129.    **PPH.**   PPH is similarly directly harmed by the new requirements in the NCC Notice.

130.    Upon reviewing the NCC Notice, PPH faced considerable hardships. It was required to devote significant resources, including critical staff time that had previously been intended to provide other services, in an effort to respond to unclear instructions on a short timeline.

131.    Faced with an impossible situation, PPH was forced to speculate about what content OPA would determine was "in alignment" with the Executive Orders. It then had to consider whether to modify its program, or else risk forgoing its ability to renew this grant through the NCC process, which would ensure negative outcomes and exacerbate existing health disparities within its communities across two states.

132.    PPH, under protest,[37] submitted an NCC application that contained minor changes to its project, including changes to certain curriculum content to remove terms it speculated might be considered to be prohibited by the Executive Orders. PPH reduced the number of its evidence-based programs to focus on implementing three programs: Draw the Line, Respect the Line, and Safer Choices. PPH determined it could not discern how to make any additional changes "in alignment" with the Executive Orders without violating its internal mission and core principles and without abandoning the requirement that it provide, with fidelity, evidence-based, medically accurate, and age appropriate sexual and reproductive health programming that would be effective within the communities it served.

133.    As a result of the NCC Notice's new requirements, PPH faces the loss of over $2.3 million in funding anticipated over the span of three years, with an estimated $773,000 per

---

[37]PPH included the following in its application: "Planned Parenthood of the Heartland's program asserts that the applicable executive orders, memoranda, and corresponding guidance issued after January 20, 2025, by the Executive Office of the President, the Department of Health and Human Services, and the Office of Population Affairs are unlawful and unconstitutional on their face and/or as applied here. The corresponding terms of the Guidance are arbitrary, capricious, not in accordance with the law, the U.S. Constitution, and in excess of statutory authority. Based on the guidance provided, it is unclear to Planned Parenthood of the Heartland what conduct is prescribed by this requirement. Accordingly, Planned Parenthood of the Heartland's program is completing its Non-Competing Continuation Award Application that includes these unlawful terms and conditions under protest.

Although Planned Parenthood of the Heartland's program's Non-Competing Continuation Award Application includes some modifications in response to these unlawful terms and conditions, Planned Parenthood of the Heartland maintains that the EO requirements are vague and ambiguous, and thus submits this application without certifying compliance with the new EO requirements promulgated in the March 2025 update received on March 31, 2025. Applicant's certification as to SF 424B, including paragraph 18, is subject to the caveats set forth in this disclaimer. Notwithstanding the completion of the Application under protest, Planned Parenthood of the Heartland reserves the right to assert claims against the issuing agency and others acting in concert therewith, including but not limited to claims arising under federal laws and regulations, including the United States Constitution, and the federal Administrative Procedure Act."

year, which will have significant operational impact on the organization and require PPH and partners that it contracts with to lay off multiple staff members funded by this grant, effectively hampering the organization's ability to continue implementing and expanding this program.

134.    Youth in Nebraska and Iowa will also be harmed should PPH's application be denied. While there are additional programs within these geographic regions, PPH is the only program that prioritizes inclusivity for BIPOC youth, earning the trust of adults and youth within many of the communities it serves. Without these programs, many local youth and stakeholders within these communities will lose access to rigorous, inclusive, and evidence-based programming that is effective.

135.    Additionally, in certain rural communities outside of the Omaha/Council Bluffs urban area, PPH and its implementation partner are the only organizations that provide sexual and reproductive health programming. These rural areas suffer from the greatest disparities in teen health rates, and disparities in other health indicators persist as well. Because broadband internet is not widely available in the rural areas PPH serves, and no other organization conducts in-person programming outside of the local urban areas, rural youth across two states would not have access to adolescent pregnancy prevention education should PPH's application be denied.

136.    **PPCCC.**  Plaintiff Planned Parenthood California Central Coast is also seriously harmed by the new requirements in the NCC Notice.

