**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| PLANNED PARENTHOOD OF GREATER NEW YORK *et al.* | ) ) | Civil Action No. 1:25-cv-1334-TJK |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) |  |
|  | ) |  |
| U.S. DEPARTMENT OF HEALTH AND HUMAN  SERVICES, *et al.* | ) ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 4

   A.   The TPP Program from 2010 to 2024 .................................................................. 5

   B.   The TPP Program Application and Award Process ........................................... 7

   C.   Plaintiffs' Tier 1 Programs................................................................................. 10

   D.   The President's Executive Orders and HHS's New Requirements Imposed on the TPP Program .................................................................................................. 13

   E.   Plaintiffs' NCC Applications Under the New "Alignment" Requirement ...................... 16

LEGAL STANDARD....................................................................................................... 17

ARGUMENT .................................................................................................................... 17

   A.   Plaintiffs Are Likely to Succeed on the Merits................................................ 18

      1.   Plaintiffs Have Standing to Challenge the NCC Notice .......................... 18

      2.   The NCC Notice Is Unlawful Under the Constitution and the APA ...................... 21

         a.   The NCC Notice's "Alignment" Requirement Is Unconstitutionally Vague ........... 21

         b.   The "Alignment" Requirement Violates the APA Because it is Contrary to Law and Arbitrary and Capricious................................................................................ 27

            i.   The "Alignment" Requirement Contravenes Congress's Directives for the TPP Program ................................................................................................ 28

            ii.   The "Alignment" Requirement Violates The APA Because it is Arbitrary and Capricious .................................................................................... 33

      3.   The "Alignment" Requirement is *Ultra Vires* ......................................... 37

   B.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.................... 38

   C.   The Balance of Equities and Public Interest Weigh Heavily In Plaintiffs' Favor ........... 42

CONCLUSION.................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
No. 25-cv-400, 2025 WL 485324 (D.D.C. Feb. 13, 2025) ....................................................41

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) ...................................................................................................34

*Ambach v. Bell*,
686 F.2d 974 (D.C. Cir. 1982) .................................................................................................42

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) .................................................................................................33

*Armour & Co. v. Freeman*,
304 F.2d 404 (D.C. Cir. 1962) .................................................................................................41

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
280 F. Supp. 3d 59 (D.D.C. 2017) ...........................................................................................41

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................................................................27

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) .................................................................................................................33

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) .........................................................................................43

*Cath. Health Initiatives v. Sebelius*,
617 F.3d 490 (D.C. Cir. 2010) ...........................................................................................37, 41

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .................................................................................................37

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................................................................................................38

*Cherokee Nation v. U.S. Dep't of the Interior*,
643 F. Supp. 3d 90 (D.D.C. 2022) ...........................................................................................20

*Chicago Women in Trades v. Trump*,
No. 25-cv-2005, 2025 WL 1118659 (N.D. Ill. Apr. 15, 2025) ...............................................25

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
24 F.3d 1421 (D.C. Cir. 1994) ......................................................................42

*Climate United Fund v. Citibank, N.A.*,
No. 25-cv-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...............................39, 42

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971) ....................................................................................23

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) ....................................................................................21

*Costa v. Bazron*,
456 F. Supp. 3d 126 (D.D.C. 2020) ...............................................................43

*Cytori Therapeutics, Inc. v. Food & Drug Admin.*,
715 F.3d 922 (D.C. Cir. 2013) ......................................................................33

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) .................................................................42

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................................................................35

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ....................................................................................36

*Express One Int'l, Inc. v. U.S. Postal Serv.*,
814 F. Supp. 87 (D.D.C. 1992) .....................................................................39

*\*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ..............................................................................21, 23, 36, 37

*FDA v. Wages & White Lion Invs., L.L.C.*,
145 S. Ct. 898 (2025) ..................................................................................36

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ....................................................................................22

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ....................................................................................19

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ................................................................................21, 37

*Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ......................................................................42

*Guedes v. ATF,*
    920 F.3d 1 (D.C. Cir. 2019) ............................................................................17

*Hill v. Colorado,*
    530 U.S. 703 (2000) ........................................................................................23

*Karem v. Trump,*
    960 F.3d 656 (D.C. Cir. 2020) ........................................................................22

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..............................................................38, 41, 44

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................18

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ........................................................................................22

*McGregor Printing Corp. v. Kemp,*
    No. 91-3255, 1992 WL 118794 (D.D.C. May 14, 1992) ...............................39

*\*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto.*
    *Ins. Co.,*
    463 U.S. 29 (1983) ..................................................................................33, 35

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) ......................................................................20

*Multnomah Cnty. v. Azar,*
    340 F. Supp. 3d 1046  (D. Or. 201 ................................................................30

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009) ..................................................................44

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................17

*NRDC v. EPA,*
    464 F.3d 1 (D.C. Cir. 2006) ...........................................................................20

*Open Cmtys. All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) ..............................................................43

*NB ex rel. Peacock v. D.C.,*
    794 F.3d 31 (D.C. Cir. 2015) .........................................................................22

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 201 ..........................................................................37

iv

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS,*
   946 F.3d 1100 (9th Cir. 2020) ...............................................................18, 19, 28, 30

*Planned Parenthood of New York City, Inc. v. HHS,*
   337 F. Supp. 3d 308 (S.D.N.Y. 2018)...........................................................18, 27, 30

*Population Inst. v. McPherson,*
   797 F.2d 1062 (D.C. Cir. 1986) ......................................................................................42

*Pub. Citizen, Inc. v. NHTSA,*
   489 F.3d 1279 (D.C. Cir. 2007) ......................................................................................20

*Serono Labs., Inc. v. Shalala,*
   158 F.3d 1313 (D.C. Cir. 1998) ......................................................................................44

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) ........................................................................................17

*Sherrill v. Knight,*
   569 F.2d 124 (D.C. Cir. 1977) ........................................................................................22

*Sierra Club v. E.P.A.,*
   292 F.3d 895 (D.C. Cir. 2002) ........................................................................................18

*Smith v. Goguen,*
   415 U.S. 566 (1974) .........................................................................................................23

*State Nat. Bank of Big Spring v. Lew,*
   795 F.3d 48 (D.C. Cir. 2015) ..........................................................................................18

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .........................................................................................................20

*TexasChildren's Hosp. v. Burwell,*
   76 F. Supp. 3d 224 (D.D.C. 2014) ..................................................................................44

*Timpinaro v. SEC.,*
   2 F.3d 453 (D.C. Cir. 1993) ............................................................................................22

*Transactive Corp. v. United States,*
   91 F.3d 232 (D.C. Cir. 1996) ..........................................................................................34

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision,*
   967 F.2d 598 (D.C. Cir. 199 ...........................................................................................37

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021)..........................................................................................................18

v

*Turner v. U.S. Agency for Global Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020) ........................................................43

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ..................................................................................27

*United States Telecom Ass'n v. Fed. Commc'ns Comm'n*,
  825 F.3d 674 (D.C. Cir. 2016) .................................................................22

*United States v. McIntosh*,
  833 F.3d 1163 (9th Cir. 2016) ..................................................................28

*United States v. Williams*,
  553 U.S. 285 (2008) ..................................................................................24

*Winter v. NRDC*,
  555 U.S. 7 (2008) ......................................................................................17

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................39, 40

*Xiaomi Corp. v. Dep't of Def.*,
  No. 21-cv-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ......................42

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................21, 33

Cal. Educ. Code § 51933 .......................................................................................35

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034
  (2009) ...................................................................................................4, 5, 28

Hawai'i Revised Statutes § 321-11.1 ....................................................................35

Iowa Code § 279.5 ..................................................................................................35

*Pub. L. 118-47, 138 Stat. 460 (2024) ...............................5, 6, 10, 28, 29, 30, 31, 32, 37

GAO, Principles of Federal Appropriations Law 2-3 (4th ed. 2016) ...................28

**Regulations**

45 C.F.R. § 52.6 .......................................................................................................7

Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 20, 2025) ................................25

Exec. Order No. 14149, 90 Fed. Reg. 8243 (Jan. 20, 2025) ................................25

Exec. Order No. 14150, 90 Fed. Reg. 8337 (Jan. 20, 2025) ........................................25

Exec. Order No. 14151, 90 Fed. Reg. 8,339 (Jan. 29, 2025) ................................26, 31

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) ........................................25

Exec. Order No. 14168, 90 Fed. Reg. 8,615 (Jan. 20, 2025) ........................26, 31, 32

Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ........................................25

Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025) ........................................25

Exec. Order No. 14173, 90 Fed. Reg. 8,633 (Jan. 31, 2025) ................................26, 31

Exec. Order No. 14178, 90 Fed. Reg. 8647 (Jan. 23, 2025) ........................................25

Exec. Order No. 14187, 90 Fed. Reg. 8,771 (Jan. 28, 2025) ......................................26

Exec. Order No. 14190, 90 Fed. Reg. 8,853 (Jan. 29, 2025) ................................26, 31

Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) ....................................25

Exec. Order No. 14241, 90 Fed. Reg. 13673 (Mar. 20, 2025) ....................................25

**Other Authorities**

Carolyn Johnson, Scott Dance, and Joel Achenbach, *Here Are the Words Putting Science in the Crosshairs of Trump's Orders*, Wash. Post (Feb. 4, 2025) ..........................26

Congressional Research Service, Adolescent Pregnancy: Federal Prevention Programs, https:// www.congress.gov/crs-product/R45183 ......................................................4

Congressional Research Service, Federal Adolescent Pregnancy Prevention Program, Aug. 22, 2024, https://www.congress.gov/crs-product/IF10877 ..........................10

*Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Dep't of Health and Hum. Servs. (Feb. 19, 2025), http://bit.ly/44eLQ ...........................................................................................................32

Evelyn M. Kappeler & Amy Feldman Farb, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, 54 J. Adolescent Health S3 (2014) ......................................................................................5

H. Comm. on Gov't Operations, 85th Cong., Executive Orders and Proclamations: A Study of a Use of Presidential Powers 1 (Comm. Print 195).............................................24

HHS, OPA & OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER)*, <https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program- evaluations/tpp-evidence-revie....................................................................................................6, 7

*Litigation Tracker: Legal Challenges to Trump Administration Actions*, Jus Security (May 7, 2025), https://bit.ly/3SqEN .....................................................25

Off. of Population Aff., HHS Announces $68.5 Million for Teen Pregnancy Prevention Opportunities, June 23, 2023, https://content.govdelivery.com/accounts/USHHSOPA/bulletins/ 3613e0e......................9, 10

*Replicate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/replicate...........................................................................30

U.S. Dep't of Health & Hum. Servs., HHS Grants Policy Statement (effective Apr. 16, 2025), https://bit.ly/3RFge....................................................................9

## INTRODUCTION

This case challenges an extraordinary eleventh-hour effort to upend the Teen Pregnancy Prevention Program (TPP Program). The U.S. Department of Health and Human Services (HHS) issued a rule entitled *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application* (NCC Notice) requiring funding recipients to "align" their programs with at least 139 Executive Orders—a new, impossibly vague mandate—as a condition of their continued participation in the program. To the extent the vague new requirements can be discerned at all, they contravene the TPP Program's statutory mandate to "replicat[e]" "medically accurate," evidence-based programs proven to reduce teen pregnancy and associated risks, and numerous administrative-law doctrines, including the change-in-position doctrine, the fair notice doctrine, and the reasoned decisionmaking requirement. Relief cannot wait. The current grant period expires on June 30, 2025, and under the status quo, Plaintiffs stand to potentially lose mission-critical funding by that date. Absent a preliminary injunction, Plaintiffs will suffer irreparable harm— projects will terminate abruptly, specialized staff will be laid off, and critical services will be withdrawn from communities facing the gravest adolescent health disparities—all compounded by lasting reputational damage. HHS's unlawful new requirements fundamentally altering the TPP Program should be set aside, and any reliance on them preliminarily enjoined.

