**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PLANNED PARENTHOOD OF GREATER
NEW YORK, *et al.*,

        *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

        *Defendants*.

Case No. 1:25-cv-01334-TJK

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.    The TPP Program Appropriation ................................................................. 2

II.    HHS Guidance for 2025 Continuation Award Applications ....................... 4

III.    Plaintiffs' Funding Applications ................................................................. 5

IV.    This Litigation ............................................................................................. 6

STANDARD OF REVIEW ................................................................................................ 7

ARGUMENT ...................................................................................................................... 7

I.    Plaintiffs Cannot Demonstrate Irreparable Harm. ...................................... 7

II.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims. ............ 11

    A.    Plaintiffs Are Unlikely to Prevail on Their Fifth Amendment Claim. ................. 11

        1.    Plaintiffs Lack a Constitutionally Protected Interest Required for Due Process Protections to Attach. ........................................................... 11

        2.    Plaintiffs Fail to Identify Any Constitutional Deficiency. ....................... 16

    B.    Plaintiffs Are Unlikely to Prevail on Their APA Claims. ..................... 17

        1.    Plaintiffs' Claims Are Not Justiciable Under the APA. ......................... 17

            a.    The Issuance of the March 2025 Guidance Was Not Final Agency Action. ......................................................................... 17

            b.    The March 2025 Guidance Is Not Reviewable Because It Reflects Grant-Making Policy Preferences Committed to Agency Discretion by Law. ......................................................... 20

        2.    Plaintiffs' APA Claims Fail on the Merits. ............................................ 23

    C.    Plaintiffs Are Unlikely to Prevail on their Ultra Vires Claim. .............. 24

III.    The Balance of Equities and Public Interest Weigh Against Relief. ......... 25

IV.    Any Injunctive Relief Should Be Narrowly Tailored. .............................. 26

V.    A Bond Should Accompany Any Injunctive Relief. ......................................................... 27

CONCLUSION ........................................................................................................................ 27

# TABLES OF AUTHORITIES

## Cases

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*,
846 F.3d 391 (D.C. Cir. 2017) ................................................................................. 16

*Alcresta Therapeutics, Inc. v. Azar*,
755 F. App'x 1 (D.C. Cir. 2018) ................................................................................. 9

*Ambach v. Bell*,
686 F.2d 974 (D.C. Cir. 1982) ................................................................................. 10

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ................................................................................................. 24

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ............................................................................................... 13

*Bennett v. Spear*,
520 U.S. 154 (1997) ......................................................................................... 17, 20

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ............................................................................................... 20

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................... 26

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ......................................................................... 7, 8, 10

*Citizens Alert Regarding Env't v. EPA*,
102 F. App'x 167 (D.C. Cir. 2004) ............................................................................ 18

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ..................................................................................... 7

*Climate United Fund v. Citibank, N.A.*,
No. 25-cv-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ......................................... 10

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971) ............................................................................................... 17

*Cobell v. Norton*,
391 F. 3d 251 (D.C. Cir. 2004) ................................................................................... 7

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .................................................................................. 11, 15

*Gizzo v. Ben-Habib*,
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) ........................................................ 13, 15

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ........................................................................................ 13

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .................................................................................. 12, 16

*Griffith v. Fed. Labor Rels. Auth.*,
    842 F.2d 487 (D.C. Cir. 1988) ........................................................................ 24

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................................ 20

*Hosp. for Special Surgery v. Becerra*,
    Civ. A. No. 22-2928 (JDB), 2023 WL 5448017 (D.D.C. Aug. 24, 2023) ............... 21

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013) ................................................................... 7

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) .................................................................. 12, 14

*Karst Env't Educ. & Prot., Inc. v. EPA*,
    403 F. Supp. 2d 74 (D.D.C. 2005), *aff'd* 475 F.3d 1291 (D.C. Cir. 2007) .............. 18

*Lepre v. Dep't of Labor*,
    275 F.3d 59 (D.C. Cir. 2001) .......................................................................... 25

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................................................ 26

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................................. 20, 21

*Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*,
    729 F.3d 1025 (9th Cir. 2013) ........................................................................ 20

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) .................................................................. 20, 21

iv

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ............................................................................................... 17

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ........................................................................... 17, 20

*Nat'l Treasury Emps. Union v. Trump,*
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ............................... 26-27

*Nat'l Urban League v. Trump,*
    --- F. Supp. 3d ----, 2025 WL 1275613 (D.D.C. May 2, 2025) ................... 12, 15, 16

*NB ex rel. Peacock v. District of Columbia,*
    794 F.3d 31 (D.C. Cir. 2015) .............................................................................. 12, 14

*New Vision Photography Program, Inc. v. District of Columbia,*
    54 F. Supp. 3d 12 (D.D.C. 2014) .................................................................. 12, 13, 15

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................. 7, 25

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ............................................................................ 24, 25

*Ohio v. Becerra,*
    87 F.4th 759 (6th Cir. 2023) ..................................................................................... 11

*Ohio v. Becerra,*
    No. 21-4235, 2022 WL 413680 (6th Cir. Feb. 8, 2022) ............................................ 11

*Perry v. Sindermann,*
    408 U.S. 593 (1972) .................................................................................................. 13

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health and Human Services,*
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) ...................................................................... 19

*Pol'y & Rsch., LLC v. HHS,*
    313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................................ 22

*Rattlesnake Coal. v. EPA,*
    509 F.3d 1095 (9th Cir. 2007) .................................................................................. 18

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.,*
    421 F.3d 1 (1st Cir. 2005) ................................................................................... 13, 15

v

*S & D Maintenance Co. v. Goldin*,
  844 F.2d 962 (2d Cir. 1988) .................................................................... 13, 14