137.    Upon reviewing the NCC Notice, PPCCC faced considerable hardships. It was required to devote significant resources, including critical staff time that had previously been intended to provide other services, in an effort to respond to unclear instructions on a short timeline. The instructions to "align" PPCCC's programs with the Executive Orders was an

impossible task that seemed to directly conflict with the purpose of the TPP Program: to provide evidence-based programming to the communities with the highest unmet needs.

138.    Even if able to hypothesize potential changes that would "align" its programming with the Executive Orders, PPCCC could not do so without compromising its mission and values, as well as the quality, medical accuracy, and evidence-based practices implemented through its TPP Program to provide the caliber of sex education that was necessary and deserved by the communities it served.

139.    Under protest,[38] PPCCC made changes to its program materials in response to the NCC Notice by expanding the age range of its populations of focus. Separately, PPCCC was required to select two new evidence-based programs to implement, Love Notes, and Relationship

---

[38] PPCCC included the following in its application: "The OPA Guidance for Preparing a Non-Competing Continuation Award Application (March 31, 2025) requires that recipients '[p]rovide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders.' The Guidance specifically directs recipients to consider … [EOs 14168, 14190, 14187, 14151, and 14173] … (collectively "EO requirements"). Guidance at 4-5. The Guidance provides no information on the program changes necessary to 'align the project with Presidential Executive Orders.' PPCCC asserts that the applicable executive orders, memoranda, and corresponding guidance issued after January 20, 2025, by the Executive Office of the President, the Department of Health and Human Services, and the Office of Population Affairs are unlawful and unconstitutional on their face and/or as applied here. The corresponding terms of the Guidance are arbitrary, capricious, not in accordance with the law, the U.S. Constitution, and in excess of statutory authority. Based on the guidance provided, it is unclear to PPCCC what conduct is prescribed by this requirement. Accordingly, PPCCC is completing its Non-Competing Continuation Award Application that includes these unlawful terms and conditions under protest. Although PPCCC's Non-Competing Continuation Award Application includes some modifications in response to these unlawful terms and conditions, PPCCC maintains that the EO requirements are vague and ambiguous, and thus submits this application without certifying alignment with the new EO requirements promulgated in the March 2025 update received on March 31, 2025. Applicant's certification as to SF 424B, including paragraph 18, is subject to the caveats set forth in this disclaimer. Notwithstanding the completion of the Application under protest, PPCCC reserves the right to assert claims against the issuing agency and others acting in concert therewith, including but not limited to claims arising under federal laws and regulations, including the United States Constitution, and the federal Administrative Procedure Act."

Smarts Plus, because a prior evidence-based program that it had utilized, IN-Clued, had been inexplicably and unexpectedly removed from the TPPER approved evidence-based program list.

140.    PPPCCC determined that it could make no further changes to its project and program without compromising its organizational mission and values and its ability to provide, with fidelity, age appropriate, medically accurate, culturally relevant, and effective evidence-based sexual education programming to young people, trusted adults, including parents, caregivers, and other adults in their lives, to equip youth with the tools to make healthy decisions for their futures and reduce sexual risk behavior, particularly within those communities with the highest needs.

141.    PPCCC faces the loss of almost $2.4 million in funding anticipated over the span of three years, with an estimated $798,636 per year, which will have significant operational impact on the organization and require it to lay off multiple program staff funded by this grant. As a result, PPCCC will be required to stop providing vital educational programs that it cannot sustain independently, which are aimed at providing and expanding sexual and reproductive health education among young people, their families, and communities that it serves.

142.    PPCCC's program not only provides vital information to communities, and young people, related to unintended pregnancy and STI prevention: it empowers individuals with the tools to make healthy choices for themselves, understand their bodily autonomy, and to seek the resources and make the decisions that are best for themselves and their futures.

143.    Critically, terminating this programming will have significant effects on the lives of young people that benefit from and would continue to benefit from these programs over the next three years. For many young people that reside in under-resourced areas, PPCCC's TPP Program staff are among the few groups that provide direct services within their neighborhoods

in an accessible manner, including through programming in other languages. PPCCC also provides these programs at micro-access points in rural areas where communities can receive medically-accurate, inclusive, and non-judgmental educational services. These communities, and young people, would be significantly harmed short and long term by the inability to access vital educational programming that is scarcely available and accessible within many of their communities.