Congress created the TPP Program in 2009 in response to an alarming rise in teen pregnancy rates. Congress appropriated $110 million annually, of which $75 million would be set aside for "Tier 1" grants to "replicat[e]" "medically accurate" rigorously evaluated, evidence-based programs proven to reduce adolescent pregnancy. Congress charged HHS with implementing and administering the TPP Program. HHS typically implements the TPP Program via five-year project periods. The awards are disbursed on an annual basis; however, each year

Tier 1 grantees must submit a non-competing continuation application with a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year.

The Plaintiffs in this case are five participants in the TPP Program, each of which was awarded a five-year project period award in 2023. Planned Parenthood of Greater New York (PPGNY) and Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana and Kentucky (PPGNHAIK) have been grantees in the TPP Program since its inception in 2010. Planned Parenthood of the Heartland (PPH) joined the program in 2015, while Planned Parenthood Mar Monte (PPMM) joined in 2021, and Planned Parenthood California Central Coast (PPCCC) became a grantee for the first time in 2023. All five were awarded five-year grants to "replicat[e]" rigorous, medically accurate, and age appropriate evidence-based teen pregnancy prevention initiatives in their respective communities.

The five-year project period awards are about to enter their third year. Ex. 1. For the second year of the projects, HHS awarded Tier 1 funds for a budget period of July 1, 2024, to June 30, 2025. To continue receiving funds for the project's third budget year, grantees were required to submit a non-compete continuation application to the agency by April 15, 2025. Shortly before the submission deadline, on March 31, 2025, HHS distributed, via email, the NCC Notice (attached as Exhibit 2), setting forth substantial and onerous new requirements for FY 2023 Tier 1 cohort organizations seeking continuation of funding for the budget year beginning on July 1, 2025—just under two months from now. In particular, the NCC Notice requires grantees to demonstrate "that the NCC award application is aligned with current Presidential Executive Orders," and then expressly identifies several Executive Orders as examples of those that "may be of most relevance to the work of the TPP program" while requiring grantees to adhere to existing program expectations. Ex. 2 at 4-5. These new requirements are impossible for Plaintiffs to meet.

2

HHS's abrupt Executive Order alignment requirement is unlawful. The alignment requirement is unconstitutionally vague, stripping grantees of any roadmap for compliance and inviting capricious enforcement. Rather than giving clear guidance on what is prescribed, the HHS notice slips in a novel, opaque mandate and then offers no yardstick for measuring adherence— leaving grantees stumbling through a legal minefield where any misstep risks the abrupt loss of critical funding.

The alignment requirement also brazenly clashes with the program's statutory mission. Tier 1 grantees are charged with faithfully "replicating" "medically accurate," evidence-based models across multiple settings; yet this notice appears to require grantees to commandeer the core curricula, eviscerating the very fidelity requirement that Congress and HHS established and undermining the proven interventions on which the program depends.

The alignment requirement also flouts the Administrative Procedure Act's basic demands for reasoned agency decisionmaking and fair notice. HHS never accounted for grantees' reliance interests, quantified the real-world costs or logistical burdens of ripping out or amending core program models, or even considered whether fidelity to evidence-based interventions could coexist with the Executive Orders' dictates. By skirting any genuine analysis of the complexities involved in "aligning" TPP Program curricula with hundreds of Executive Orders, HHS failed to engage in the kind of reasoned decisionmaking the APA demands.

Plaintiffs need immediate relief. The current grant period ends June 30, 2025. Unless this Court enjoins or vacates HHS's new unlawful alignment requirement and permits grantees to submit new or amended applications in short order, critical funding will run out on June 30. Grantees and those that they serve will then suffer irreparable harms—loss of vital, medically accurate and age appropriate education services; layoffs of specialized program staff; abrupt

disruption of school and community partnerships; erosion of trust with youth and families; and the attendant spike in unintended teen pregnancies, sexually transmitted infections, and health disparities among already vulnerable populations the TPP Program was enacted to prevent. The Court should preliminarily enjoin the unlawful alignment requirement and order HHS to accept new or amended applications that HHS can consider and grant before TPP Program funding expires on June 30, 2025.

## STATEMENT OF FACTS

Teenage pregnancy has long been a public health concern in the United States. "Despite a substantial decline over the past two decades, the rate of [unintended] adolescent pregnancy in the United States remains higher than that of comparable high-income countries, with persistent racial, ethnic, and geographic disparities."[1] Unintended teenage pregnancy, childbirth, and in some cases, parenthood, can have significant and determinative short- and long-term impacts on the health and quality of a young person's life and can be associated with adverse health, social, and economic challenges.[2] As a result, public health organizations, including the Centers for Disease Control and Prevention, agree that reducing unintended teenage pregnancy and preventing sexually transmitted infections is in the best interest of not only teenagers, but society as a whole.[3]

In 2009, Congress mandated the creation of the TPP Program to fund a wide array of evidence-based approaches that are rigorously tested through scientific methods, in order to combat unintended teen pregnancy.[4] Congress established the TPP Program "to create evidence-based social policy initiatives to improve policymaking and program outcomes" by "designing

---

[1] Congressional Research Service, Adolescent Pregnancy: Federal Prevention Programs, https:// www.congress.gov/crs-product/R45183.
[2] *Id.*
[3] *Id.*
[4] Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

new initiatives to build rigorous data, rather than treating evaluation as an afterthought, and using the evidence that emerges for action."[5]

## A.  The TPP Program from 2010 to 2024

In FY 2010, Congress appropriated $110 million in funds to the TPP Program and directed that such funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants."[6] Since then, Congress has continuously funded the TPP Program at approximately the same levels in the same manner and with the same statutory requirements.[7] The program competitively awards grants to public and private entities to implement a variety of evidence-based or innovative models that seek to influence adolescent sexual behavior. Ex. 1, U.S. Dep't of Health and Hum. Servs., Notice of Funding Opportunity: Advancing Equity in Adolescent Health Through Evidence-Based Teen Pregnancy Prevention Programs and Services (FY 2023 NOFO), at 16, 18. Such models focus on sexual abstinence or information about the use of contraception, among other approaches. Kappeler & Feldman, *supra* note 5, at S4.

The TPP program funds two types of grants. *Id.* at S3-S4; Ex. 5, Declaration of Leslie M. Kantor, PhD, MPH, ¶ 22. Relevant to this case are grants of the first type, known as "Tier 1" grants, which Congress charged with the task of replicating models that HHS has already determined to be proven effective in reducing unintended teen pregnancy or impacting associated sexual risk behaviors and consequences through a systematic review of rigorous evaluation studies

---

[5] Evelyn M. Kappeler & Amy Feldman Farb, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, 54 J. Adolescent Health S3, S3 (2014).

[6] Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

[7] *See* Pub. L. 118-47, 138 Stat. 460, 671 (2024).

of these programs.[8] After federal administration costs, 75% of available TPP funds are reserved for Tier 1 grants.[9]

Tier 1 grantees are statutorily required to replicate, with fidelity, established evidence-based programs. The most recent appropriation for the TPP Program (which is materially identical to the language in every appropriation since the program's start in 2009) provides:

> That of the funds made available [to HHS's Office of the Secretary], $110,000,000 shall be for making competitive contracts and grants to public and private entities <u>to fund medically accurate and age appropriate programs that reduce teen pregnancy</u> and for the Federal costs associated with administering and evaluating such contracts and grants, of which not less than $75,000,000 <u>shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors</u> . . . .[10]

Programs eligible for "replication" are identified by HHS, through the agency's Teen Pregnancy Prevention Evidence Review (TPPER) process.[11] Relying on a systematic review of studies and program evaluations, TPPER determines whether a program is proven effective in serving the required TPP goals: reducing teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors.[12] The TPPER "currently identifies 52

---

[8] *See, e.g.*, Pub. L. 118-47, 138 Stat. 460, 671 (2024) (allocating funds "for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors"); *see also* Ex. 5 ¶ 23 (describing Tier 1 programs).

[9] Pub. L. 118-47, 138 Stat. 460, 671 (2024). The remaining 25% of TPP program funds are awarded to "Tier 2" research and demonstration grants. *Id.*; Ex. 5 ¶ 46. These Tier 2 grants are focused on programs that are designed to develop, replicate, and refine additional evidence-based models and innovative strategies for reducing unintended teenage pregnancy rates. *See, e.g.*, Pub. L. 118-47, 138 Stat. 460, 671 (2024) (allocating funds to "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy"); *see also* Ex. 5 ¶ 46 (describing Tier 2 programs).

[10] Pub. L. 118-47, 138 Stat. 460, 671-72 (2024) (emphasis added).

[11] HHS, OPA & OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER)*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review (last visited May 8, 2025).

[12] *Id.*

6

programs that meet the review criteria for evidence of effectiveness."[13] Each of Plaintiffs' TPP Program projects implements and replicates, with fidelity, at least one of these evidence-based programs that HHS has identified as effective and consistent with Congress's mandate for the program.[14]

## B.  The TPP Program Application and Award Process

Tier 1 funding recipients, including Plaintiffs in this case, receive funding for their projects through two distinct processes: a competitive award cycle, in which they propose and are selected to replicate evidence-based programs up to a five-year period, and an annual non-competitive continuing award process in which funding recipients apply to HHS to receive a one-year continuing award of funds as part of the five-year project period. *See* Ex. 1 at 2. The procedures governing this practice are codified in HHS's regulations. *See* 45 C.F.R. § 52.6.