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................. 10

*Schroer v. Billington*,
  525 F. Supp. 2d 58 (D.D.C. 2007) ........................................................ 24

*Sea Containers Ltd. v. Stena AB*,
  890 F.2d 1205 (D.C. Cir. 1989) .............................................................. 8

*Serrato v. Clark*,
  486 F.3d 560 (9th Cir. 2007) ................................................................ 21

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ................................................................................ 11

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977) .............................................................. 14

*State ex. rel. Becerra v. Sessions*,
  284 F. Supp. 3d 1015 (N.D. Cal. 2018) ................................................ 19

*Timpinaro v. SEC*,
  2 F.3d 453 (D.C. Cir. 1993) .................................................................. 15

*Town of Castle Rock v. Gonzalez*,
  545 U.S. 748 (2005) ................................................................................ 13

*Trump v. Wilcox*,
  --- S. Ct. ---, 2025 WL 1464804 (May 22, 2025) ................................ 25

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016) ................................................................................ 19

*U.S. Telecom Assoc. v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016) .......................................................... 14, 15

*Univ. of Cal. Student Ass'n v. Carter*,
  --- F. Supp. 3d ---, 2025 WL 542586 (D.D.C. Feb. 17, 2025) ............ 10

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ................................................................................ 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................ 7, 25

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 7, 9

**Statutes**

5 U.S.C. § 551 ..................................................................................................... 17

5 U.S.C. § 701 ..................................................................................................... 20

5 U.S.C. § 704 ..................................................................................................... 17

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................................. 2, 3, 22

**Rules**

Fed. R. Civ. P. 65 ............................................................................................... 26

**Regulations**

45 C.F.R. pt. 75 .................................................................................................. 22

Executive Order 14151 ......................................................................................... 4

Executive Order 14168 ......................................................................................... 4

Executive Order 14173 ......................................................................................... 4

Executive Order 14187 ......................................................................................... 4

Executive Order 14190 ......................................................................................... 4

# INTRODUCTION

Plaintiffs, all applicants for continued government funding, have run to Court seeking an injunction over a guidance document that asks them to provide additional information in their grant applications. The Court should not entertain Plaintiffs' motion, as they have not satisfied the demanding standards for preliminary injunctive relief.

To start, Plaintiffs cannot establish irreparable harm. The U.S. Department of Health and Human Services (HHS), which administers the Teen Pregnancy Prevention Program ("TPP Program"), is currently evaluating continuation funding applications for the upcoming year and will issue funding decisions on or around June 30. For the Plaintiffs who applied for continuation funding, their alleged irreparable harm—*i.e.*, that they will be denied funding—is pure speculation that cannot support an injunction. Even more, because of the non-competitive nature of TPP Program grants, HHS commits to hold the maximum amount of continuation funding available to Plaintiffs beyond the end of the current funding period, until August 31, without disbursing or obligating those funds. Thus, to the extent Plaintiffs could articulate a viable claim after HHS makes a funding decision, there is ample time for Plaintiffs to seek redress, meaning that injunctive relief *now* is foreclosed.

Plaintiffs' motion should be denied for other reasons, too. Their Due Process Clause claim fails at the outset, because the void-for-vagueness doctrine does not apply when the government acts as benefactor, and because Plaintiffs lack a constitutionally protected property interest in continued funding. Plaintiffs' constitutional claim also fails on the merits, as the March 2025 guidance they challenge merely asks Plaintiffs to explain how they intend to comply with preexisting obligations.

Plaintiffs are also unlikely to prevail on their Administrative Procedure Act (APA) claims.

At the threshold, Plaintiffs do not challenge any final agency action, and HHS's decision to issue guidance for applications under the TPP Program is purely discretionary and thus unreviewable. And on the merits, Plaintiffs cannot demonstrate that the challenged guidance document is contrary to law or arbitrary and capricious.

Plaintiffs' ultra vires claim also cannot justify a preliminary injunction. Instructions to applicants for continued funding are not the stuff of ultra vires review, and Plaintiffs can point to no clear and unambiguous (or indeed any) statutory violation that would give rise to a plausible ultra vires claim.

And, finally, as to the balance of the equities, the broad injunctive relief that Plaintiffs seek would upend HHS's consideration of TPP Program applications for the coming year, and Plaintiffs will not suffer any harm in the absence of injunctive relief. So that factor weighs against granting an injunction as well.

## BACKGROUND

### I.    The TPP Program Appropriation

Since 2010, Congress has appropriated money to HHS annually for "grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4876 (2022). There are two funding categories, referred to as Tier 1 and Tier 2. After program support expenses, three-quarters of the appropriation goes to Tier 1 projects for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavior[] risk factors underlying teenage pregnancy, or other associated risk factors." *Id.* Remaining funds go to Tier 2 projects for "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage

pregnancy." *Id.* Only Tier 1 projects are at issue in this case.

HHS solicited applications for TPP Program grant funds in April 2023 through a Notice of Funding Opportunity (NOFO). *See* Pls.' Ex. 1, ECF No. 8-2. Applicants could request funding from $350,000 to $2 million per year for a period of up to five years. *Id.* at 4. Applications for TPP Program funds go through a formalized agency review process laid out in the NOFO before final decisions are made and funds are obligated. After initial selection for funding, for each year of the approved period of performance, grant recipients are required to submit a noncompeting application for funds. *Id.* at 16. That application requires grantees to submit a "progress report for the current budget year, [a] work plan, [and] budget and budget justification for the upcoming year." *Id.* at 16-17, 56. HHS awards continuation funding based on "availability of funds, satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." *Id.* at 56.