144.    **PPMM.** Plaintiff PPMM was substantially harmed by the issuance of the new requirements in the NCC Notice.

145.    Upon receiving the NCC Notice, PPMM attempted to discern how it could respond to the new requirements while continuing to provide evidence-based programming that would be effective for the populations its project serves, which include those with the highest unmet needs experiencing the greatest significant disparities within the counties it covers.

146.    PPMM is committed to adopting culturally appropriate, medically accurate, comprehensive, age appropriate, and non-judgmental sex education in a wide array of settings where they can reach youth and trusted adults in their lives, and organizations where youth are receiving safety net services. Despite devoting significant resources, including critical staff time that had previously been intended to provide other services, in an effort to respond to unclear instructions on a short timeline, PPMM determined it could not identify how its project could be modified without abandoning this commitment.

147.    PPMM determined that it could not attempt to change its project or its evidence-based programs in an attempt to "align" with the Executive Orders as such a requirement would be contrary to the interests of the young people experiencing the highest unmet needs within its geographic areas of focus, and the organization's mission and values.

Making such changes would also impede PPMM's ability to replicate the approved evidence-based programs with fidelity, as is required by the TPP Program.

148.    PPMM determined that any efforts to "align" its programs with the terms of the identified Executive Orders would require it to abandon the underlying purpose of its project. Accordingly, PPMM made the difficult determination that it could not afford to expend further limited resources on attempting to change its TPP program on such short notice, knowing that any changes it could make would not satisfy the new requirements.

149.    Because of the ambiguous language of the NCC Notice, PPMM was uncertain as to which aspects of its program may be deemed "noncompliant," even though lawful. For example, PPMM was unsure if staff within the program would be deemed to be out of compliance if they declined to answer youth-initiated questions related to race, ethnicity, nationality, culture, gender, or sexuality within the scope of the program, or if they addressed cultural and social stigmas associated with sexual and reproductive health. While responding to questions is crucial to fostering trust and engagement in these programs, PPMM feared that program staff would have to be instructed to abruptly end all such conversations to remain "in alignment" with the Executive Orders. In effect, this would dilute any trust established with the youth its programs serve and prevent its staff from helping its youth better engage with the program materials.

150.    PPMM faces an estimated funding loss of almost $3 million over the span of three years as a direct result of the NCC Notice. This will have significant operational impacts on PPMM and the community programs with which it contracts to implement its TPP program. And PPMM would likely need to lay off numerous individuals within its staff as a result.

151.    This loss would also disrupt the successful capacity building partnerships that PPMM has established and invested in over the first two years of this program. Given the limited resources that fund comprehensive sex education programs, the majority of PPMM's community partners will not be able to continue this work without PPMM's TPP grant.

152.    Most importantly, the loss of these funds will have a tremendous impact on young people in California and Nevada, particularly those already experiencing unintended adolescent pregnancy and STIs at a higher rate than the national average, and who would have benefitted from the programs over the next three years. The termination of this program will only contribute to the dearth of resources available to young people within these communities.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT -
UNCONSTITUTIONAL UNDER THE FIFTH AMENDMENT'S DUE PROCESS
CLAUSE**

153.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

154.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The APA also allows the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

155.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to

provide fair notice and prevent arbitrary enforcement. In *Grayned v. City of Rockford*, 408 U.S. 104 (1972), the Supreme Court held that a law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or if it encourages arbitrary enforcement. In *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), the Court emphasized that regulations must provide clear guidance to prevent arbitrary and discriminatory enforcement.