HHS regulations governing the award of grants and cooperative agreements are primarily codified at 45 C.F.R. Part 75. Additionally, 45 C.F.R. § 52.6(c) allows HHS to notice an award for a "project period," during which HHS intends to support the project "without requiring the project to recompete for funds." Consistent with these regulations, the TPP Program competitive grantmaking process necessarily begins with a notice of funding opportunity (NOFO), *i.e.*, a public announcement in which HHS's Office of Population Affairs (OPA) declares its intention to award

---

[13] *Id.*

[14] *See* Ex. 6, Declaration of Wendy Stark on behalf of PPGNY, ¶ 23; Ex. 7 Declaration of Rebecca Gibron on behalf of PPGHNAIIK, ¶ 17; Ex. 8, Declaration of Jenna Tosh on behalf of PPCCC ¶ 22; Ex. 9, Declaration of Christine Cole on behalf of PPH, ¶ 19; Ex. 10, Declaration of Courtney Macavinta on behalf of PPMM, ¶ 20; https://rhntc.org/resources/evidence-based-teen-pregnancy-prevention-programs-glance (listing approved programs).  HHS has removed the Teen Pregnancy Prevention Evidence Review website, which listed the HHS-approved evidence based programs. However, the list of eligible evidence-based programs is available on the Reproductive Health National Training Center's website. *See* https://rhntc.org/resources/evidence-based-teen-pregnancy-prevention-programs-glance.

funds and outlines the program goals, objectives, and conditions for applying. *See, e.g.*, Ex. 1, at 20-22.

The TPP Program has awarded funds to multiple cohorts of Tier 1 grantees since FY 2010. Ex. 5 (Kantor Decl.) ¶ 22. The current cohort of Tier 1 grantees, including Plaintiffs, were selected based on a FY 2023 NOFO titled "Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Program and Services." Ex. 1 at 1. In particular, this NOFO solicited "applications for projects to serve communities and populations with the greatest needs and facing significant disparities to advance equity in adolescent health through the replication of evidence-based teen pregnancy prevention programs (EBPs) and services." *Id.*; *see also* Ex. 3, OASH, OPA, *Advancing Equity Through Replication of EBPs and Services (TPP23 Tier 1)*.

In justifying the need for programs that "advance equity in adolescent health," the FY 2023 NOFO highlighted the "significant disparities in adolescent sexual health outcomes by race, ethnicity, geography, and among those that have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." *Id.* at 1, 5. One of the eight "expectations" for the projects required that programs "[f]ocus on [a]reas of [g]reatest [n]eed and [f]acing [s]ignificant [d]isparities" and "serv[e] youth who are . . . disproportionally affected by unintended teen pregnancies (including rapid repeat pregnancy) and STIs due to factors such as: [r]ace; [e]thnicity; [g]eography; and/or [o]therwise historically underserved or marginalized. This includes those that have been adversely affected by persistent poverty and inequality (*e.g.*, youth experiencing homelessness, youth in foster care, youth in juvenile justice, LGBTQI+ youth, youth with disabilities, expectant and/or parenting teens, etc.)." *Id.* at 6-7.

The FY 2023 NOFO also required applicants to select evidence-based programs that were "a good fit, demonstrating clear alignment between the selected EBPs, project goals and desired

outcomes, needs of the community/population, and the capacity/readiness of the implementation site(s) and implementing organization(s)." *Id.* at 8. HHS defined "evidence-based" approaches as those "that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." *Id.* at 2; *see also id.* at 64-66 (glossary defining each of these terms). HHS further emphasized the importance of grantees using materials accompanying the evidence-based programs that are "age appropriate, medically accurate, culturally and linguistically appropriate, trauma-informed, and inclusive of all youth." *Id.* at 8; *see also id.* at 64-66 (glossary defining each of these terms). In evaluating applications for the FY 2023 cohort, HHS considered seven criteria, placing most weight on whether a program served areas of greatest need and disparities. *Id.* at 43-46.

Per the NOFO, for each year of the approved performance period grantees would "be required to submit a noncompeting continuation application which includes a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." *Id.* at 56. "Specific guidance [would be provided annually by OASH and OPA] via Grant Solutions well in advance of the application due date. OASH [then] will award continuation funding based on availability of funds, satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." *Id.*; *see also* U.S. Dep't of Health & Hum. Servs., HHS Grants Policy Statement at 21 (effective Apr. 16, 2025), https://bit.ly/3RFgeir.

In the FY 2023 Tier 1 cohort, 53 grantees in 29 states and Puerto Rico were awarded more than $68.5 million to "replicate and scale evidence-based programs" that had been proven effective

to improve sexual and reproductive health outcomes and promote positive youth development.[15]

In its announcement, HHS emphasized that through this cohort of grantees, the agency sought "to

advance equity in adolescent health by supporting projects that serve communities and populations

with the greatest needs and facing significant disparities" with a "focus on reaching communities

and populations that are disproportionately affected by unintended teen pregnancy and STIs."[16]

Grantees served 140,935 youth in FY 2023,[17] the most recent period for which this data is

available.

## C. Plaintiffs' Tier 1 Programs

Plaintiffs are Tier 1 funding recipients who were selected to execute five-year sex-

education projects under the FY 2023 funding opportunity. All of their projects are modeled on

programs that were selected from HHS's pre-approved list, which have been proven through

rigorous evaluation to reduce unintended teenage pregnancy, behavioral risk factors underlying

teenage pregnancy, or other associated risk factors, and which were determined to be a good fit for

the communities they serve.[18]  For the last two years since Plaintiffs' five-year awards were

granted, each Plaintiff has diligently worked to replicate these evidence-based programs.[19]

Consistent with Congress's mandate, each has worked to "replicat[e]" "medically accurate and age

appropriate" programs "that have been proven effective through rigorous evaluation to reduce

---

[15] Off. of Population Aff., HHS Announces $68.5 Million for Teen Pregnancy Prevention Opportunities, June 23, 2023, https://content.govdelivery.com/accounts/USHHSOPA/bulletins/ 3613e0e.

[16] Id.

[17] Congressional Research Service, Federal Adolescent Pregnancy Prevention Program, Aug. 22, 2024, at 1, available at https://www.congress.gov/crs-product/IF10877.

[18] Ex. 6 (PPGNY Decl.) ¶¶ 22-23, 57-58; Ex. 7 (PPGNHAIK Decl.) ¶¶ 17, 19-20; Ex. 8 (PPCCC Decl.) ¶¶ 22-23; Ex. 9 (PPH Decl.) ¶¶ 19-21; Ex. 10 (PPMM Decl.) ¶¶ 16, 20.

[19] Ex. 6 (PPGNY Decl.) ¶¶ 17-37; Ex. 7 (PPGNHAIK Decl.) ¶¶ 17-30; Ex. 8 (PPCCC Decl.) ¶¶ 25-33; Ex. 9 (PPH Decl.) ¶¶ 17-33; Ex. 10 (PPMM Decl.) ¶¶ 21-28.

teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."[20] And, as required by the NOFO, each does so in a manner that "serve[s] communities and populations with the greatest needs and facing significant disparities" within their regions in order "to advance equity in adolescent health." Ex. 1 at 1.

Specifically, each Plaintiff's program is designed to reach age groups and communities that have been determined, based on abundant evidence, to face significant disparities in access to high-quality, fact-based sexual and reproductive health education, and who therefore face disproportionately high rates of teenage pregnancy and STIs.[21] For example, based on clear public health data demonstrating communities most in need across New York City, PPGNY's program focuses on all youth aged 10-24; youth who identify as LGBTQ+; youth who are English language learners; and youth with intellectual and developmental disabilities. Ex. 6 (PPGNY Decl.) ¶ 18. As another example, PPGNHAIK's project is designed to reach native Hawaiian/Native American Pacific Islander and LGBTQ+ youth who experience teen birth and HIV/STI incidence rates two- to four-times higher than the national average. Ex. 7 (PPGHNAIK Decl.) ¶¶ 13, 19.

In order to achieve their project goals, each Plaintiff has invested considerable resources into building and expanding their projects, consistent with the five-year plans that were approved by HHS. All of Plaintiffs' TPP projects are fully funded by the federal appropriations they receive through the program.[22] In accordance with the terms of their grants, Plaintiffs use the money received to fund personnel (including salaries and wages), supplies and equipment associated with

---

[20] Pub. L. 118-47, 138 Stat. 460, 671 (2024); Ex. 6 (PPGNY Decl.) ¶ 23; Ex. 7 (PPGHNAIK Decl.) ¶ 17; Ex. 8 (PPCCC Decl.) ¶ 32; Ex. 9 (PPH Decl.) ¶ 19; Ex. 10 (PPMM Decl.) ¶ 20.

[21] Ex. 6 (PPGNY Decl.) ¶¶ 17-18; Ex. 7 (PPGHNAIK Decl.) ¶¶ 13, 19; Ex. 8 (PPCCC Decl.) ¶¶ 22-23; Ex. 9 (PPH Decl.) ¶¶ 19-20, 49; Ex. 10 (PPMM Decl.) ¶¶ 16-19.

[22] Ex. 6 (PPGNY Decl.) ¶ 63; Ex. 7 (PPGNHAIK Decl.) ¶ 32; Ex. 8 (PPCCC Decl.) ¶ 49; Ex. 9 (PPH Decl.) ¶ 66; Ex. 10 (PPMM Decl.) ¶¶ 58, 59.

the project, and contracts or subawards for goods, services and location sites, including third-party contractual agreements with other organizations and businesses.[23] Plaintiffs each hired and trained multiple staff members specifically to fulfill the demands of their TPP projects, and also trained other staff internally and externally in order to implement the programs.[24] In order to set up and grow their projects, Plaintiffs also conducted curricula reviews, conducted community need and resource assessments, developed promotional materials, and established the necessary community partnerships to ensure their programs would be a success.[25] In addition, as contemplated by the grant, Plaintiffs created youth and community Advisory Boards in order to solicit feedback from stakeholders.[26]

As a result of Plaintiffs' adherence to a medically accurate evidence-based approach, and the considerable resources they have invested, their programs have consistently succeeded in the first two years and are projected to achieve even greater results going forward:

- Plaintiff PPGNY's program receives annual funding of approximately $1,091,185, and offers education programs in multiple settings across New York City. Ex. 6 (PPGNY Decl) ¶¶ 1, 12. During the 2023/2024 program year, PPGNY's Project reached 506 youth. By the end of the five-year grant period, PPGNY's project is expected to reach approximately 6,300 youth throughout New York City. *Id.* ¶ 38.

- Plaintiff PPGNHAIK's program receives annual funding of approximately $487,013. Ex. 7 (PPGNHAIK Decl.) ¶ 12. During the 2023/2024 program year, PPGNHAIK's Project reached 449 youth. *Id.* ¶ 30. By the end of the five-year grant period, the project is projected to reach approximately 1,900 youth. *Id.* ¶ 30].