As part of the registration process to receive funding, the NOFO required applicants to certify that they will comply "with all applicable requirements of all other federal laws, executive orders, regulations, and public policies governing financial assistance awards[.]" *Id.* at 61–62. The Notice of Award provided to Tier 1 funding recipients, under its "Standard Terms," further states that "[t]he recipient must comply with all terms, conditions, and requirements outlined in this Notice of Award, including[] . . . [a]ll requirements imposed by program statutes and regulations, Executive Orders, and HHS grant administration regulations, as applicable. . . ." *See* Notice of Award at 5–6 (attached as Ex. A).[1]

---

[1] Defendants' Exhibit A is the redacted Notice of Award for Plaintiff Planned Parenthood California Central Coast. The Notices of Award for the other four Plaintiffs contain the same terms and requirements.

**II.     HHS Guidance for 2025 Continuation Award Applications**

In January 2025, HHS issued guidance for funding recipients to apply for continuation awards in the third year of funding, to cover July 1, 2025 through June 30, 2026. Pls.' Ex. 4, ECF No. 8-5. The January 2025 guidance set an application deadline of April 15, 2025. *Id.* at 2, 15. Among other requirements, the January 2025 guidance instructed applicants to provide a project narrative for work to be performed in the upcoming year, including a brief summary of any proposed changes to the project work plan from the previous budget year, and a work plan to address expectations set forth in the NOFO. *Id.* at 5.

HHS provided updated guidance to applicants on March 31, 2025 ("March 2025 guidance"). Pls.' Ex. 2, ECF No. 8-3. The March 2025 guidance largely mirrors the guidance HHS provided in January 2025. The March 2025 guidance, however, added additional instructions that recipients of funding are "expected to review and be aware of current Presidential Executive Orders," and the March 2025 guidance stated that recipients should "revise their projects, as necessary, to demonstrate that the [non-competing continuation] award application is aligned with current Executive Orders." *Id.* at 4. The March 2025 guidance states that "[r]ecipients should review and be aware of all current Presidential Executive Orders; however, the following may be of most relevance to the work of the TPP program":

- Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*;

- Executive Order 14190, *Ending Radical Indoctrination in K-12 Schooling*;

- Executive Order 14187, P*rotecting Children From Chemical and Surgical Mutilation*;

- Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*;

- Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*.

4

*Id.* at 4–5. The March 2025 guidance further instructed applicants to include in the project narrative accompanying their applications a "[d]escription of changes made to align with Executive Orders, if applicable," including "the steps taken to review the project and identify the modifications proposed." *Id.* at 5. It provided examples of changes that recipients may make to align their projects, such as "selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc." *Id.* It also instructed applicants to provide a brief summary of any proposed substantial changes to the project work plan from the previous budget; to provide a work plan that "address[es] the expectations outlined in the original NOFO, to the extent aligned with Presidential Executive Orders;" and to "submit program materials to [the Office of Population Affairs] for review" by uploading them as an appendix through the online portal for grant applications. *Id.* at 5, 15.

Of the 55 grantees who received funding from the 2024 appropriation, 54 submitted an an application for continuation funding by the April 15, 2025 deadline. *See* Declaration of Amy Margolis ("Margolis Decl.") ¶ 5 (attached as Ex. B).

### III.    Plaintiffs' Funding Applications

Plaintiffs are five not-for-profit organizations that received Tier 1 finding awards for a period of up to five years pursuant to the NOFO. *See* Compl. ¶ 50, ECF No. 1. They are Planned Parenthood of Greater New York (PPGNY); Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana and Kentucky (PPGNHAIK), Planned Parenthood of the Heartland, Inc. (PPH); Planned Parenthood California Central Coast (PPCCC); and Planned Parenthood Mar Monte (PPMM). All five Plaintiffs received continuation awards for 2024. *Id.*

For 2025, four of the five Plaintiffs—PPGNY, PPGNHAIK, PPCCC, and PPH—submitted applications for continued funding. *Id.* ¶ 111. As Plaintiffs explain, "some Plaintiffs submitted

applications stating that no meaningful changes had been made to the programs to 'align' with the Executive Orders," while "[o]thers noted the lack of clarity about the requirement to 'align' with Executive Orders, but explained their attempts to make some changes" in response to the March 2025 guidance. *Id.* PPMM did not apply for continued funding. *Id.*

## IV.    This Litigation

Plaintiffs filed their complaint in this action on May 1, 2025. ECF No. 1. The complaint contains four claims. In Count I, Plaintiffs allege, through the APA, that the NCC Notice violates Plaintiffs' purported rights under the Due Process Clause. *Id.* ¶¶ 153–66. In Counts II and III, Plaintiffs allege that, in issuing the March 2025 guidance, HHS acted arbitrarily and capriciously, and in violation of the law, and therefore violated the APA. *Id.* ¶¶ 167–93. And in Count IV, Plaintiffs claim that HHS's issuance of the March 2025 guidance was ultra vires. *Id.* ¶¶ 194–200.

Plaintiffs moved for a preliminary injunction on May 12. Mot. for Prelim. Inj., ECF No. 8. Plaintiffs ask the Court to enjoin HHS from (1) requiring any Tier 1 funding recipients to modify their programs to align with Executive Order, (2) requiring any Tier 1 funding recipients to demonstrate or certify alignment with Executive Orders; (3) requiring any Tier 1 funding recipients to submit program materials demonstrating alignment with Executive Orders or to memorialize changes to the programs they implement to align with Executive Orders; or (4) denying any Tier 1 non-competing continuation award application on the ground that the application fails to align with, to document changes to evidence-based programs to align with, or to certify alignment with Executive Orders. Proposed Order at 1–2, ECF No. 8-14. Plaintiffs also seek an injunction requiring HHS to "reopen the period for Tier 1 non-competing continuation award applications to permit applicants to submit applications without regard to" the March 2025 guidance, "regardless

whether such applicants have already submitted a non-competing continuation award application[.]" *Id.* at 2.