156.    A denial of non-competive continuation funding implicates protected liberty and property interests.

157.    The NCC Notice requires grantees to demonstrate "alignment with current Presidential Executive Orders," and expressly identifies five Executive Orders as "of most relevance to the work of the TPP program":

- Executive Order 14168: "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ;

- Executive Order 14190: "Ending Radical Indoctrination in K-12 Schooling" ;

- Executive Order 14187: "Protecting Children From Chemical and Surgical Mutilation" ;

- Executive Order 14151: "Ending Radical and Wasteful Government DEI Programs and Preferencing" ;

- Executive Order 14173: "Ending Illegal Discrimination and Restoring Merit-Based Opportunity".

158.    The NCC Notice fails to define:

- What "alignment" with these Executive Orders entails;

- Whether full compliance, partial consistency, or mere consideration is required;

- How to reconcile potentially conflicting directives within these Executive Orders;

- The consequences of perceived misalignment, including potential denial of funding;

- The standards or criteria OPA will use to evaluate "alignment."

159.   The Executive Orders themselves contain broad and undefined terms, leading to significant vagueness concerns. For instance:

- Executive Order 14168 mandates federal agencies to enforce laws based on the recognition of only two sexes and provides that "[f]ederal funds shall not be used to promote gender ideology" but fails to coherently define "gender ideology," leaving ambiguity about what specific beliefs or practices are prohibited.

- Executive Order 14190 aims to eliminate "radical, anti-American ideologies" in K-12 education, and provides that "[f]ederal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology" but fails to coherently define "illegal and discriminatory treatment and indoctrination in K-12 schools" which is a capacious

concept that "includes" "gender ideology and discriminatory equity ideology" which are also terms that lack a coherent definition in the order;

- Executive Order 14187 directs federal agencies to halt funding to institutions providing gender-affirming care to minors, labeling such care as "chemical and surgical mutilation," and requires the federal government to "take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."  It does not appear to have any relevance whatsoever to the TPP program making it especially unclear what it is that grantees are expected to do to come into alignment with its requirements.

- Executive Order 14151 terminates federal Diversity, Equity, and Inclusion (DEI) programs in the federal government, labeling them as "radical and wasteful," but does not delineate which specific programs are considered as such, creating confusion about which initiatives are affected. Moreover, it does not impose any requirements respecting federal funding making it unclear what relevance it has to implementation of the TPP program.

- Executive Order 14173 revokes previous directives related to affirmative action and orders the federal government to "combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."  But the order does not define "illegal DEI."

160.    The Executive Orders are also directives to government agencies, not private parties, making it even more unclear how private parties are to "align" their activities with them.

56

161.    The vagueness of both the NCC Notice and the referenced Executive Orders fails to provide grantees with sufficient notice of the criteria by which their NCC application will be judged. This lack of clarity exposes grantees to the risk of arbitrary or discriminatory action based on subjective interpretations of "alignment."

162.    As a result, the NCC Notice's requirement to align with these Executive Orders is unconstitutionally vague, violating the Fifth Amendment's Due Process Clause and the requirements of the APA, and rendering the NCC Notice invalid under 5 U.S.C. § 706(2)(A).

163.    The NCC Notice must be declared unlawful.

164.    The NCC Notice must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

165.    If the NCC Notice is not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

166.    This Court should therefore "postpone the effective date" of the NCC Notice pending conclusion of these proceedings by ordering Defendants to refrain from relying on the Notice in reviewing Plaintiffs' NCC applications. 5 U.S.C. § 705.

## COUNT II

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – CONTRARY TO LAW**

167.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

168.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also allows the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

169.    The Administrative Procedure Act, 5 U.S.C. § 706, authorizes federal courts to set aside agency action that is contrary to law.

170.    The statutory authority for the TPP Program, as provided in the relevant appropriations statutes, allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific allocation for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."    Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, 138 Stat. 460, 671-72 (2024).

171.    The NCC Notice's requirement for grantees to "align" their programs with specific Executive Orders imposes additional obligations not contemplated by, and inconsistent with, the statutory framework established by Congress for the TPP Program.

172.    Grantees cannot simultaneously "align" their programs with Executive Orders 14168, 14190, 14187, 14151, and 14173 while also fulfilling the statutory mandate to "replicat[e]" existing effective evidence-based programs.