- Plaintiff PPH's program receives annual funding of approximately $773,619, and aims to reach underserved communities in Iowa and Nebraska. Ex. 9 (PPH Decl.)

---

[23] Ex. 6 (PPGNY Decl.) ¶¶ 66-68; Ex. 7 (PPGNHAIK Decl.) ¶¶ 32, 61, 68; Ex. 8 (PPCCC Decl.) ¶¶ 25, 50-51; Ex. 9 (PPH Decl.) ¶¶ 17, 71; Ex. 10 (PPMM Decl.) ¶¶ 58-60.

[24] Ex. 6 (PPGNY Decl.) ¶ 68; Ex. 7 (PPGNHAIK Decl.) ¶¶ 32, 61; Ex. 8 (PPCCC Decl.) ¶¶ 25; Ex. 9 (PPH Decl.) ¶¶ 17, 71; Ex 10 (PPMM Decl.) ¶¶ 58-59.

[25] Ex. 6 (PPGNY Decl.) ¶¶ 21-22; Ex. 7 (PPGNHAIK Decl.) ¶¶ 27-29; Ex. 8 (PPCCC Decl.) ¶ 25; Ex. 9 (PPH Decl.) ¶¶ 17-19, 24; Ex. 10 (PPMM Decl.) ¶¶ 13, 21.

[26] Ex. 6 (PPGNY Decl.) ¶ 22; Ex. 7 (PPGNHAIK Decl.) ¶ 27; Ex. 8 (PPCCC Decl.) ¶ 28; Ex. 9 (PPH Decl.) ¶ 23; Ex. 10 (PPMM Decl.) ¶ 24.

¶ 9. During the 2023/2024 program year, PPH's Project reached 145 youth. *Id.* ¶ 22. From July 2023-present, PPH has reached over 13,000 youth through education and outreach activities. *Id.* ¶ 23. By the end of its five-year grant period, PPH's project is expected to have impacted approximately 2,100 youth. *Id.* ¶¶ 22-23, 34.

- Plaintiff PPCCC's program receives annual funding of $798,636, and focuses on underserved communities in California's tri-county Central Coast region. Ex. 8 (PPCCC Decl.) ¶ 24. During the 2023/2024 program year, PPCCC's Project reached approximately 360 youth. *Id.* ¶ 32. By the end of the five-year grant period, CSEC is projected to reach 2,900 individuals. *Id.*

- Plaintiff PPMM's program receives annual funding of $985,867, and is designed to reach underserved communities in certain counties of California and Nevada. Ex. 10 (PPMM Decl.) ¶ 11. In the first two years of the program, PPMM's Project reached 1,962 participants. *Id.* ¶ 21. By the end of the five-year grant period, PPMM's Project is projected to reach an estimated 10,100 individuals. *Id.* ¶ 30.

In sum, Plaintiffs' projects were created in reliance on TPP Program funds and with the expectation that the 5-year grant period would be completed. Plaintiffs will thus be forced to shut down their projects prematurely if the remaining funding is withheld.[27]

## D. The President's Executive Orders and HHS's New Requirements Imposed on the TPP Program

In January 2025, OPA distributed information for preparing the Year 3 NCC award application to Tier 1 Recipients, which mirrored the information received in prior years. Ex. 6 (PPGNY Decl.) ¶ 40; Ex. 7 (PPGNHAIK Decl.) ¶ 33; Ex. 8 (PPCCC Decl.) ¶ 34; Ex. 9 (PPH Decl.) ¶ 35; Ex. 10 (PPMM Decl.) ¶ 31. These applications were due on April 15, 2025 at 6:00 PM. Ex. 4, Office of Population Affairs, Guidance for Preparing a Non-Competing Continuation Award Application (dated January 2025). That same month, OPA distributed another version of the information with only minor updates. Ex. 6 (PPGNY Decl.) ¶ 41; Ex. 7 (PPGNHAIK Decl.) ¶ 34; Ex. 8 (PPCCC Decl.) ¶ 34; Ex. 9 (PPH Decl.) ¶ 36; Ex. 10 (PPMM Decl.) ¶ 32.

---

[27] Ex. 6 (PPGNY Decl.) ¶ 63; Ex. 7 (PPGNHAIK Decl.) ¶ 59; Ex. 8 (PPCCC Decl.) ¶ 49; Ex. 9 (PPH Decl.) ¶ 66; Ex. 10 (PPMM Decl.) ¶ 58.

On March 31, 2025, a little more than two weeks before the applications were due, OPA emailed recipients of TPP Tier 1 Program funding the NCC Notice, which imposed new requirements for recipients' NCC application. Ex. 2 at 1. This Notice's contents and requirements were starkly different from the prior versions distributed in January, but did not modify the April 15, 2025 6:00 PM EST deadline for application submissions. *See id.* The NCC Notice indicated that it "prescribes the content, information, and requirements for the OPA NCC award application" and "should be used in conjunction with the [FY 2023 NOFO]," which "provides information and guidance for recipients for the entire project period." *Id.* at 3. Most notably, the NCC Notice introduced a vague new requirement that mandates "alignment" of TPP projects with all current Executive Orders.

The NCC Notice first mentioned the alignment requirement on page 3 where it stated that award applications will be reviewed, in part, for whether "NOFO expectations are being met, to the extent aligned with Presidential Executive Orders (see Table 1)." Ex. 2, at 3. On the next page, it provided that "Recipients are expected to review and be aware of current Presidential Executive Orders" and "are encouraged to revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders." *Id.* at 4. It further stated: "Recipients *should review and be aware of all current Presidential Executive Orders.*" *Id.* (emphasis in original). It then continued: "[H]owever, the following may be of most relevance to the work of the TPP program" and lists five specific Executive Orders:

- Executive Order 14168 Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;
- Executive Order 14190 Ending Radical Indoctrination in K-12 Schooling;
- Executive Order 14187 Protecting Children From Chemical and Surgical Mutilation;
- Executive Order 14151 Ending Radical and Wasteful Government DEI Programs and Preferencing; and

14

- Executive Order 14173 Ending Illegal Discrimination and Restoring Merit-Based Opportunity.

*Id.* at 4-5. Immediately thereafter, on the same page, the NCC Notice stated that "*[s]uccessful applications will include* the following information in the project narrative" and listed first among its three criteria "[d]escription of changes made to align with Executive Orders, if applicable" and second "[s]ummary of proposed changes in scope." *Id.* (emphasis added). The Notice elaborated on these new requirements later on the same page, stating:

> ### Description of Changes Made to Align with Executive Orders
> Provide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders, if applicable, including the steps taken to review the project and identify the modifications proposed. Examples of changes that recipients may make to align their projects include, but are not limited to, selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc.
>
> ### Summary of Changes in Scope
> Provide a *brief* summary of any proposed substantial changes to the project work plan from the previous budget year, including any proposed changes in scope to align the project with Presidential Executive Orders, such as change in geographic location, change in population of focus, bringing on or parting ways with major partners, etc. Changes in scope from the currently approved project should be clearly highlighted in your work plan and justified in your application. See HHS Grants Policy Statement for explanation of change of scope.

*Id.* Under another heading on the same page entitled "Work Plan," the NCC Notice stated that "[t]he work plan should address the expectations outlined in the original NOFO, to the extent aligned with Presidential Executive Orders." *Id.* The other mention of the alignment requirement appeared on page 15 of the NCC Notice: "As part of the NCC award application, recipients are expected to submit program materials to OPA for review. Recipients are expected to align program materials with Presidential Executive Orders." *Id.* at 15.

Notably, the Notice did not eliminate other existing expectations and requirements for TPP-funded projects under the current grant—*e.g.*, that the projects "focus on areas of greatest need" and "replicate to scale evidence-based teen pregnancy prevention programs with fidelity and

15

quality." *Id.* at 7; *see also* Ex. 1 at 6-7 (setting forth these same requirements in the NOFO governing the 5-year grant period); Ex. 3 at 1-2.

**E. Plaintiffs' NCC Applications Under the New "Alignment" Requirement**

Defendants' actions forced Plaintiffs into an impossible choice. The first option was to submit an application that attempted to comply with the "alignment" requirement by modifying existing evidence-based programs to, for example, remove certain aspects of the curriculum or target population. Even then, Plaintiffs would have to certify compliance, despite lack of guidance as to what alignment even looked like and thus without knowing whether it had actually been achieved. The second option was to face exclusion from the program by declining to modify their program in order to avoid eliminating essential elements of their projects and to ensure that their projects continue implementing evidence-based programs with fidelity in the populations they are designed to serve.

All Plaintiffs but one submitted an application. Those that submitted applications asserted that the NCC Notice was unlawful, that the applications were being completed under protest, and that the applications were being submitted without certifying alignment with the Executive Orders. Some Plaintiffs, such as PPGNY and PPGNHAIK, submitted applications stating that no meaningful changes could be made to the programs to "align" with the Executive Orders. *See* Ex. 6 (PPGNY Decl.) ¶¶ 50-51; Ex. 7 (PPGNHAIK Decl.) ¶ 53. Both organizations determined that overhauling their TPP Programs to cease all services that might be considered "DEI"-related, or remove reference to LGBTQIA+ identities, would materially compromise the programs' mandate to advance equity in adolescent health, diminish their relevance to the communities they are designed to serve, erode the original intention of this funding, and significantly impair their ability

to achieve the intended public health outcomes. *See* Ex. 6 (PPGNY Decl.) ¶¶ 52-54; Ex. 7, (PPGNHAIK Decl.) ¶¶ 44-49.

Others, such as PPH and PPCCC, noted the lack of clarity about the requirement to "align" with Executive Orders but explained their attempts to make some changes in response to the NCC Notice and then stated that they could not make any further changes (e.g., to cease all programming that might be considered "DEI"-related, or remove reference to LGBTQIA+ identities) while continuing to provide evidence-based programs and to meet their project goals. *See* Ex. 8 (PPCCC Decl.) ¶¶ 41-42, 44-46; Ex. 9 (PPH Decl.) ¶¶ 48-56, 59-60. One Plaintiff, PPMM, was unable to identify any changes it could make and documentation that it could submit, even under protest, without abandoning all of the essential components of its project and organizational mission. *See* Ex. 10 (PPMM Decl.) ¶¶ 43, 46-47, 51-53.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). "The last two factors 'merge when the Government is the opposing party.'" *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

All of the preliminary injunction factors are met here; the Court should preliminarily enjoin the NCC Notice's unlawful "alignment" requirement and issue all necessary and appropriate relief to preserve the status quo.