## STANDARD OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of . . . a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion[,]" *Cobell v. Norton*, 391 F. 3d 251, 258 (D.C. Cir. 2004) (citation omitted).

A party moving for a preliminary injunction must demonstrate all of the following factors: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Jack's Canoes*, 933 F. Supp. 2d at 75–76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). Where, as here, the government is opposing a motion for emergency injunctive relief, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Cannot Demonstrate Irreparable Harm.

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). It also must be of such "*imminence* that there is a clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co.*, 758 F.2d at 674). A

motion for preliminary injunction can be denied solely on the basis that the plaintiffs have failed to demonstrate irreparable injury. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))). Plaintiffs have failed to meet this standard.

Plaintiffs' alleged irreparable harm is the economic injury the five organizations will purportedly suffer if continuation funding is denied based on the March 2025 guidance. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 38–42, ECF No. 8-1 ("Mot."). Yet, it is entirely premature and speculative to assume—as is required to accept Plaintiffs' irreparable harm arguments—that continuation funding will be denied. The Court need only look at Plaintiffs' own language in their brief to conclude their alleged injury is neither certain nor imminent. Plaintiffs state that, "*[i]f* Plaintiffs' continuation applications are denied . . . . Plaintiffs *could* face abrupt termination of all funding[.]" Mot. at 39 (emphasis added). They go on to say that "[t]he harm from this loss of funds *would be* tremendous and irreparable," and that, "*[i]f* Plaintiffs are foreclosed from obtaining their TPP funds," their projects will suffer. *Id*. at 40 (emphasis added). These sorts of hypotheticals cannot justify a preliminary injunction.

In short order, HHS will make a funding decision on Plaintiffs' applications, and—except for PPMM, which chose not to apply for continuation funding—it is pure speculation to assume that their requests for continued funding will be denied. The March 2025 guidance "prescribes the content, information, and requirements" for applications, ECF No. 8-2 at 3, but nothing in that document precludes HHS from awarding continuation funding to any of the Plaintiffs who applied. It is therefore a purely theoretical possibility that the organizations that applied will not receive

funding—hardly the type of "certain and great" harm that is required for a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

And, as for PPMM, its alleged harm is not the result of the March 2025 guidance but rather its own decision not to apply for funding. *See Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 6 (D.C. Cir. 2018) ("Of course it is not enough for Appellants to demonstrate irreparable harm of any sort. The alleged harm must 'directly result from the action which the movant seeks to enjoin.'" (quoting *Wis. Gas Co.*, 758 F.2d at 675 )). Among the 55 grantees who received funding from the 2024 appropriation, PPMM stands alone in failing to apply. *See* Margolis Decl. ¶ 5. PPMM's independent decision not to apply for continuation funding—when even the other Plaintiffs in this case submitted applications, not to mention the dozens of other recipients participating in the program—is sufficient to preclude injunctive relief as to that organization. An organization is not entitled to receive funding it did not apply for. *See* NOFO, ECF No. 8-2 at 16–17 ("Recipients will be required to submit a non-competing continuation application for each budget period after the first.").[2]

Plaintiffs attempt to explain away PPMM's failure to apply, stating that PPMM "was unable to identify any changes it could make and documentation that it could submit, even under protest, without abandoning all of the essential components of its projects and organizational mission." Compl. ¶ 111. But that explanation is hard to square with Plaintiffs' claims that the March 2025 guidance is "completely unclear[.]" Mot. at 24. Other recipients, moreover, like PPGNY, did not make any proposed changes in response to the March 2025 guidance, but still

_____

[2] There are independent reasons, moreover, why PPMM may not have received continuation funding. HHS has flagged PPMM for poor performance for serving less than 5 percent of the total number of youth it planned to reach on an annual basis in its original grant application. Margolis Decl. ¶ 4.

applied. *See* Compl. ¶¶ 115–16.

The speculative nature of Plaintiffs' alleged irreparable harm is enough to deny Plaintiffs' motion. But Plaintiffs are not entitled to a preliminary injunction for another reason. As Plaintiffs point out (Mot. at 42), courts have found irreparable harm in situations where grant funding will be obligated to other grantees, making the funds the plaintiffs would otherwise receive unrecoverable. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025) ("[I]n cases involving government expenditures, *once the relevant funds have been obligated*, a court cannot reach them in order to award relief." (emphasis added) (quotation omitted)); *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are *distributed to the States and obligated*, they cannot be recouped." (emphasis added)). Here, however, as established by the accompanying declaration of Amy Margolis, Deputy Director of HHS's Office of Population Affairs, HHS will *not* obligate the funds Plaintiffs seek immediately upon a decision on continuation funding applications. *See* Margolis Decl. ¶ 3. Rather, HHS will keep the funds available until August 31. *Id.* And HHS can backdate those funds to July 1, *id.*, meaning that, hypothetically, if Plaintiffs are denied continuation funding and Plaintiffs were to prevail on a challenge to that decision, Plaintiffs could use those funds to cover any interim expenditures. *Id.*[3]

The linchpin of Plaintiffs' irreparable harm argument is therefore missing. Mot. at 42 (arguing that, "absent immediate relief, the funding that Plaintiffs rely upon may become unrecoverable"). The general rule in this Circuit is that "injuries are not 'irreparable' if there is a

---

[3] During discussions over the briefing schedule for Plaintiffs' motion, and to explore the possibility of avoiding preliminary injunction proceedings, counsel for Defendants informed counsel for Plaintiffs that HHS would be willing to hold the relevant continuation funding past June 30. Plaintiffs, however, opted to continue to pursue relief before the upcoming continuation funding decisions.