173.    By imposing requirements beyond those authorized by statute, the NCC constitutes agency action that is not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

174.    The NCC Notice must be declared unlawful.

175.    The NCC Notice must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

176.    If the NCC Notice is not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

177.    This Court should therefore "postpone the effective date" of the NCC Notice pending conclusion of these proceedings by ordering Defendants to refrain from relying on the Notice in reviewing Plaintiffs' NCC applications. 5 U.S.C. § 705.

## COUNT III

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS

178.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

179.    Under the APA a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The APA also allows the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

180.    The Administrative Procedure Act, 5 U.S.C. § 706, authorizes federal courts to set aside agency action that is arbitrary and capricious.

181.    The NCC Notice fails to provide any reasoned explanation for (a) selecting Executive-Order alignment as a funding criterion or (b) how grantees might satisfy that criterion.

182.    There is no evidence that OPA considered, for example:

- Whether the Executive Orders bear any rational nexus to teen-pregnancy outcomes;

- How alignment with each Executive Order could be operationalized in evidence-based curricula;

- The significant risk of undermining the statutory mandate to replicate proven models;

- Grantees' reasonable reliance interests—including prior investments developing and implementing a specific project that implemented evidence-based programming made in good faith under earlier guidance;

- Whether any grantee could practicably align its existing program with the cited Executive Orders without sacrificing core, evidence-based elements required by statute;

- The administrative and financial burdens imposed by retrofitting curricula, staff training, data systems, and evaluation metrics to track "alignment";

- The lack of fair notice, given that OPA imposed these requirements after grantees had already substantially committed to implementing existing models and projects approved by the agency;

- Failure to consider the impact that requiring Executive Order "alignment" to seek non-compete continuation funding could have on Grantees' partnerships, subcontractors, and young people that benefit from TPP Tier 1 Grants, which by design were awarded to projects targeting communities with unmet needs with sparse alternative resources available;

- Potential conflicts between the objectives of the Executive Orders and the scientific evidence endorsed by HHS's own Teen Pregnancy Prevention Evidence Review;

- Potential conflicts with state laws that require sex education to be, *inter alia*, medically accurate, comprehensive, and/or inclusive;

- Whether any exceptions or hardship waivers would be provided for grantees unable to comply;

- Seeking or considering feedback from existing TPP grantees, state health departments, or community‑based providers on the feasibility or impact of an Executive Order‑alignment mandate;

- How requiring "alignment" with these Executive Orders might disproportionately burden or exclude grantees serving higher-need or resource-constrained communities;

- How grantees would monitor or report "alignment" in their performance metrics, nor any guidance on appropriate data collection methods;

- Less intrusive means of advancing any legitimate policy goals  before imposing a binding, high-stakes requirement.

183.    Because OPA provided no empirical justification or reasoned analysis for adding an ideological "alignment" requirement, the NCC Notice is arbitrary and capricious.

184.    The NCC notice is arbitrary and capricious because it fails to acknowledge, much less sufficiently explain, the change in position from prior guidance issued by OPA.

185.    The NCC Notice is arbitrary and capricious because it fails to address the reversal of course, and contradictory expectations between the FY 2023 NOFO and the directive to "align" TPP projects with the Executive Orders.

186.    The NCC notice further fails to consider an important aspect of the program: it fails to consider or explain the implication for existing reliance interests, including those of grantees subject to new requirements after investing significant time and resources into designing and implementing specific projects and replicating approved evidence-based programs, and those interests of individuals served by TPP programming, which by design required that grantees provide services in areas where needs were unmet by alternative resources.

187.    Moreover, the NCC Notice is so vague in what it purports to require that it fails to provide "fair notice" and "reasoned decision-making" required by the APA.

188.    The NCC notice also fails to account for other legal requirements that may be implicated by the changes it implements, such as how the program can comply with the other requirements of the Tier 1 Program.