**A. Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs are likely to succeed on the merits. As a threshold matter, Plaintiffs clearly have standing. And Defendants' actions: (1) violate Plaintiffs' due process rights; and (2) violate the Administrative Procedure Act because they are both contrary to statute, and arbitrary and capricious.

**1. Plaintiffs Have Standing to Challenge the NCC Notice**

As a threshold matter, there can be no doubt that Plaintiffs have Article III standing. *See generally TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring injury, traceability, and redressability). Indeed, two courts have already expressly held that TPP program applicants, including some plaintiffs here, have standing to challenge changes to the program's terms. *See Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1108-09 (9th Cir. 2020); *Planned Parenthood of New York City, Inc. v. HHS*, 337 F. Supp. 3d 308, 319-24 (S.D.N.Y. 2018).

First, Plaintiffs are suffering an "injury in fact that is concrete, particularized, and actual or imminent." *Transunion LLC*, 594 U.S. at 423. As TPP funding recipients who are two years into a five year grant, Plaintiffs are directly affected by the NCC Notice, which mandates compliance with unlawful new requirements. *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting Lujan, 504 U.S. at 561-62) ("The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated."); *Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (A "petitioner's standing to seek review of administrative action is self-evident" where "the complainant is 'an object of the action (or forgone action) at issue.'" (quoting *Lujan*, 504 U.S. at 561-62)). Indeed, because of the unlawful Notice, Plaintiffs have already been forced to start expending significant resources in connection with deciphering the vague new requirements and

18

developing options for addressing them. Ex. 6 (PPGNY Decl.) ¶ 50; Ex. 7 (PPGNHAIK Decl.) ¶¶ 37, 55-56; Ex. 8 (PPCCC Decl.) ¶ 43; Ex. 9 (PPH Decl.) ¶¶ 42-43; Ex. 10 (PPMM Decl.) ¶ 37. This diversion of resources to address the impact of the Notice's new requirements will remain ongoing absent an injunction, and is sufficient alone to establish harm for purposes of standing.

Plaintiffs have further been harmed by the NCC Notice because they were forced to incorporate its unlawful requirements into their continuation applications—which expressly required them to certify compliance with the Executive Order "alignment" directive. Ex. 6 (PPGNY Decl.) ¶ 59; Ex. 7 (PPGNHAIK Decl.) ¶ 57; Ex. 8 (PPCCC Decl.) ¶ 45; Ex. 9 (PPH Decl.) ¶ 56. Thus, when submitting applications, Plaintiffs had no choice but to address the new requirements—whether through proposing changes to their programs, submitting "protest language," or both. Having to amend their applications in order to address or overcome these unlawful requirements is a harm unto itself. *Cf. Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding that the harm for standing purposes may be the unconstitutional "imposition of the barrier" to receiving a federal benefit, rather than "the ultimate inability to obtain the benefit"). In other words, regardless of whether Plaintiffs' applications are ultimately denied, harm is already occurring.[28]

Finally, while the Court need not also address Plaintiffs' loss of critical funding to find standing here, it bears mentioning that this harm also exists and is substantial. It is obvious that

---

[28] This same principle applies for Plaintiff PPMM, which was compelled to forgo submitting its Year 3 NCC application entirely as a result of the new requirements in the NCC Notice, and because it could not reconcile the NCC Notice's vague alignment obligation with its statutorily-mandated programming. As another court held in finding that a TPP recipient had standing to challenge program requirements despite not having submitted an application, "[i]t is a plaintiff's ability and readiness to bid that ensures an injury-in-fact is concrete and particular" and "deciding not to bid makes the injury imminent." *Planned Parenthood of Greater Wash.& N. Idaho*, 946 F.3d at 1109.

HHS would not have dramatically transformed the requirements for receiving continuation funding unless compliance with the requirement was a material and substantial factor in receiving continuation awards. And as the Notice makes clear, applicants who fail to "align with Executive Orders" will not be "[s]uccessful" in their applications. *Id.* at 5. Given Defendants' emphasis on the dispositive nature of these unlawful requirements, coupled with Plaintiffs' clear statements that they are unable to certify compliance with them, there can be no serious doubt that Plaintiffs' continuation funding will be denied. Under these circumstances, the likelihood of that harm is beyond substantial. *See Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1296 (D.C. Cir. 2007) (Kavanaugh, J.) (holding that where "increase in the risk of harm [] is 'substantial,' and the ultimate risk of harm also is 'substantial' then the individual or organization has demonstrated an injury in fact"); *see NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996). Notably, as detailed *infra* in Part B, the harms that will flow from the loss of these critical funds would be devastating and irreparable—including shuttering entire education programs that are proven to combat unintended teen pregnancy and STI rates within otherwise-underserved communities.

Traceability and redressability are also present here. Harm to Plaintiffs directly flows from the new requirements in the NCC Notice. *See Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (traceability is satisfied where unlawful conduct is the but-for cause of plaintiffs' injuries). And a preliminary injunction would restore Plaintiffs' ability to submit Year 3 NCC applications under the same criteria on which they were selected—thereby eliminating their need to expend further resources to address the unlawful requirements, removing the unlawful barriers imposed upon their current continuation applications, relieving them from the harm of having submitted applications that forced them to address the unlawful requirements,

and preventing the loss of critical funding that would result in the shutdown of vital public-health programming. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (redressability met if it is "likely that a favorable judicial decision [on the claim] will prevent or redress the [plaintiff's] injury.").

### 2.  The NCC Notice Is Unlawful Under the Constitution and the APA

Plaintiffs are likely to succeed on the merits of their claims because the NCC Notice's Executive Order "alignment" requirements are plainly unlawful. The "alignment" requirement is: (1) unconstitutionally vague; (2) violates the APA because it is contrary to law and arbitrary and capricious.

### a.  The NCC Notice's "Alignment" Requirement Is Unconstitutionally Vague

The NCC Notice's "alignment" requirement is unconstitutionally vague and, as a result, violates the Fifth Amendment's Due Process Clause and the requirements of the APA. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).  The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement. In *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972), the Supreme Court held that a law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or if it encourages arbitrary enforcement. *See also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common

intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").

As a threshold issue, Plaintiffs have a property interest protected by due process here: an interest in receiving money from a successful non-competing continuing award application under the TPP Program. The protections of due process extend to the denial of a government benefit that a person has an interest in receiving. *See Goldberg v. Kelly*, 397 U.S. 254, 261-62 (1970); *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976). A person has a protected property interest if that "person would be entitled to receive the government benefit *assuming* she satisfied the preconditions to obtaining it" and "award of the benefit would follow from satisfaction of applicable eligibility criteria." *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 41 (D.C. Cir. 2015). "[I]f the statute or implementing regulations place substantive limitations on official discretion to withhold award of the benefit upon satisfaction of the eligibility criteria, there is a legitimate claim of entitlement, as to which the Due Process Clause affords protection." *Id.* at 41-42 (cleaned up). That is the case here. As the NOFO states: "OASH *will* award continuation funding based on availability of funds, satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." Ex. 1 at 56 (emphasis added). So long as those criteria are met, non-competing continuation awards must be made.

The void for vagueness doctrine, specifically, has long been held to protect the interests that derive from similar benefits, even if the vague government requirement at issue is not a statute or regulation, but rather an administrative action. *See Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (upholding vagueness challenge to revocation of a White House press pass); *Sherrill v. Knight*, 569 F.2d 124, 130-31, 131 n.22 (D.C. Cir. 1977) (upholding vagueness challenge to denial of a White House press pass). Courts have applied the void-for-vagueness doctrine to review

administrative action. *See United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 734 (D.C. Cir. 2016); *Timpinaro v. SEC.*, 2 F.3d 453, 460 (D.C. Cir. 1993) (remanding unconstitutionally vague SEC rule); *see also Fox Television Stations, Inc.*, 567 U.S. at 253 (similar).

The void for vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television Stations, Inc.*, 567 U.S. at 253. Thus, a court will find an agency action unconstitutionally vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see Coates v. City of Cincinnati*, 402 U.S. 611, 611-14 (1971) (holding ordinance against "annoying" conduct unconstitutionally vague); *Smith v. Goguen*, 415 U.S. 566, 573-77 (1974) (holding prohibition against treating the American flag "contemptuously" unconstitutionally vague).

The NCC Notice's new alignment requirements flunk both prongs of the void-for-vagueness test. A reasonable person has no way of understanding what is required to bring a program into "alignment" with the more than 139 Executive Orders the new Administration has issued, particularly as several of those EOs have already been found unconstitutionally vague. *See infra*, note 31. And the breadth of meanings that the alignment requirement could have encourages arbitrary and discriminatory enforcement.

**Vagueness As To What Is Required**.   Notably, the NCC Notice does not require applicants to "comply" with the Executive Orders—presumably because the Executive Orders

themselves are not self-executing as to private entities (i.e., they direct *agencies* to take various actions) and, therefore, do not in and of themselves create any new obligations for funding recipients.[29] So, instead, Defendants take a sweeping and indecipherable approach by demanding "alignment." The first and most basic problem with this approach is that it is completely unclear what constitutes "alignment" with an Executive Order. Unlike a word like "comply" that has a settled legal meaning, the word "alignment" is a word—like the words "'annoying' or 'indecent'"—whose meaning turns on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).

The word "alignment" is never defined in the NCC Notice. Nor does the NCC Notice even clearly indicate what specific requirements it is that grantees are supposed to be aligning with. The NCC Notice nowhere specifies any provision of any Executive Order that it puts forward as binding on grantees (or even as something grantees should prioritize or consider). Instead, the NCC Notice states that "Recipients *should review and be aware of all current Presidential Executive Orders*," Ex. 2. at 4—over 139 at last count. And there are also countless Executive Orders still in effect from past presidential administrations (which may number in the many hundreds). Some of the orders issued just in the first few months of this administration are directed to national security and immigration, trade issues, free-speech protections and censorship rollbacks, reorganization of federal agencies and workforce controls, technology and financial innovation mandates, historical record declassification and cultural-renaming initiatives, natural resources initiatives, foreign-policy realignments and foreign aid re-evaluations, and purported

---

[29] H. Comm. on Gov't Operations, 85th Cong., Executive Orders and Proclamations: A Study of a Use of Presidential Powers 1 (Comm. Print 1957) ("Executive orders are generally directed to, and govern actions by, Government officials and agencies. They usually affect private individuals only indirectly.").

"weaponization of the federal government."[30] Many have been enjoined.[31] Many consist of instructions to Federal agencies rather than private parties. No reasonable person can discern what the NCC Notice means when it states that grantees should "align" their programs with "all" of these myriad orders. The NCC Notice fails to provide any guidance as to how grantees are to reconcile potentially conflicting directives within and among Executive Orders, or what grantees are supposed to do in the event of a clash between "alignment" with Executive Orders and the statutory requirements of the TPP Program.