'possibility' that 'adequate compensatory or other corrective relief will be available at a later date.'" *Univ. of Cal. Student Ass'n v. Carter*, --- F. Supp. 3d ---, 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.").

Because the funds Plaintiffs seek will not be obligated upon HHS's continuation funding decision—which is scheduled to come on or before June 30—Plaintiffs cannot show that "an injunction must be imposed *now*, as opposed to once grant allocations have been determined or announced." *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *4 (6th Cir. Feb. 8, 2022); *see also Ohio v. Becerra*, 87 F.4th 759, 782–83 (6th Cir. 2023) (finding irreparable harm only for the plaintiff that had provided concrete evidence of economic injuries resulting from the challenged grant awards). If, hypothetically, Plaintiffs do not receive continuation funding, they would have ample time—a full two months—to seek any appropriate relief. *See* Margolis Decl. ¶ 3.

Given Plaintiffs' failure to establish irreparable harm resulting from the March 2025 guidance, Plaintiffs' motion for a preliminary injunction should be denied.

## II.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims.

### A.    Plaintiffs Are Unlikely to Prevail on Their Fifth Amendment Claim.

Plaintiffs challenge the March 2025 guidance under the Due Process Clause, arguing that the March 2025 guidance is void for vagueness. Plaintiffs' claim fails at the threshold and on the merits.

1.    <u>Plaintiffs Lack a Constitutionally Protected Interest Required for Due Process Protections to Attach</u>.

To begin with, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of

the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (plurality opinion) (emphasis added) (citation omitted). And although courts have applied this doctrine outside of the statutory context, they have done so with respect to regulations of primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)); *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (noting that the Fifth Amendment's "requirement of clarity" applies when the government imposes "civil penalties" (citations omitted)).

There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise in the context of government grants, where the government is acting as a benefactor, and, indeed, "courts have resisted" applying "due process principles to government contracts" outside "the employment context." *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014).

Even if the Court were to conclude that the Due Process Clause can reach beyond the regulation of primary conduct, Plaintiffs are unlikely to prevail because they lack an interest that the Due Process Clause protects. As this Court explained recently in *National Urban League v. Trump*, "[a] void-for-vagueness challenge is, at bottom, a due process claim, so Plaintiffs must show that they were deprived of a constitutionally-protected property or liberty interest." --- F. Supp. 3d ----, 2025 WL 1275613, at *18 (D.D.C. May 2, 2025) (citations omitted). And the "first

inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." *Id.* (quoting *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015)).

Plaintiffs do not assert that they have a protected liberty interest; they rely only on an alleged property interest "in receiving money from a successful non-competing continuing award application under the TPP program." Mot. at 22. The procedural component of the Due Process Clause, however, "does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted).

Applying these principles, the Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collected cases). The due process protections afforded to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography*, 54 F. Supp. 3d at 29 ("The Supreme Court 'has never held that government contracts for goods and services create property interests protected by due process.'" (citation omitted)).

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co.*

*v. Goldin*, in the new-property line of cases, "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure[.]" 844 F.2d 962, 966 (2d Cir. 1988) (footnote omitted). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id.* at 967. Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns[.]" *Id.* at 966.

Plaintiffs do not address these principles in any meaningful way. They cite *NB ex. rel. Peacock* for the proposition that, if a "'statute or implementing regulations place substantive limitations on official discretion,'" due process protections may be required. Mot at 22 (quoting *NB ex. rel. Peacock*, 794 F.3d at 41). But Plaintiffs cite no statute or regulation that limits HHS's discretion with regard to continuation funding. Plaintiffs point to language in the NOFO to suggest they are entitled to a continuation of funding. Mot. at 22. Yet, even assuming a notice of a funding opportunity could limit the agency's discretion in a way that implicates the Due Process Clause— which it cannot for the reasons discussed above—the NOFO itself gives HHS broad discretion, including to deny continuation funding if it is not in the "continued best interests of the government." ECF No. 8-2 at 56. No constitutional property interest attaches in these circumstances.

Plaintiffs also note that "[c]ourts have applied the void-for-vagueness doctrine to review administrative action." Mot. at 22–23. Yet, none of the cases Plaintiffs cite supports the proposition that Plaintiffs have a constitutionally protected interest in receiving continuation funding resulting from a government grant. Both *Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020), and *Sherrill v.*

*Knight*, 569 F.2d 124 (D.C. Cir. 1977), addressed the revocation of White House press passes—a far cry from alleged entitlement to continuation funding. The courts in those cases, moreover, concluded that the plaintiffs had a protected liberty interest in their passes. *Karem*, 960 F.3d at 665; *Sherrill*, 569 F.2d at 130–31. Plaintiffs do not assert a liberty interest here, nor could they.

Plaintiffs also cite *United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), which addressed whether the FCC could regulate the primary conduct of telecommunications providers. *Id.* at 734 (explaining that the challenged General Conduct Rule forbids broadband providers from engaging in conduct that unreasonably interferes or unreasonably disadvantages end users and edge providers). In *Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993), the court addressed a Securities and Exchange Commission rule that arguably deprived the plaintiffs of the opportunity to be heard before being designated as a "professional trader," which would prohibit access to their use of a system for trading securities. And, finally, *FCC v. Fox Television Stations, Inc.* was another case about primary regulation—specifically, the FCC sought to regulate broadcasters (subject to civil penalties) over the transmission of indecent material. *See* 567 U.S. at 254–55.