189.    By imposing requirements that are arbitrary and capricious, the NCC Notice constitutes agency action that is not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

190.    The NCC Notice must be declared unlawful.

191.    The NCC Notice must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

192.    If the NCC Notice is not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

193.    This Court should therefore "postpone the effective date" of the NCC pending conclusion of these proceedings by ordering Defendants to refrain from relying on the Notice in reviewing Plaintiffs' NCC applications. 5 U.S.C. § 705.

## COUNT IV

## *ULTRA VIRES* ACTION

194.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

195.    HHS, through its officials, may exercise only the authority conferred by statute.

196.    The TPP Program, as provided in the relevant appropriations statutes, allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific allocation for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."   Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, 138 Stat. 460, 671-72 (2024).

197.    The NCC Notice's requirement for grantees to align their programs with specific Executive Orders imposes additional obligations not contemplated by the statutory framework established by Congress for the TPP Program.

198.    Moreover, Defendants' actions are patently outside of their statutory authority because the NCC Notice is flatly incompatible with Congress' mandate for the TPP Program and contradicts the text, structure, and fundamental purpose of the TPP Program that 75% of remaining appropriated funds go to replicating rigorously evaluated programs.   By conditioning appropriated funds on the fulfillment of criteria irreconcilable with Congress' criteria, Defendants have violated the separation of powers and encroached upon Congress's Spending authority, and thereby acted *ultra vires*.

199.    The NCC Notice must be declared unlawful.

200.    If the NCC Notice is not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs respectfully request an order:

a.   declaring unlawful OPA's new requirements in the NCC Notice for recipients of Teen Pregnancy Prevention (TPP) Program funding in the FY 2023 TPP Tier 1 grant cohort titled *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application* (the "NCC Notice");

b.   staying the implementation of the NCC Notice for recipients of TPP Program funding in the FY 2023 TPP Tier 1 grant cohort;

c.   preliminarily and permanently enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants from implementing, maintaining, or giving effect to the new requirements in the NCC Notice;

d.   postponing the effective date of the NCC Notice pending conclusion of these proceedings, by ordering Defendants to refrain from relying on the NCC Notice in reviewing Plaintiffs' NCC applications;

e.   vacating and setting aside the new requirements in the NCC Notice;

f.   requiring HHS to open an "amendment" application period for the Non-Competing Continuation Award cycle, that does not delay evaluation of the applications, to permit TPP Program participants that submitted modified applications to submit applications without the unlawful new requirements in the

NCC Notice, and to permit TPP Program participants that were unable to apply for continuation funding because of the unlawful NNC Notice requirements to submit applications.

g.  entering judgment in favor of Plaintiffs;

h.  requiring HHS to submit status reports every 30-days after the date of the entry of the Court's order to ensure prompt and complete compliance with the Court's directive;

i.  awarding Plaintiffs their reasonable costs and attorney's fees in accordance with law including but not limited to 28 U.S.C. § 2412; and

j.  issuing any and all other such relief as the Court deems just and proper.

Dated: May 1, 2025                                 Respectfully submitted,

By:    /s/ Andrew Tutt
        Drew A. Harker (DC Bar # 412527)
        Andrew T. Tutt (DC Bar # 1026916)
        Daniel Yablon (DC Bar # 90022490)
        Arnold & Porter Kaye Scholer LLP
        601 Massachusetts Avenue, NW
        Washington, DC 20001
        (202) 942-5000
        draw.harker@arnoldporter.com
        andrew.tutt@arnoldporter.com
        daniel.yablon@arnoldporter.com

        Emily Nestler (DC Bar # 973886)
        Planned Parenthood Federation of
        America
        1100 Vermont Avenue NW
        Washington, DC 20005
        (202) 973-4800
        emily.nestler@ppfa.org

Valentina De Fex**
Kyla Eastling **
Planned Parenthood Federation of America
123 William Street, Floor 9
New York, NY 10038
valentina.defex@ppfa.org
kyla.eastling@ppfa.org

*Attorneys for Plaintiffs*


\*\* *pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

Executed on May 1, 2025.

/s/ Andrew Tutt
Andrew T. Tutt (DC Bar # 1026916)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

*Attorney for Plaintiffs*