The NCC Notice highlights five specific Executive Orders that "may be of most relevance to the work of the TPP program," but that list only adds to the confusion. It is unclear how or why these Executive Orders apply to the TPP program.[32] The Orders themselves contain broad and

---

[30] *See, e.g.*, Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats"); Exec. Order No. 14150, 90 Fed. Reg. 8337 (Jan. 20, 2025) (entitled "America First Policy Directive to the Secretary of State"); Exec. Order No. 14149, 90 Fed. Reg. 8243 (Jan. 20, 2025) (entitled "Restoring Freedom of Speech and Ending Federal Censorship"); Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) (entitled "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative); Exec. Order No. 14178, 90 Fed. Reg. 8647 (Jan. 23, 2025) (entitled "Strengthening American Leadership in Digital Financial Technology"); Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025) (entitled "Restoring Names That Honor American Greatness); Exec. Order No. 14241, 90 Fed. Reg. 13673 (Mar. 20, 2025) (entitled "Immediate Measures to Increase American Mineral Production"); Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) (entitled "Reevaluating and Realigning United States Foreign Aid"); Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 20, 2025) (entitled "Ending the Weaponization of the Federal Government").

[31] *See, e.g.*, *Chicago Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1118659, at *1 (N.D. Ill. Apr. 15, 2025) (enjoining enforcement of EOs 14151 and 14173 insofar as they mandated termination of equity-related grant or compliance certification by grantee); *see also Litigation Tracker: Legal Challenges to Trump Administration Actions*, Just Security (May 7, 2025), https://bit.ly/3SqEN2M (collecting cases in which injunctions have been issued). The NCC Notice's failure to distinguish those Executive Orders that remain in effect from others compounds both the arbitrariness and vagueness of the Notice's alignment requirements and the difficulty of compliance.

[32] The Executive Orders are: *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (14168), *Ending Radical Indoctrination in K-12 Schooling* (14190), *Protecting Children From Chemical and Surgical Mutilation* (14187), *Ending*

25

undefined (or underdefined) terms like "gender ideology" (EO 14168), "discriminatory equity ideology" (EO 14190), and "illegal DEI" (EO 14173). The orders also contain vague and conditional directives, such as directives to take "appropriate steps," (EO 14187) or to implement the order "to the maximum extent allowed by law" (EO 14151). The specific orders are also all directed to government agencies, not private actors, making any specific application to the activities of private grantees in the TPP Program totally unclear.

Adding further to the confusion is the fact that the administration has offered varying and capacious interpretations of the requirements of these orders in other contexts. For example, public reporting reflects that the government has deemed grant-funded programming to amount to prohibited DEI for "including words like 'trauma,' barriers,' 'equity,' and 'excluded.'"[33] The variance between what the Executive Orders say and what Executive Branch officials *say* that they say makes the requirements HHS is seeking to impose even more incomprehensible. A reasonable person is left to guess what is required to "align" a program with these Executive Orders consistent with the statutory requirements of the TPP Program.

**Invitation to Arbitrary Enforcement**.  The NCC Notice is also void because it invites arbitrary and discriminatory enforcement. For all the reasons discussed above, the NCC Notice is vague about the degree to which a grantee must modify its program to satisfy the "alignment" requirement. These fundamental ambiguities permit HHS to use these new requirements to make *ad hoc* decisions based on political or ideological views, or any other myriad factors or preferences that are inconsistent with the criteria for inclusion in the TPP Program. The result is to empower

---

*Radical and Wasteful Government DEI Programs and Preferencing* (14151), and Ending *Illegal Discrimination and Restoring Merit-Based Opportunity* (14173).

[33] Carolyn Johnson, Scott Dance, and Joel Achenbach, *Here Are the Words Putting Science in the Crosshairs of Trump's Orders*, Wash. Post (Feb. 4, 2025), https://www.washingtonpost.com/science/2025/02/04/national-science-foundation-trump-executive-orders-words/.

HHS to deny applications for arbitrary and discriminatory reasons in the name of failure to "align" programs with Executive Orders. Because the "alignment" requirement is so standardless, grantees denied continuation awards in the name of failure to "align" will have no way of testing whether the denial is legitimate or pretextual.

This is a textbook case for application of the void-for-vagueness doctrine. No reasonable person could determine based on the NCC Notice what program participants are supposed to do to bring their programs into "alignment" with Executive Orders, whether that is read expansively to require alignment with the hundreds on the books, or the five specifically called out in the NCC Notice.

### b. The "Alignment" Requirement Violates the APA Because it is Contrary to Law and Arbitrary and Capricious

Defendants' unlawful "alignment" requirement violates the APA because it is contrary to law and arbitrary and capricious.

As a threshold matter, the NCC Notice is final agency action that is therefore reviewable under the APA. Indeed, as at least one court has already held, a document that sets terms and conditions for the TPP Program is a reviewable final agency action. *Planned Parenthood of New York City*, 337 F. Supp. 3d at 326. By its terms, the NCC Notice "prescribes the content, information, and requirements" for continuing awards for FY2023 cohort funding recipients, and thus finally determines the requirements they must meet to remain in the TPP Program. Ex. 2, at 3. Because the NCC Notice imposes binding requirements with which recipients must comply, or else face the end of their grant and loss of funds, it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations … from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016) (holding that an agency document

announcing program requirements is "immediately reviewable" even if it has yet to be applied "against a particular [regulated party].").

Turning to the substance, the NCC Notice is unlawful under the APA for multiple reasons: (a) it contravenes Congress's directives for the TPP program; and (b) it is devoid of any reasoned decisionmaking, much less explanation, and thus is arbitrary and capricious.

### i.    The "Alignment" Requirement Contravenes Congress's Directives for the TPP Program

The NCC Notice violates the APA because it is contrary to law. The law is clear that Congressional appropriations requirements must be followed when an agency administers a federally-funded program. *See United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016). Appropriations "represent legal authority granted by Congress to incur obligations and to make disbursements for the purposes, during the time periods, and up to the amount limitations specified in the appropriation acts." GAO, Principles of Federal Appropriations Law 2-3 (4th ed. 2016).

The "alignment" requirement in the NCC Notice defies two key aspects of Congress's longstanding directive that TPP Program funding recipients provide medically accurate and evidence-based programming. First, since the TPP Program's inception, Congress has mandated that Tier 1 funding recipients "replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671 (current appropriation) (emphasis added); *see, e.g.*, 123 Stat. at 3253 (2010 appropriation); *see also Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1113 (9th Cir. 2020). What it means to "replicate[] a program" is well established in the public health field: it requires the program administrator to "provid[e] the program the way it was conducted when it was researched and found to be effective." Ex. 5 (Kantor Decl.) ¶ 20(b). To replicate a particular

28

program with fidelity, the provider "must adher[e] *very closely* to the way the program" was conducted when it was originally tested and found to be effective. *Id.* Though adaptations of approved programs are permitted, such adaptations must "be carefully thought out." *Id.* at ¶ 28. Indeed, "[i]n the past, any adaptations that were made to evidence based teen pregnancy programs were closely overseen by the Office of Population Affairs," which issued "very specific guidelines about the types of adaptations that could be made." *Id.* HHS published a "Making Adaptations Tip Sheet," which provides that "[a]ll adaptation changes, regardless of their motives, need to be reviewed and approved *in the context of maintaining fidelity to core components*—i.e., the characteristics necessary to ensure that a replicating program produces outcomes similar to those demonstrated in the original evaluation research."[34]

Second, all TPP Program funds must be spent on "medically accurate and age appropriate programs that reduce teen pregnancy." 138 Stat. at 671. "Information is medically accurate if it is supported by the weight of scientific evidence that is conducted consistent with generally recognized scientific theory and under accepted scientific methods." Ex. 5 (Kantor Decl.) ¶ 20(e). "Such evidence also must be published in peer-reviewed scientific journals and recognized as accurate and objective by mainstream professional organizations." *Id.*

The NCC Notice contravenes each of these requirements.

---

[34] The HHS Tip Sheet, attached as Exhibit 11, provides examples of "green light," "yellow light," and "red light" adaptations. *Id.* at 5; *see also* Ex. 5 (Kantor Decl.) ¶ 31. "Green light" adaptations include "using wording, names, or settings more reflective of the youth being served" and "making activities more interactive." Tip Sheet at 5. "Yellow light" adaptations include changing session order or sequence of activities. *See id.* "Red light" activities include "shortening a program," "reducing or eliminating activities that allow youth to personalize risk or practice skills," and "contradicting, or competing with or diluting the program's goals." *Id. See also* OPA, Documenting Adaptations Tip Sheet (July 2020), attached as Exhibit 12 (applying these guidelines specifically to the TPP Program).

First, the NCC Notice violates the requirement that the programs "replicat[e] programs that have been proven effective," because it expressly requires funding recipients to make "changes" to approved evidence-based programs with no regard for whether the programs can be modified to align with the EOs while still maintaining fidelity to the program's core components, as Congress has required. Ex. 2, at 5; *Planned Parenthood of Greater Wash*., 946 F.3d at 1113 ("[T]he 2018 Tier 1 [NOA] would incorrectly permit grants for programs not proven effective, contrary to the TPPP"); *Planned Parenthood of New York City, Inc.*, 337 F. Supp. 3d at 331-37 ("Defendants have violated their statutory obligation to select model 'programs' 'proven effective through rigorous evaluation.'"); *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1067-68  (D. Or. 2018) (vacating 2018 Tier 1 Funding Announcement as "not in accordance with law" because "HHS … ignore[d] the qualifier that the programs 'must be proven effective by rigorous evaluation.'"). As set forth in the Notice, the unspecified changes required for alignment may be "substantial," and include, among other changes, "adaptations to existing curriculum, and updating policies, staffing, and training." Ex. 2, at 5. Making substantial "changes," "modifications," and "adaptations" to approved programs and curricula without a rigorous analysis of how such changes affect the program's core components, *id.*, is the opposite of "replicating" them, 138 Stat. at 671; *see Replicate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/replicate (last visited May 7, 2025) (defining "replicate" as to "duplicate" or "repeat").

Indeed, to the extent the Executive Orders highlighted in the Notice impose discernible standards at all, those standards appear to be fundamentally incompatible with the agency-approved programs Plaintiffs implement. As just one example, under the NOFO, Plaintiffs are required to adopt programs that are calibrated to "Ensure Equitable, Safe, Supportive, and Inclusive Environments." Ex. 1; Ex. 4, at 6-7. Yet Executive Order 14151 purports to require

agencies to terminate any "'equity-related' grants or contracts." 90 Fed. Reg. 8,339, 8,339 (Jan. 29, 2025), and Executive Order 14173 purports to require agencies to terminate all "'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and other like mandates, requirements, programs, or activities," 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025). In other words, any "alignment" with EO 14151 and EO 14173 appears inextricably at odds with the core nature of the approved programs at issue, under any interpretation.