Plaintiffs' failure to cite any cases supporting their alleged property interest in the continuation of a government grant is unsurprising, given that "'ordinary' or 'routine' government contracts do not, by themselves, give rise to . . . an interest" that due process protects. *Gizzo*, 44 F. Supp. 3d at 385. Put another way, as this Court explained in *National Urban League*, Plaintiffs "offer no reason to think that their [ ] grants—which are '[o]utside of the employment context'— are different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'" 2025 WL 1275613, at *18 (quoting *New Vision Photography*, 54 F. Supp. 3d at 29 (citation omitted)). And accepting Plaintiffs' theory that they

have a property interest in continuation funding would "'risk . . . transmogrifying virtually every dispute involving an alleged breach of contract by' the government 'into a constitutional case.'" *Id*. (quoting *Redondo-Borges*, 421 F.3d at 10). Because Plaintiffs do not have a property interest in continued funding protected by the Constitution, their Due Process Clause claim necessarily fails.

      2.    <u>Plaintiffs Fail to Identify Any Constitutional Deficiency</u>.

Even if the Court were to get past that fundamental deficiency in Plaintiffs' Due Process Clause claim, Plaintiffs would still be unlikely to prevail. The thrust of Plaintiffs' Due Process Claim is purported confusion over what it means to "align" with executive orders. Mot. at 23–26. But the March 2025 guidance is not vague or ambiguous. It states—consistent with the NOFO and Notice of Award—that applicants are "expected to review and be aware of current Presidential Executive Orders," and the March 2025 guidance encouraged recipients "to revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders." *Id.* at 14. That is consistent with, and no more vague than, the previous requirement— unchallenged by Plaintiffs—that funding recipients comply with "[a]ll requirements imposed by programs statutes and regulations, *Executive Orders*, and HHS grant administration regulations, as applicable." Ex. A at 6 (emphasis added).

Plaintiffs also argue that the March 2025 guidance is unconstitutional because it "invites arbitrary and discriminatory enforcement." Mot. at 26–27. But this claim, too, lacks merit. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. This doctrine demands scrutiny of statutes and regulations that identify new conduct for punishment—typically in the context of

law enforcement authorities. *See Nat'l Urban League*, 2025 WL 1275613 at *19; *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (law is "void for vagueness" when "it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement" (internal quotation marks and citation omitted)). It has little, if any, application "when the Government is acting as patron rather than as sovereign," where the effects "of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998); *compare Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971) (holding prohibition of "annoy[ing]" conduct unconstitutionally vague in the context of a criminal ordinance). And, indeed, Plaintiffs cite no authority to suggest that the alleged potential for arbitrary "enforcement" in the context of grant decisions is constitutionally problematic. Mot. at 23–24. There is no "enforcement," either criminal or civil, when the government makes a funding decision.

### B.    Plaintiffs Are Unlikely to Prevail on Their APA Claims.

#### 1.    Plaintiffs' Claims Are Not Justiciable Under the APA.

##### a.    The Issuance of the March 2025 Guidance Was Not Final Agency Action.

The March 2025 guidance is not reviewable under the APA because it is not a final agency action. The APA generally authorizes judicial review only of final agency actions. 5 U.S.C. § 704. The APA defines final "'agency action' [as] includ[ing] the whole or a part of . . . relief, or the equivalent or denial thereof[.]" *Id.* § 551(13). In turn, "'relief' includes the whole or a part of an agency['s] . . . grant of money[.]" *Id.* § 551(11)(A). "An agency action is final only if it is *both* 'the consummation of the agency's decisionmaking process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Mining*

*Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Whether a change to an agency's grant application process is a final agency action depends, in part, on whether that change alone is outcome determinative. When the change involves some exercise of agency discretion, until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review." *Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004); *see also Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103–04 (9th Cir. 2007) (holding that there was no "final agency action . . . until the [agency] ha[d] reviewed a grant application and decided to disburse the funds"); *Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (holding that there was no final agency action when the agency "ha[d] not yet decided whether to award the grant"), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007).

Here, the March 2025 guidance expresses an "expect[ation]" that recipients "review and be aware of current Presidential Executive Orders," and instructs recipients to "[p]rovide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders, *if applicable*, including the steps taken to review the project and identify the modifications proposed." ECF No. 8-3 at 4–5 (emphasis added). The March 2025 guidance, moreover, directs that recipients' "work plan should address the expectations outlined in the original NOFO, to the extent aligned with Presidential Executive Orders." *Id.* at 5. Nothing in these statements—nor anything else in the March 2025 guidance—makes Plaintiffs ineligible for a continuation award or limits HHS's discretion regarding continued funding. Indeed, under the terms of the NOFO and the initial Notice of Award issued to all Plaintiffs, Plaintiffs are required to comply with all applicable executive orders. *See* ECF No. 8-2 at 56; Ex. A at 6. And continuation

decisions continue to be judged by the same standards articulated in the NOFO—*i.e.*, "based on availability of funds, satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." ECF No. 8-2 at 56. Accordingly, there is no final agency action for Plaintiffs to challenge.

Despite these facts, Plaintiffs blithely assert that the March 2025 guidance document is final agency action (Mot. at 27–28), relying primarily on *Planned Parenthood of New York City, Inc. v. United States Department of Health and Human Services ("PPNYC")*, 337 F. Supp. 3d 308 (S.D.N.Y. 2018). To start, that out-of-Circuit decision is inconsistent with the precedent in this District, discussed above. But in any event, the facts of that case are not analogous. In *PPNYC*, the court concluded that final agency action was present because the challenged requirements in the TPP Program funding announcement itself made the plaintiffs "*not eligible*" to receive funds. *Id.* at 328. Here, there is no such restriction on eligibility, or anything at all that would preclude HHS from awarding continuation funding to any of the Plaintiffs who applied. The requirements are the same; HHS has merely instructed applicants to explain how they intend to comply with their preexisting obligations. *Compare State ex. rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (finding final agency action in the context of grant applications based on the addition of a new requirement to certify compliance with the government's interpretation of a provision of the Immigration and Nationalization Act requiring the sharing of information with federal law enforcement).