Many of the specific programs Plaintiffs replicate likewise run afoul of the broad interpretations of the Executive Orders the government has advanced in other contexts. Some of Plaintiffs' projects, for example, are required to reach underserved communities with the highest unmet needs including LGBTQ+ youth, but the gender-ideology Executive Orders purportedly require funding recipients to disavow that individuals may have gender identities differing from their sex assigned at birth. *Compare, e.g.,* Ex. 6 (PPGNY Decl.) ¶ 52-53; Ex. 7 (PPGNHAIK Decl.) ¶¶ 44, 47, 49; Ex. 9 (PPH Decl.) ¶¶ 48-50, *with* Executive Order 14168 (Jan. 20, 2025) (defining prohibited "gender ideology" to "include[] the idea that there is a vast spectrum of genders that are disconnected from one's sex"); Executive Order 14190 (Jan. 29, 2025) (barring from receipt of federal funding entities that "directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology"). Requiring Plaintiffs to change their programming around these ideological requirements is incompatible with the statutory mandate that TPP Program funding recipients replicate the evidence-based programs the agency has approved.

Second, the NCC Notice violates the statutory requirement that TPP programming be "medically accurate." 138 Stat. at 671. Executive Order 14168 instructs that there are "two sexes,

male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." 90 Fed. Reg. at 8,615. Implementing guidance defines sex based on whether an individual's reproductive system has "the biological function of producing eggs (ova)" or "the biological function of producing sperm."[35] The Executive Order further asserts that it is a "false claim" to assert that "males can identify as and thus become women and vice versa." 90 Fed. Reg. at 8,615.

As a matter of medical science, a program that adopted the Executive Order's definitions could neither be "medically accurate" nor effectively "reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors" in populations with highest risk. 138 Stat. at 671. For one, the Executive Order's sex definitions deny the existence of intersex persons altogether. *See* Ex. 5 (Kantor Decl.) ¶ 44 ("[A] large scientific literature on the biological basis of sex concludes that there is significant variation within the category of biological sex."). And notwithstanding this omission, individuals can and do identify with gender identities that differ from their sex assigned at birth. *See* Ex. 5 (Kantor Decl.) ¶ 45. "Youth who identify as transgender are a particularly vulnerable group in the United States," with heightened sexual risk compared with their cisgender peers. *Id.* ¶ 47. Plaintiffs cannot provide "medically accurate" programming, much less replicate the equitable and inclusive programs mandated in the 2023 NOFO, while denying the existence of transgender and gender-nonconforming youth and excluding them from programming. The requirement that funding recipients "align" their

---

[35] *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Dep't of Health and Hum. Servs. (Feb. 19, 2025), http://bit.ly/44eLQmz.

programming with views contrary to medical science contravenes the Congress's express command.

### ii. The "Alignment" Requirement Violates The APA Because it is Arbitrary and Capricious

The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, a reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

The new "alignment" requirement is arbitrary and capricious agency action for several reasons:  (1) it is neither reasonable nor reasonably explained; (2) it constitutes an unexplained change-in-position that significantly upsets existing reliance interests; and (3) it is so vague that it fails to provide parties with fair notice of what it requires. Each of these grounds would independently require setting the NCC Notice aside. Together they show overwhelmingly that the new "alignment" requirement is unlawful.

**Neither Reasonable Nor Reasonably Explained.**  The "alignment" requirement is neither reasonable nor reasonably explained. Agency action must be "reasonable and reasonably explained" to survive arbitrary and capricious review. *Cytori Therapeutics, Inc. v. Food & Drug Admin.*, 715 F.3d 922, 926 (D.C. Cir. 2013) (Kavanaugh, J.). Here, Defendants have failed to "identif[y] and explain[] the reasoned basis" for the sudden introduction of the new "alignment" requirement. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). The NCC Notice offered no explanation or justification whatsoever for the imposition of a vague and sweeping condition for continuation of funding. And even if Defendants could articulate some goal that they believed the "alignment" requirement served, they have not—and cannot—explain why a vague and sweeping order to "align" with "all Presidential Executive Orders" was necessary to achieve it. Nor have they explained why they did not implement a more straightforward or targeted approach, such as the imposition of specific, concrete requirements. *See Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses.").

Moreover, there is no evidence that HHS spent any time at all considering the real-world implications of the alignment requirement. For example, it did not consider whether grantees could practicably align any existing programs with the cited Executive Orders without sacrificing core, evidence-based elements required by statute. And there is no indication that HHS considered how "alignment" with the EOs would change recipients' TPP projects in a manner that would negatively impact the very communities that the TPP Program is designed to serve—which includes underserved youth populations that are disproportionately affected by unintended teen pregnancies (including rapid repeat pregnancy) and STIs. There is also no evidence that HHS considered how requiring alignment might create potential conflicts with state laws that require

34

sex education to be, *inter alia*, medically accurate, comprehensive, and/or inclusive.[36] Nor is there evidence that HHS considered the administrative and financial burdens imposed by retrofitting curricula, staff training, data systems, and evaluation metrics to track "alignment."

Accordingly, Defendants have "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. There is no evidence that Defendants spent even a moment contemplating the decision to impose this requirement. Defendants cannot demonstrate that it was a reasonable action and have not attempted to reasonably explain why it was taken. This is the definition of arbitrary and capricious action.

**Unexplained Change in Position.**  Compounding the arbitrary and capricious violation here is that the alignment requirement constitutes an unexplained and unreasonable change in longstanding agency position, and Defendants failed to account for the substantial reliance interests their actions have eviscerated. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation and quotation marks omitted). Yet Defendants did not consider the effect the new requirement would have on grantees

---

[36] For example, Hawai'i requires that "[s]exuality health education programs funded by the State . . . provide *medically accurate* and factual information that is age appropriate and includes education on abstinence, contraception, and methods of disease prevention to prevent unintended pregnancy and sexually transmitted disease, including human immunodeficiency virus." Hawai'i Revised Statutes (HRS) § 321-11.1 (emphasis added). Similarly, California requires that "[e]ach school district . . . ensure that all pupils in grades 7 to 12, inclusive, receive *comprehensive* sexual health education and HIV prevention education." Cal. Educ. Code § 51934. This "comprehensive sexual health education and HIV prevention education"  must be "age appropriate," "medically accurate and objective," and "appropriate for use with pupils of all races, genders, sexual orientations, and ethnic and cultural backgrounds, pupils with disabilities, and English learners." *Id.* 51933. Iowa requires that "each school board . . . provide age-appropriate and research-based instruction in human growth and development." Iowa Code § 279.5. Research-based is defined as "medically accurate and objective," and "free of racial, ethnic, sexual orientation, and gender biases." *Id.*

and their employees, community partners, and communities—all of whom have relied on the TPP Program's longstanding adherence to evidence-based programs and prior grant requirements. Defendants have failed to "display [any] awareness that [they are] changing position[s]," much less articulated "good reasons" for the shift. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted); *Fox Television Stations, Inc.*, 556 U.S. at 515-16 (when an agency departs from a prior policy, it ordinarily must "display awareness that it *is* changing position" and offer "a reasoned explanation" for doing so, particularly where regulated parties have relied on the old rule).

For over a decade, since its creation in 2009, HHS has operated the TPP Program by requiring Tier 1 grantees to carry out the statutory mandate to "replicat[e]" "medically accurate" evidence based programs. There has been no additional requirement that grantees "align" their programs with Executive Orders. Nor has there been any requirement to "align" programs with some of the topics addressed in the Executive Orders mentioned in the NCC Notice. Defendants' eleventh-hour imposition of this vague new requirement, which allowed just two weeks for grantees to research and modify programs to "align" with over 137 Executive Orders, posed significant implementation challenges to grantees. This plainly triggered the change-of-position doctrine, requiring the agency to display awareness it was changing its position and provide a reasoned explanation for the shift. *See FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 916-17 (2025). Here, HHS provided no explanation at all for its change in position. Nor did HHS even display an awareness that it was upsetting significant reliance interests by imposing the new "alignment" requirement. This is an open-and-shut case of a change-in-position violation.

**Lack of Fair Notice.**  The NCC Notice is arbitrary and capricious for yet another reason, which is that it is so vague that it fails to provide regulated parties fair notice. Any agency

requirement that is unconstitutionally vague is *per se* arbitrary and capricious. An agency must promulgate standards that "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" or required; otherwise the rule is impermissibly vague under the APA's notice and arbitrariness constraints. *See Grayned*, 408 U.S. at 108; *see also Fox Television Stations*, Inc., 567 U.S. 239, 253-56 (2012) (standard must "provide a person of ordinary intelligence fair notice of what is prohibited"). For all the reasons that the alignment requirement is unconstitutionally vague, it is also arbitrary and capricious.

### 3.  The "Alignment" Requirement is *Ultra Vires*

"It is central to the real meaning of the rule of law and not particularly controversial" that executive branch actors have no power to act unless authorized to do so by Congress or the Constitution. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) (quotation marks omitted), *abrogated on other grounds*, 864 F.3d 591 (D.C. Cir. 2017). This principle is such a "cardinal principle" of American law, *Cath. Health Initiatives v. Sebelius*, 617 F.3d 490, 497 (D.C. Cir. 2010) (Brown, J., concurring), that no express statutory cause of action is necessary to sue to enjoin *ultra vires* executive action. Courts "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

Here, Defendants have imposed requirements that directly conflict with the relevant appropriations statutes. The TPP Program, as provided in the relevant appropriations statutes, allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific allocation for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or

other associated risk factors." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024). The NCC Notice's requirement for grantees to align their programs with specific Executive Orders imposes additional obligations not contemplated by the statutory framework established by Congress for the TPP Program. Moreover, Defendants' actions are patently outside of their statutory authority because the NCC Notice is incompatible with Congress's mandate for the TPP Program and contradicts the text, structure, and purpose of the TPP Program that 75% of remaining appropriated funds go to replicating rigorously evaluated programs. By conditioning appropriated funds on the fulfillment of criteria irreconcilable with those Congress prescribed, Defendants have acted beyond their authority, violated the separation of powers and encroached upon Congress's spending power, and thereby acted *ultra vires*.

**B. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**

To demonstrate irreparable harm, the moving party must satisfy two requirements. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). This standard is clearly met here.