Plaintiffs' reliance on *United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016), is also misplaced. In that case, the Court addressed a judicial determination that deprived mining companies and affiliated properties of a safe harbor from liability under the Clean Water Act, which carries with it "significant criminal and civil penalties." *Id.* at 600. The Court concluded

that, in light of those consequences, the determination constituted final agency action. *Id*. Plaintiffs here are exposed to no such civil or criminal liability. Rather, Plaintiffs seek continued funding for their projects.

The March 2025 guidance is just that—guidance—for what recipients should include in their request for additional funds. It is neither "the consummation of the agency's decisionmaking process," nor "a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Mining Ass'n*, 758 F.3d at 250 (quoting *Bennett*, 520 U.S. at 177–78). And "[t]he question is not whether judicial review will be available but rather whether judicial review is available *now*." *Id*. at 253. As it stands, no continuation funding decisions for the upcoming year have been made, and Plaintiffs therefore cannot identify a final agency action that is subject to the APA.

b.      The March 2025 Guidance Is Not Reviewable Because It Reflects Grant-Making Policy Preferences Committed to Agency Discretion by Law.

Plaintiffs are also unlikely to prevail on their APA claim because they fail to demonstrate that there are standards for the Court to apply in reviewing the March 2025 guidance. "[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)," *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which precludes review under the APA if the challenged agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The APA presumes agency action is judicially reviewable, but "[t]his is 'just' a presumption." *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Under § 701(a)(2), "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. "In such a case," the relevant statutory provision "can be taken to have committed the decisionmaking to the agency's judgment absolutely." *Id*. (internal quotation marks omitted).

20

An agency's allocation of appropriated funds is typically and presumptively committed to agency discretion by law because "the very point" "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192; *see Milk Train, Inc. v. Veneman*, 310 F.3d 747, 748–51 (D.C. Cir. 2002); *Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*, 729 F.3d 1025, 1038 (9th Cir. 2013); *Serrato v. Clark*, 486 F.3d 560, 568–70 (9th Cir. 2007). This is why agencies' grant-award decisions are presumptively unreviewable. *See Lincoln*, 508 U.S. at 191–92 (including "allocation of funds from a lump-sum appropriation" among the "administrative decision[s] traditionally regarded as committed to agency discretion" that have been held "to be presumptively unreviewable"); *see also Milk Train, Inc.*, 310 F.3d at 750–51 (applying *Lincoln* in the context of non-lump-sum appropriations).

Plaintiffs cannot overcome the presumption that HHS's March 2025 guidance document—which merely reiterates, in different words—recipients' obligations to comply with executive orders, is unreviewable. Congress has provided HHS sparse guidance for how HHS should distribute Tier 1 grants amounting to tens of millions of dollars. Regarding such grants, Congress instructed HHS only "to fund medically accurate and age appropriate programs that . . . replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral factors underlying teenage pregnancy, or other associated risk factors." That language does not limit HHS's discretion when determining whether to continue funding, much less whether the agency may issue guidance documents requiring compliance with Executive Branch policy directives. *See Hosp. for Special Surgery v. Becerra*, Civ. A. No. 22-2928 (JDB), 2023 WL 5448017, at *7 (D.D.C. Aug. 24, 2023) (concluding that statutory language must be directly related to the decision the plaintiff challenges). Indeed, the statute says nothing at all about

21

whether—once awarded a grant—a particular recipient should receive funding in a subsequent year. And the NOFO itself—which Plaintiffs do not challenge, and, in fact, rely on—states that continuation funding will be awarded on criteria that includes the "continued best interests of the government." ECF No. 8-2 at 56.

Indeed, at least one court in this District has concluded that grant making decisions for TPP projects specifically are presumptively unreviewable. *See Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018). In *Policy & Research*, the court remarked that there was "little doubt that HHS's decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable." *Id.* at 76. The court concluded, however, that agency regulations governing "termination" applied where the agency "shorten[ed] Plaintiffs' project periods" by denying continuation funding, and therefore—as to the "termination" there were standards for the Court to apply—*i.e.*, the agency's regulation in 45 C.F.R. pt. 75. *See Pol'y & Rsch.*, 313 F. Supp. 3d at 76–78. And, therefore, the court reasoned, the court could consider whether HHS's denial of continuation funding without explanation was arbitrary and capricious under the APA. *Id.* at 76–79, 83.

Here, however, there has been no "termination." It is undisputed that HHS has not made a decision on Plaintiffs' applications for continuation funding. Nothing in HHS's regulations, moreover, cabins the agency's discretion to issue instructions—as HHS did in the March 2025 guidance—to inform the agency's consideration of those applications. It necessarily follows that, even if the March 2025 guidance constituted a final agency action (it does not), the decision to issue mere instructions that applicants for continued funding should review and explain their compliance with executive orders is an unreviewable agency decision.

2.  <u>Plaintiffs' APA Claims Fail on the Merits</u>.

Plaintiffs would also be unlikely to prevail on their APA claims if the Court were to reach them. Plaintiffs' APA arguments are based on an unsupported and inaccurate premise—*i.e.*, that the March 2025 guidance requires funding recipients to change their programs in such a way that would not allow recipients to "replicat[e] programs that have been proven effective through rigorous evaluation[.]" 138 Stat. at 671. As Plaintiffs acknowledge, HHS "did not eliminate [ ] existing expectations and requirements for TPP-funded projects . . . *e.g.*, that the projects 'focus on areas of greatest need' and 'replicate to scale evidence-based teen pregnancy prevention programs with fidelity and quality.'" Mot. at 15–16 (quoting March 2025 guidance, ECF No. 8-3 at 7). And again, as Plaintiffs acknowledge—these are the same requirements "set[] forth" in the NOFO, Mot. at 16, and reiterated in the "deep dive into each of the expectations of [the] grant program," Advancing Equity through Replication of EBPs and Services (TPP 23 Tier 1), ECF No. 8-4 (revised March 2025). As much as Plaintiffs contend that the March 2025 guidance fundamentally changed TPP Program requirements, they fail to make that showing. Rather, the March 2025 guidance is a common-sense instruction that applicants should conform their projects to executive orders "if applicable" consistent with their preexisting obligations.