Absent removal of the unlawful barriers imposed by the Notice, Plaintiffs will lose access to all of their TPP funds and their projects will be forced to shut down when the present budget year concludes on June 30, 2025. As detailed *supra* in Part A, Plaintiffs are unable to satisfy the new requirements; they cannot certify that they will "align" their Tier 1 projects with the over 100

newly-issued Executive Orders, both because that directive is impossibly vague and because it contravenes other core facets of the program at issue. Plaintiffs thus had no choice but to make this position explicit in their continuation applications, Ex. 6 (PPGNY Decl.) ¶ 59; Ex. 7 (PPGNHAIK Decl.) ¶ 54; Ex. 8 (PPCCC Decl.) ¶ 42; Ex. 9 (PPH Decl.) ¶ 60, or else not submit an application at all, Ex. 10 (PPMM Decl.) ¶ 56. If Plaintiffs' continuation applications are denied, there will be no time to challenge the denial before program funds expire on June 30. Thus, if the Notice's unlawful new requirements are not enjoined, Plaintiffs could face abrupt termination of all funding for Plaintiffs' five-year projects, forcing them to shutter those projects, irreversibly harming their businesses and the communities they serve.

The harm from this loss of funds would be tremendous and irreparable, since Plaintiffs' TPP programs are fully funded by the appropriations at issue. "Obviously, when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025). While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Id*. at *10 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

If Plaintiffs are foreclosed from obtaining their TPP funds, they will have no choice but to shut down their projects altogether midstream, and they will have to lay off most or all of the staff that administer their TPP programs. Ex. 6 (PPGNY Decl.) ¶¶ 63, 68; Ex. 7 (PPGNHAIK Decl.) ¶¶ 59-62; Ex. 8 (PPCCC Decl.) ¶¶ 49-51; Ex. 9 (PPH Decl.) ¶¶ 66, 71; Ex. 10 (PPMM Decl.) ¶¶ 58-

59. *See Express One Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992) (finding irreparable injury where the monetary loss would cause significant capital costs and employee lay-offs); *McGregor Printing Corp. v. Kemp*, No. 91-3255, 1992 WL 118794, at *5 (D.D.C. May 14, 1992) (finding that "the irretrievable monetary loss to [plaintiff] in combination with the loss in employment to [plaintiff's] employees" amounted to irreparable harm); *cf. Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (monetary loss that "threatens the very existence of the movant's business" constitutes irreparable harm). The end of these TPP programs will effectively shut down some Plaintiffs' education departments altogether, or else eliminate a huge bulk of their education programming, and it will also end all evidence-based sex education programming in many of the regions served. *See* Ex. 6 (PPGNY Decl.) ¶¶ 67-69; Ex. 7 (PPGNHAIK Decl.) ¶ 62; Ex. 9 (PPH Decl.) ¶¶ 67-71. For Plaintiffs who are able to maintain other parts of their education departments, the loss of TPP funding will nonetheless still impact their other education work as well; because TPP projects are central to some Plaintiffs' education work, TPP funds are a significant part of how the staff within those departments are funded, and Plaintiffs will still have no choice but to lay off staff members within those departments absent the continuation of TPP funding. *See* Ex. 8 (PPCCC Decl.) ¶¶ 50, 52; Ex. 10 (PPMM Decl.) ¶ 58. In addition, losing TPP funds will force Plaintiffs to terminate ongoing contracts prematurely, leaving them to pay penalties and still remain liable for covering costs of partial deliveries. *See* Ex. 6 (PPGNY Decl.) ¶ 66; Ex. 7 (PPGNHAIK Decl.) ¶¶ 68-69; Ex. 9 (PPH Decl.) ¶ 71; Ex. 10 (PPMM Decl.) ¶ 58.

The loss of TPP programs, along with other capacity reductions that will flow to Plaintiffs' education departments, will impede Plaintiffs' ability to sustain and deliver high-quality sexual

and reproductive health education for youth, to serve as a reliable resource for the community, to connect young people and families to essential care services, and provide critical support to schools, community-based organizations, and residential sites that rely on these services. *See* Ex. 6 (PPGNY Decl.) ¶ 64; Ex. 7 (PPGNHAIK Decl.) ¶ 62; Ex. 8 (PPCCC Decl.) ¶ 50; Ex. 9 (PPH Decl.) ¶¶ 67-68; Ex. 10 (PPMM Decl.) ¶¶ 58-60. This loss will acutely impact youth who rely on Plaintiffs' programs, many of whom are already part of underserved communities. *See* Ex. 6 (PPGNY Decl.) ¶ 65; Ex. 7 (PPGNHAIK Decl.) ¶ 66; Ex. 8 (PPCCC Decl.) ¶¶ 52, 54; Ex. 9 (PPH Decl.) ¶¶ 68-69; Ex. 10 (PPMM Decl.) ¶ 61. The loss of these resources will only contribute to the historic exclusion and neglect that indisputably have contributed to the disproportionate rates of unintended teen pregnancy and STI rates within these groups.

The "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission," *League of Women Voters*, 838 F.3d at 9, which includes providing evidence-based programming that is effective within the communities they serve and fostering relationships in those communities. *See* Ex. 6 (PPGNY Decl.) ¶ 8; Ex. 7 (PPGNHAIK Decl.) ¶ 6; Ex. 8 (PPCCC Decl.) ¶ 8; Ex. 9 (PPH Decl.) ¶¶ 4, 6; Ex. 10 (PPMM Decl.) ¶¶ 4-6. The abrupt shuttering of programs that youth and their families have come to rely upon will undermine the trust that Plaintiffs have built, and this inability to meet ongoing commitments, *see* Ex. 6 (PPGNY Decl.) ¶ 67; Ex. 7 (PPGNHAIK Decl.) ¶¶ 63-64; Ex. 8 (PPCCC Decl.) ¶ 55; Ex. 9 (PPH Decl.) ¶ 71; Ex. 10 (PPMM Decl.) ¶ 60, will erode Plaintiffs' "goodwill, reputation, and relationships with employees, partners, subcontractors," *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. 25-cv-400, 2025 WL 485324, at *3 n.2 (D.D.C. Feb. 13, 2025); *see also*

*Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was

apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air,*

*Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) (holding that reputational

injury can "rise to the level necessary to support the issuance of an injunction"); *Xiaomi Corp. v.*

*Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

Finally, absent immediate relief, the funding that Plaintiffs rely upon may become

unrecoverable. The new budget period begins on July 1, 2025, at which time HHS may allocate

the appropriated funds to other recipients if they—incorrectly and unlawfully—deem Plaintiffs

ineligible. "[I]n cases involving government expenditures, 'once the relevant funds have been

obligated, a court cannot reach them in order to award relief.'" *Climate United Fund,* 2025 WL

1131412, at *17 (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426-27

(D.C. Cir. 1994)); *cf. id.* ("Any transfer, re-allocation, or re-obligation of these funds would be an

irreparable loss—one that threatens the very existence of Plaintiffs' businesses."); *see also, e.g.,*

*Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to

the States and obligated, they cannot be recouped. It will be impossible in the absence of a

preliminary injunction to award the plaintiffs the relief they request if they should eventually

prevail on the merits."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986)

(noting that "if the government in the instant case is permitted to *distribute* the $10 million to other

organizations, the appeal will become moot").

## C.  The Balance of Equities and Public Interest Weigh Heavily In Plaintiffs' Favor

"When the movant seeks to enjoin the government, the final two TRO factors—balancing

the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020)

(citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation marks and citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … — that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). That is especially true where, as here, constitutional rights are at stake. The Constitution "is the ultimate expression of the public interest," so "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (cleaned up); s*ee also, e.g., Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks and citation omitted)). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity and the public interest require relief.

Granting preliminary relief is also in the public interest because it will preserve a vital resource—critical teen pregnancy prevention programs—for communities most in need. Tens of thousands of people, and particularly youth from historically underserved communities, rely upon TPP programs to deliver medically accurate, current, and high-quality sexual and reproductive health education. *See supra* at pp. 12-13. Without these programs, youth and their families will lose access to those effective resources, which will only contribute to the dearth of sexual education

information available to young people within those communities. Evidence shows that pregnancy prevention programs reduce sexual activity, reduce STIs, increase use of contraceptives, including condom use, and reduce teen pregnancy. *See* Ex. 8 (PPCC Decl.) ¶ 11; *see also* Ex. 5 (Kantor Decl.) ¶¶ 17, 39, 42. This loss will have long-term effects, since lowering the rate of unintended pregnancies ultimately improves health outcomes, such as decreased risk of maternal mortality and adverse child health outcomes. Plaintiffs' projects have made tremendous strides to address these issues over the past two years, and have invested significant resources to build and expand their programs with great success, all of which progress will be lost if they are stopped in their tracks. Ex. 6 (PPGNY Decl.) ¶¶ 68-69; Ex. 7 (PPGNHAIK Decl.) ¶¶ 58-62; Ex. 8 (PPCCC Decl.) ¶ 55; Ex. 9 (PPH Decl.) ¶¶ 66-71; Ex. 10 (PPMM Decl.) ¶¶ 58-60.

On the other side of the ledger, the burden of an injunction on HHS would be minimal. The TPP program has been administered using the same criteria for over a decade, and HHS would suffer no harm from merely continuing to administer funding consistent with that criteria. There is also a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (internal quotation marks omitted); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (when an agency failed to adhere to a statute's standards, the "public interest balance plainly would weigh in favor of an injunction"); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014) (recognizing an independent and compelling public interest in ensuring the Secretary of HHS complies with the applicable statute). In the context of the APA, "[t]he public

interest is served when administrative agencies comply with their obligations." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). An injunction would require nothing more.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion, preliminarily enjoin the NCC Notice and any actions to implement its requirements, and permit Tier 1 funding recipients to submit new or amended applications, as set forth in the contemporaneously filed proposed order.

Plaintiffs respectfully request that the Court rule on their motion by no later than June 15, 2025, so that applicants can submit applications and have them resolved before the new funding cycle begins on July 1, 2025.

Dated: May 12, 2025

Respectfully submitted,

By:     /s/ Andrew Tutt
Drew A. Harker (DC Bar # 412527)
Andrew T. Tutt (DC Bar # 1026916)
Daniel Yablon (DC Bar # 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
draw.harker@arnoldporter.com
andrew.tutt@arnoldporter.com
daniel.yablon@arnoldporter.com

Emily Nestler (DC Bar # 973886)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1100 Vermont Avenue NW
Washington, DC 20005
(202) 973-4800
emily.nestler@ppfa.org

Valentina De Fex**
Kyla Eastling **
PLANNED PARENTHOOD FEDERATION OF
AMERICA
123 William Street, Floor 9
New York, NY 10038
valentina.defex@ppfa.org
kyla.eastling@ppfa.org

*Attorneys for Plaintiffs*

** *pro hac vice forthcoming*