Plaintiffs' arguments also present a false choice between replicating programs that have been proven effective to reduce teenage pregnancy and aligning TPP projects with Executive Branch policy priorities as set forth in executive orders. The March 2025 guidance provides examples of potential changes recipients "may make to align their projects," which include "selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc." ECF No. 8-3 at 5. That is hardly a directive to abandon evidence-based programs.

There is also no merit to Plaintiffs' assertions that the March 2025 guidance is an unexplained change in the agency's position, or that Plaintiffs lacked fair notice. *See* Mot. at 35–36. The NOFO that announced TPP Program grants for the operative appropriation required certification of compliance with executive orders governing financial assistance awards, NOFO, ECF No. 8-2 at 63, and the Notice of Award all recipients received in 2023 further required compliance with "all requirements imposed by . . . Executive Orders . . . as applicable," Ex. A at 6. There is therefore no change in position for HHS to explain. To the extent Plaintiffs rely on a purported distinction between "align[ing]" Plaintiffs' projects to conform to relevant executive orders (Mot. at 36), and "comply[ing]" with them (Ex. A at 6), Plaintiffs' argument is based in semantics rather than substance.

### C.    Plaintiffs Are Unlikely to Prevail on their Ultra Vires Claim.

Ultra vires review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More specifically, ultra vires review of agency action is only available when an agency's error is "patently a misconstruction of [statute;]" "when the agency has disregarded a specific and unambiguous statutory directive[;]" or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotations omitted). "Garden-variety errors of law or fact are not enough." *Id.*

Providing instructions to grant recipients that they should conform their applications for continued funding to executive orders—particularly when grantees accepted funds in the first place with the understanding that such compliance was required—is hardly the type of fundamental error that justifies ultra vires review. Plaintiffs fail to point to anything "specific and unambiguous" in

Congress's appropriation of funds for the TPP Program that prohibits the March 2025 guidance, because none exists, and therefore Plaintiffs' ultra vires claim fails.

Plaintiffs' ultra vires claim faces another insurmountable hurdle. Both the Supreme Court and D.C. Circuit have made clear that an ultra vires claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge. *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"); *Lepre v. Dep't of Labor*, 275 F.3d 59, 72 (D.C. Cir. 2001) (a "critical" requirement for ultra vires review is "the lack of any alternative means of judicial review for the plaintiffs"); *see also Nyunt*, 589 F.3d at 449.

If Plaintiffs continuation funding is denied, they may pursue relief at that time. The potential for review after a decision on Plaintiffs' applications thus provides a plausible alternate avenue for Plaintiffs to pursue relief, if they are, in fact, denied continuation funding. Plaintiffs are therefore unlikely to prevail on their ultra vires claim.

## III.    The Balance of Equities and Public Interest Weigh Against Relief.

A party seeking a preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two "factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in their favor, Plaintiffs mostly repackage their arguments on alleged irreparable harm and on the merits. For all the reasons described above, Plaintiffs' harm and merits arguments fail. On the other hand, granting Plaintiffs' motion—which includes a broad request that all potential recipients of TPP program continuation funding be permitted to reapply—would upend HHS's ongoing consideration of applications for the

upcoming year. *See Trump v. Wilcox*, --- S. Ct. ---, 2025 WL 1464804, at *1 (May 22, 2025) (granting request for stay of injunction "to avoid [ ] disruptive effects" on government operations). Therefore, the balance of the equities and public interest favor denying Plaintiffs' request for injunctive relief, particularly given that the agency's decisions on Plaintiffs' continuation funding requests are around the corner, and, as described above, HHS will keep the funds Plaintiffs seek available until August 31.

## IV.    Any Injunctive Relief Should Be Narrowly Tailored.

The Court should deny Plaintiffs' motion for a preliminary injunction. But if the Court were to provide injunctive relief, the injunction should be narrowly tailored. It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). In line with these principles, to the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, any preliminary relief should be limited to address any established harms of the present Plaintiffs.

There is no basis for extending relief to non-parties in this suit, as Plaintiffs propose. ECF No. 8-14 (Proposed Order). Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to any grants involving Plaintiffs specifically. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis added)).

V.      **A Bond Should Accompany Any Injunctive Relief.**

If the Court were to grant Plaintiffs' motion, Defendants respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." As the D.C. Circuit recently clarified, "injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). The Court has broad discretion to determine the amount of an appropriate bond. If the Court were to enter an injunction, Defendants ask that the bond amount reflect the cost and disruption to HHS's administration of the TPP Program resulting from Plaintiffs' requested relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: March 28, 2025                              Respectfully submitted,

                                                   YAAKOV M. ROTH
                                                   Acting Assistant Attorney General
                                                   Civil Division

                                                   MICHELLE R. BENNETT
                                                   Assistant Director, Federal Programs Branch

                                                   */s/ Bradley P. Humphreys*
                                                   BRADLEY P. HUMPHREYS
                                                   (D.C. Bar No. 988057)
                                                   Senior Trial Counsel
                                                   Federal Programs Branch
                                                   Civil Division, Department of Justice
                                                   1100 L Street NW
                                                   Washington, DC 20005
                                                   Telephone: (202) 305-0878

Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*