**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF | **)** | |
| GREATER NEW YORK *et al.* | **)** | Civil Action No. 1:25-cv-1334-TJK |
| | **)** | |
| Plaintiffs, | **)** | |
| v. | **)** | |
| | **)** | |
| U.S. DEPARTMENT OF HEALTH AND | **)** | |
| HUMAN  SERVICES, *et al.* | **)** | |
| | **)** | |
| Defendants. | **)** | |
| | **)** | |

**REPLY IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 2

   I.   Plaintiffs Will Suffer Significant Irreparable Harm Absent Injunctive Relief .................. 2

   II.   Plaintiffs Are Likely to Succeed on the Merits ................................................ 8

      A.   The NCC Notice is Quintessential Final Agency Action ........................................ 8

      B.   The NCC Notice Does Not Reflect a Decision Committed to Agency Discretion . 13

      C.   The NCC Notice is Unlawful .................................................................. 16

   III.   The Court Should Issue Plaintiffs' Requested Relief ........................................ 22

      A.   The Balance of Equities and Public Interest Weigh Heavily In Plaintiffs' Favor ... 22

      B.   Relief Akin to Vacatur in its Scope and Effect is Appropriate .............................. 23

   IV.   The Court Should Require At Most a Nominal Injunction Bond .................................. 25

CONCLUSION ........................................................................................................... 25

CERTIFICATE OF SERVICE .......................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)...........................................................................................10

*AID Atlanta, Inc. v. HHS*,
340 F. Supp. 3d 1 (D.D.C. 2018)....................................................................14

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
766 F. Supp. 3d 74 (D.D.C. 2025)..................................................................14

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
No. 25-cv-400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................3

*Associated Press v. Budowich*,
No. 25-cv-532, 2025 WL 1039572 (D.D.C. Apr. 8, 2025)........................25

*Baja Contractors, Inc. v. City of Chicago*,
830 F.2d 667 (7th Cir. 1987) .........................................................................20

*Bennett v. Spear*,
520 U.S. 154 (1997)......................................................................................9, 10

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986).........................................................................................14

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020)...............................................................23

*Citizens Alert Regarding Env't v. EPA*,
102 F. App'x 167 (D.C. Cir. 2004).................................................................11

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971).........................................................................................13

*Climate United Fund v. Citibank, N.A.*,
No. 25-cv-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025)......................25

*County of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ..........................................................21

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024).........................................................................................24

*CropLife Am. v. EPA,*
   329 F.3d 876 (D.C. Cir. 2003) ...................................................................10, 12

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ...........................................................................................16

*DSE, Inc. v. United States,*
   169 F.3d 21 (D.C. Cir. 1999) .............................................................................25

*Encino Motorcars, LLC v. Navarro,*
   584 U.S. 79 (2018) .............................................................................................16

*Florida v. HHS,*
   19 F.4th 1271 (11th Cir. 2021) .........................................................................24

*Frozen Food Express v. United States,*
   351 U.S. 40 (1956) .............................................................................................12

*Gratz v. Bollinger,*
   539 U.S. 244 (2003) .............................................................................................5

*Griffith v. FLRA,*
   842 F.2d 487 (D.C. Cir. 1988) ..........................................................................21

*Healthy Futures of Tex. v. HHS,*
   315 F. Supp. 3d 339 (D.D.C. 2018) .............................................................13, 14

*Healthy Teen Network v. Azar,*
   322 F. Supp. 3d 647 (D. Md. 2018) ..................................................................13

*Hi-Tech Furnace Sys., Inc. v. FCC,*
   224 F.3d 781 (D.C. Cir. 2000) ..........................................................................13

*Int'l Ladies' Garment Workers' Union v. Donovan,*
   722 F.2d 795 (D.C. Cir. 1983) .....................................................................13, 14

*Ipsen Biopharmaceuticals, Inc. v. Azar,*
   943 F.3d 953 (D.C. Cir. 2019) ............................................................................9

*Karem v. Trump,*
   960 F.3d 656 (D.C. Cir. 2020) ..........................................................................19

*Karst Env't Educ. & Prot., Inc. v. EPA,*
   403 F. Supp. 2d 74 (D.D.C. 2005) ....................................................................11

*King County v. Azar,*
   320 F. Supp. 3d 1167 (W.D. Wash. 2018) ........................................................13

*King County. v. Turner,
    No. 25-cv-814, 2025 WL 1331488 (W.D. Wash. May 7, 2025) ........................................3, 19

League of United Latin Am. Citizens v. Exec. Off. of the President,
    No. 25-cv-946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025)....................................................25

League of Women Voters of the United States v. Newby,
    838 F.3d 1 (D.C. Cir. 2016) ...............................................................................................4, 6

Lincoln v. Vigil,
    508 U.S. 182 (1993)...........................................................................................................14, 15

Marin Audubon Soc'y v. FAA,
    121 F.4th 902 (D.C. Cir. 2024)................................................................................................9

Milk Train, Inc. v. Veneman,
    310 F.3d 747 (D.C. Cir. 2002) ...............................................................................................15

Multnomah County v. Azar,
    340 F. Supp. 3d 1046 (D. Or. 2018) .................................................................................13, 17

Nat'l Ass'n of Postal Supervisors v. USPS,
    26 F.4th 960 (D.C. Cir. 2022)................................................................................................22

Nat'l Min. Ass'n v. McCarthy,
    758 F.3d 243 (D.C. Cir. 2014) .................................................................................................8

*Nat'l Urb. League v. Trump,
    No. 25-cv-471, 2025 WL 1275613 (D.D.C. May 2, 2025)
    .....................................................................................................3, 4, 5, 6, 9, 13, 19, 20

National Mining Association v. Jackson,
    768 F. Supp. 2d 34 (D.D.C. 2011)......................................................................................11, 12

Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,
    508 U.S. 656 (1993).................................................................................................................5

Nebraska v. Biden,
    52 F.4th 1044 (8th Cir. 2022) ................................................................................................24

New York v. Trump,
    764 F. Supp. 3d 46 (D.R.I. 2025) ............................................................................................3

North Carolina v. Covington,
    581 U.S. 486 (2017)................................................................................................................24

NRDC v. Morton,
    337 F. Supp. 167 (D.D.C. 1971).............................................................................................25

iv

*NRDC, Inc. v. SEC*,
    606 F.2d 1031 (D.C. Cir. 1979) ....................................................................13

*NB ex rel. Peacock v. D.C.*,
    794 F.3d 31 (D.C. Cir. 2015) .......................................................................20

*Oregon v. FCC*,
    102 F.3d 583 (D.C. Cir. 1996) ....................................................................20

*PFLAG, Inc. v. Trump*,
    No. 25-cv-337-BAH, 2025 WL 685124 (D. Md. Mar. 4, 2025) ...........................21

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ....................................................................16

*\*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
    946 F.3d 1100 (9th Cir. 2020) ..........................................................5, 13, 17

*\*Planned Parenthood of New York City, Inc. v. HHS*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) ...............................................8, 13, 14, 15, 17

*Pol'y & Rsch., LLC v. HHS*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ...............................................................13

*Rattlesnake Coal. v. EPA*,
    509 F.3d 1095 (9th Cir. 2007) ....................................................................11

*S. Educ. Found. v. Dep't of Educ.*,
    No. 25-cv-1079, 2025 WL 1453047 (D.D.C. May 21, 2025)...................14, 22, 25

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) .............................................................15, 16

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ...............................................................25

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ....................................................................16

*Tarpeh-Doe v. United States*,
    904 F.2d 719 (D.C. Cir. 1990) ....................................................................20

*Toxco, Inc. v. Chu*,
    801 F. Supp. 2d 1 (D.D.C. 2011) ...............................................................20

*Trump v. Wilcox*,
    No. 24A966, 2025 WL 1464804 (U.S. May 22, 2025) ......................................23

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)...................................................................................................10, 12

*Washington v. Trump*,
    No. 25-cv-244, 2025 WL 835030 (W.D. Wash. Mar. 17, 2025).................................................3

*Whitman-Walker Clinic, Inc. v. HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020)..........................................................................................6

*Winter v. NRDC*,
    555 U.S. 7 (2008)................................................................................................................22

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985).............................................................................................2

**Statutes**

5 U.S.C. § 706.......................................................................................................................23

42 U.S.C. § 801.....................................................................................................................16

Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (2024)......................................................................15, 21

**Regulations**

Exec. Order No. 14168, 90 Fed. Reg. 8,615 (Jan. 20, 2025)...............................................10

Exec. Order No. 14190, 90 Fed. Reg. 8,853 (Jan. 29, 2025)...............................................10

**Court Rules**

Fed. R. Civ. P. 65(a)(2)........................................................................................................24

**Other Authorities**

*Align*, Merriam Webster, https://www.merriam-webster.com/dictionary/align;............................9

*Comply*, Merriam Webster, https://www.merriam-webster.com/dictionary/comply....................9

Emergency Mot. for Administrative Stay and Stay Pending Appeal, *RFE/RL, Inc.*
    *v. Lake*, No. 25-5158 (D.C. Cir. May 1, 2025)...........................................................7

Motion for Preliminary Injunction, *Pol'y & Rsch., LLC v. HHS*, No. 18-cv-346
    (D.D.C. Feb. 23, 2018)........................................................................................14

U.S. Br., *112 Genesee St., LLC v. United States*,
    No. 25-1373 (Fed. Cir. Mar. 14, 2025).................................................................7

## INTRODUCTION

Fifteen days before non-competing continuation award applications were due, the Department of Health and Human Services (HHS) issued a surprise "NCC Notice"[1] that fundamentally altered longstanding Teen Pregnancy Prevention (TPP) Program criteria. The NCC Notice demands that applicants "align" with all executive orders, and particularly five specified orders—none of which by their own terms imposes any obligations on private TPP Program participants. Plaintiffs indisputably have been unable to certify compliance with these unlawful new requirements, and they are thus poised to lose funding for their teen pregnancy prevention programs when funding expires on June 30, shuttering those programs absent an injunction.

The government makes no effort to defend its unlawful new requirements on the merits. Instead, it principally contends that the NCC Notice does nothing, and so various doctrines stand in the way of judicial review. That position flouts the NCC Notice's plain text, which explicitly prescribes this new requirement for non-competing continuation applications and warns that applicants failing to "align" with executive orders will not be "successful" in their applications. It ignores the reality that agency contracts and grants have been terminated across the federal government for purported disalignment with the policies espoused in recent executive orders. And it defies extensive precedent finding changes to TPP Program terms reviewable and enjoining similar requirements for other grant programs.

None of the doctrines the government invokes imposes any obstacle to preliminary relief. The NCC Notice sets the final terms governing non-competing continuation applications for the TPP program, and it is squarely final agency action that is reviewable under the APA. As this Court has recently held, changes to grant program terms inflict real and immediate harm on

---

[1] Ex. 2 to Mot. for Preliminary Injunction (PI Br.), ECF 8.

program participants faced with the choice to revise their programs or forfeit federal funding. Here, there is no meaningful possibility of remediating those harms after application decisions. As uncontroverted record evidence shows, absent a preliminary injunction critical teen pregnancy prevention programs will shut down, destroying proven methods for preventing unintended teen pregnancies, sexually transmitted infections, and health disparities among already vulnerable populations. And this case fits comfortably within the bounds of Administrative Procedure Act review. The NCC Notice marks a final decision on the terms governing non-competing continuation applications—terms that are not only unreasoned and unreasonable but that also conflict with mandatory statutory commands. Although the Court need not reach Plaintiffs' constitutional arguments to set the NCC Notice aside, established precedent—including in recent grant cases—confirms that the NCC Notice violates Plaintiffs' due process rights and is ultra vires.

The Court should grant Plaintiffs' motion, enjoin the NCC Notice, and direct HHS to accept new or amended applications so that these vital programs may continue uninterrupted.

## ARGUMENT

### I.    Plaintiffs Will Suffer Significant Irreparable Harm Absent Injunctive Relief

The government does not dispute that interruption of TPP Program funding would have catastrophic impacts on Plaintiffs and the communities they serve, requiring Plaintiffs to shutter programs, lay off staff, and sacrifice community relationships developed over years. *See* Opp. 7-11; PI Br. 39-40. Nor does the government dispute that those injuries, which "threaten[] the very existence of the movant's business," amount to irreparable harm under controlling circuit precedent. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Unable to refute the scope of this obvious irreparable harm, the government argues only that it is "premature and speculative" because Plaintiffs' applications have not yet been denied.

2

Opp. 8. This argument defeats the purpose of a preliminary injunction: inviting the harm to occur prior to the issuance of an order. For at least three reasons, the government's position fails.

*First*, the injury the NCC Notice inflicts on Plaintiffs is concrete and certain. As this Court has recognized, new grant program terms—particularly, as here, when backed by a certification requirement—impose on would-be grantees a "lose-lose-lose choice." *Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613, at *11 (D.D.C. May 2, 2025). They must "change their programming, risk a false certification, or forgo the federal funds or contract." *Id.* However a prospective applicant answers that impossible dilemma, it faces harm that is both "real" and "likely." *Id.*; *see also King County. v. Turner*, No. 25-cv-814, 2025 WL 1331488, at *1 (W.D. Wash. May 7, 2025) (finding irreparable harm from executive order-based grant terms that "put Plaintiffs in the position of having to choose between accepting conditions that they believe are unconstitutional, and risking the loss of hundreds of millions of dollars in federal grant funding").

The government's recent cancellation of wide swaths of grants across sectors for purported disalignment with policies espoused in the President's executive orders belies its suggestion that HHS will not do so here. *See, e.g.*, *Washington v. Trump*, No. 25-cv-244, 2025 WL 835030, at *1 (W.D. Wash. Mar. 17, 2025) (describing termination of research and education grants on ground that they "related to Transgender issues"); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-cv-400, 2025 WL 752378, at *13 (D.D.C. Mar. 10, 2025) (describing termination of foreign-assistance awards on ground they were not "in alignment with" executive orders); *New York v. Trump*, 764 F. Supp. 3d 46, 52-53 (D.R.I. 2025) (describing withholding of health grant funds to "align … [with] President Trump's priorities" as expressed in executive orders). The myriad

"examples of agencies acting consistently with [similar] directives by terminating or suspending grants and contracts" makes termination of Plaintiffs' programs highly likely, if not a foregone conclusion. *Nat'l Urb. League*, 2025 WL 1275613, at *12. "Damocles's sword does not have to actually fall on all [Plaintiffs] before the court will issue an injunction." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Plaintiffs' harm is made all the more acute by the NCC Notice's certification requirements, which both expose them to the risk of penalties so long as the NCC Notice remains in effect and effectively guarantee that their applications will be denied. In their non-competing continuation applications, Plaintiffs were required to certify compliance with all "policies governing this program," Form SF-424B, attached as Ex. A—including the alignment requirements announced in the NCC Notice. *See* NCC Notice at 4; *see also id.* at 3 (stating that the NCC Notice "prescribes the content, information, and requirements for the OPA NCC award application"). And there is no dispute that, as a result of the new alignment requirements, Plaintiffs' applications do not include conforming certifications. Rather, to avoid the "risk [of] a false certification," *Nat'l Urb. League*, 2025 WL 1275613, at *11, Plaintiffs made explicit in their applications that they were "in no way certifying" compliance with the NCC Notice. PI Ex. 6 (PPGNY Decl.) ¶ 19; PI Ex. 7 (PPGNHAIK Decl.) ¶ 54; *see* PI Ex. 8 (PPCCC Decl.) ¶ 42 (stating that PPCCC "submits this application without certifying alignment" as required by the NCC notice); PI Ex. 9 (PPH Decl.) ¶ 60 (same for PPH). Thus, even if HHS improbably construed the NCC Notice's alignment requirements to have no teeth at all, it would have to look past its unambiguous certification requirement to grant Plaintiffs' applications. "So *Defendants* are the ones speculating by suggesting that [HHS] will

4

disregard [the NCC Notice] when implementing [its] provisions." *Nat'l Urb. League*, 2025 WL 1275613, at *12.

The inevitability that funding will be terminated is especially obvious for PPMM, which did not submit any application because it determined the new requirements were insurmountable and the risk of certifying was too great. *See* PI Ex. 10 (PPMM Decl.) ¶ 53. While the government contends that PPMM's harm is therefore self-inflicted, Opp. 9, courts have recognized that a prospective grantee suffers harm traceable to the government's conduct—not its own—when it forgoes applying to a program for which it is "able and ready to bid" but for unlawful program terms. *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1108 (9th Cir. 2020) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). Because PPMM, absent immediate relief, has no chance to receive funds on which its business vitally depends, its harm is irremediable by anything other than an injunction requiring HHS to reopen applications without the Notice's unlawful requirements.[2]

*Second*, the government ignores that some Plaintiffs have already made changes to their programs in response to the unlawful notice, which would thus go into effect even if their applications were improbably granted. While explaining that full alignment would be impossible, PPGNY, PPCCC, and PPH each made changes to their programs in an attempt to satisfy the NCC

---

[2] The government asserts in a footnote that PPMM "may not have received continuation funding" anyway because it had "poor performance." *See* Opp. 9 n.2. That assertion is both irrelevant and misleading. PPMM has met its benchmarks in all but two of its semi-annual reports, and the agency has informed PPMM that PPMM was "adequately addressing" agency concerns. Supp. PPMM Decl. ¶¶ 4, 6 (attached as Ex. B). In any event, that the agency might have other, lawful grounds on which it might base a termination decision has no bearing on its harm from the NCC Notice's unlawful terms, *see Gratz v. Bollinger*, 539 U.S. 244, 262 (2003), as the government does not dispute.

Notice. *See* PI Ex. 6 (PPGNY Decl.) ¶ 50; PI Ex. 8 (PPCCC Decl.) ¶ 41; PI Ex. 9 (PPH Decl.) ¶ 59. In PPCCC's case, this meant removing "language on the gender and cultural ideologies from [its existing] program materials" and "adding two new [evidence-based programs]" for the coming year. PI Ex. 8 (PPCCC Decl.) ¶ 41. For PPH, changes included "redacting words like 'gender'" and scrapping Spanish-language materials that PPH staff lacked the expertise to review for alignment. PI Ex. 9 (PPH Decl.) ¶ 59. Even if HHS were to *grant* their applications, those Plaintiffs would thus suffer irreparable harm because they would be locked into program materials that do not fully serve their mission. *See Nat'l Urb. League*, 2025 WL 1275613, at *11 (recognizing "change[s] [to] programming" as "real" and nonspeculative harm). Absent an injunction now, "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9.

The NCC Notice also imposes administrative burdens on Plaintiffs that cannot be recouped. Plaintiffs who modified their programs "will have to divert resources from prior aspects of the TPP Program"—in PPCCC's case, by implementing an entirely new evidence-based program. PI Ex. 8 (PPCCC Decl.) ¶ 47. In addition to financial costs, doing so "will have a significant impact on PPCCC's ability to meet its other program goals and retain the caliber of its current teen education programs." *Id.*; *see Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57 (D.D.C. 2020) (finding irreparable harm where agency action would force plaintiffs to "to devote more resources" and increase "community outreach"). "Courts routinely find irreparable harm based on similar allegations of future injury." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 57 (D.D.C. 2020).

*Third*, the government's claim (Opp. 10-11) that even Plaintiffs' economic harms could be redressed by subsequent judicial review of HHS's grant determinations defies logic. Apparently,

the government's position is that Plaintiffs should continue running their programs—incurring chargeable costs and paying employees after HHS terminates them from the program—on the hope that they may ultimately persuade a court to reinstate their grants. Uncontroverted record evidence shows that Plaintiffs cannot afford to do so. Loss of funding—even on an interim basis—would leave Plaintiffs "no choice but to drastically reduce [their] education programming," PI Ex. 6 (PPGNY Decl.) ¶ 63; lay off staff, PI Ex. 7 (PPGNHAIK Decl.) ¶ 61, PI Ex. 8 (PPCCC Decl.) ¶ 50, PI Ex. 9 (PPH Decl.) ¶ 71; and abandon longstanding community partnerships, PI Ex. 6 (PPGNY Decl.) ¶ 66, PI Ex. 9 (PPH Decl.) ¶ 71. It would also irremediably damage Plaintiffs' reputations and jeopardize their credibility with contracting partners, who will be unwilling to work with Plaintiffs if funding is disrupted. PI Ex. 6 (PPGNY Decl.) ¶ 67.

In these circumstances, post-termination remedies—even if available—would plainly be inadequate.[3] Courts in this District have had little trouble concluding that monetary losses like these, which would cause attendant reputational harm and employee layoffs, suffice for irreparable harm. *See* PI Br. 39-41.

---

[3] The government, for its part, declines even to represent that it would litigate such claims on the merits in this forum—stating only that Plaintiffs would have two months "to seek any appropriate relief" before it re-obligates TPP Program funds. As has become routine in grant-termination cases, the government is likely to argue that the agency's termination decisions are reviewable only in the Court of Federal Claims. *See, e.g.*, Emergency Mot. for Administrative Stay and Stay Pending Appeal at 18-23, *RFE/RL, Inc. v. Lake*, No. 25-5158 (D.C. Cir. May 1, 2025). There, it will surely contend that no relief is available because federal grant programs are not "money-mandating." U.S. Br. 30-32, *112 Genesee St., LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025). Plaintiffs do not suggest that such arguments should succeed, but the government's pattern of disputing the reviewability of grant-termination claims in every forum in which they are presented weighs heavily against its contention that this Court should wait for termination decisions to act.

II.    **Plaintiffs Are Likely to Succeed on the Merits**

A.    **The NCC Notice is Quintessential Final Agency Action**

As set forth in Plaintiff's motion, the NCC Notice is final agency action because it "prescribes the content, information, and requirements" for continuation awards, NCC Notice at 3, and marks the consummation of HHS' determination of program terms. *See* PI Br. 27-28; *see also Planned Parenthood of New York City*, 337 F. Supp. 3d at 326-30 (holding that TPP Program application terms in funding announcement were reviewable final agency action). In resisting that straightforward result, the government advances two arguments that grossly misread both the Notice and circuit precedent. Principally, the government contends (Opp. 18-20) that the NCC Notice—despite including mandatory language and stressing alignment with executive orders no fewer than fifteen times—in fact imposes no new requirements on applicants whatsoever. Further, relying exclusively on cases involving environmental challenges to individual project approvals, it contends (Opp. 18) that APA claims are categorically unripe until the government applies program terms to grant or deny an individual application. Neither argument has merit.

First, the government's contention that the NCC Notice imposes no obligations on TPP Program participants ignores its unambiguously mandatory language. The NCC Notice speaks in mandatory terms: it "prescribes the … requirements" for non-competing continuation applications. NCC Notice at 3. The Notice also makes clear that applications that fail to align with executive orders will not be "[s]uccessful." *Id.* at 5. And if those provisions left any doubt, it further "requires" that program participants submit SF-424B, which includes a mandatory certification that applicants comply with all "policies governing the program." Ex. A. By its terms, applicants are not "free to ignore" these requirements. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). Rather, they face a "forced choice" to "change their programming, risk a false

certification, or forgo the federal funds or contract." *Nat'l Urb. League*, 2025 WL 1275613, at *11; *see also Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 957 (D.C. Cir. 2019) (holding that agency letter amounted to final agency action where it subjected party to risk of false certification). As this Court recently recognized, imposing this forced choice "is like a 'regulation[] that require[s] … some action by the plaintiff," *Nat'l Urb. League*, 2025 WL 1275613, at *11, which is a quintessential final agency action. The NCC Notice thus determines the "rights [and] obligations" of program participants, and it has "direct and appreciable legal consequences" for those organizations, *Bennett v. Spear*, 520 U.S. 154, 178 (1997)—including both eligibility for federal funding and the risk of a false certification.

Alternatively, the government contends (Opp. 18) that these plainly binding obligations are not truly *new* obligations because TPP Program recipients must already "comply" with executive orders. But that position ignores both the NCC Notice's text and practical reality. For one, "align" and "comply" mean different things—to "align" means to "array on the side of or against a party or cause," while "comply" means to "to conform … as *required*."[4] That distinction is  especially acute when applying executive orders, which typically "focus[] solely on the internal management of the Executive Branch" and impose no direct obligations on private parties. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 913 (D.C. Cir. 2024). That is, absent the new alignment requirements, most executive orders do not on their own require Plaintiffs to "comply" with anything at all.

Tellingly, that is true for the five executive orders the NCC Notice identifies as "of most relevance" to its requirements, NCC Notice at 4-5, all of which direct only *federal agencies* to take specific action and impose no direct requirements on grantees. Executive Order 14168 relating to

---

[4] *Align*, Merriam Webster, https://www.merriam-webster.com/dictionary/align; *Comply*, Merriam Webster, https://www.merriam-webster.com/dictionary/comply (emphasis added).

"gender ideology extremism," for example, instructs federal agencies to provide guidance, enforce laws, and assess grant conditions; it does not by its own force direct grantees to take any action. Exec. Order No. 14168, 90 Fed. Reg. 8,615 (Jan. 20, 2025). Likewise, the executive order regarding "Radical Indoctrination in K-12 Schooling" instructs agency heads to prepare a plan to carry out the administration's policies, re-establishes the 1776 Commission, and directs agencies to monitor compliance with federal law. *See* Exec. Order No. 14190, 90 Fed. Reg. 8,853 (Jan. 29, 2025). Its only mention of federal grants is to direct *agency heads*—not private parties—to develop "recommendations and a plan for" federal funding related to "gender ideology or discriminatory equity ideology." *Id.* The remaining three executive orders similarly command government actors alone, as do many of the other executive orders with which Plaintiffs must now "align." Thus, if only compliance with the *requirements* of executive orders were at issue in the NCC Notice, these orders would be irrelevant—not "of most relevance" as stated in the NCC Notice.

The government's second argument that TPP Program terms are unripe for adjudication is equally off-base. The NCC Notice marks the "'consummation' of the agency's decisionmaking process" regarding the requirements for non-competitive continuation awards, and it is not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177-78. There is no administrative procedure through which Plaintiffs might compel HHS to revisit its decision, and Plaintiffs "will be afforded no additional opportunity to make the arguments to the agency that they now present in this" lawsuit. *CropLife Am. v. EPA*, 329 F.3d 876, 882 (D.C. Cir. 2003). That individual application decisions might also be reviewable makes no difference for finality. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016) (explaining that agency action may be final even if it "would have effect only if and when" it was implemented "against a particular [regulated party]" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967))).

Contending otherwise, the government cites three cases about the National Environmental Policy Act (NEPA), all of which involved challenges to preliminary project approvals, for the proposition that final agency action does not occur until the agency "completes its review and reaches a decision [on the grant award]." Opp. 18 (quoting *Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004)). These cases are a red herring. Because Plaintiffs here protest the agency's rule imposing new requirements for an award, not its application of those criteria to a specific grant application, the government's cases do not apply. *Citizens Alert* considered a challenge to the EPA's ongoing environmental assessment as part of a specific grant to fund a sewer line, not the generally applicable rules EPA applies to those assessments. *See* 102 F. App'x at 168. In *Karst*, the Court held only that a party could claim no final agency action (thereby triggering NEPA requirements) based on the agency's ongoing *consideration* of whether to obligate funds for an industrial complex. It has nothing to do with the finality of generally applicable rules governing eligibility for a federal program. *See Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005). *Rattlesnake Coal* is even further afield, as the court there merely clarified that a *congressional appropriation* is not final agency action. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103–04 (9th Cir. 2007). The government thus cites no relevant authority that a rule made generally applicable to *all* applicants is non-final.

On the contrary, applicable cases demonstrate that Plaintiffs can challenge the NCC Notice now rather than contesting the agency's separate decisions on their applications. In *National Mining Association v. Jackson*, for instance, another court in this Circuit held that the EPA took final action when it "implemented a change in the permitting process" under the Clean Water Act through "a series of memoranda and a detailed guidance." 768 F. Supp. 2d 34, 38, 44 (D.D.C. 2011). The court there rejected the agency's position that such "actions are not final because they

do not mark the grant or denial of the various permits at issue." *Id.* at 42. So too did final action occur here when HHS "implemented a change" to the NCC process.

And the posture of this case is also similar to that of *CropLife America*. The court there held that a press release changing criteria for pesticide safety evaluations represented final agency action because the "directive constitute[d] a binding regulation that [wa]s directly aimed at and enforceable against" the petitioners, and its "clear and unequivocal language …. reflect[ed] an obvious change in established agency practice" creating a "binding norm." 329 F.3d at 118. The NCC Notice here similarly represents "an obvious change in established agency practice" through "clear and unequivocal language" that is "directly aimed at" Plaintiffs. *Id.*; *see also* NCC Notice at 3, 5 (specifying requirements for successful application).[5]

Finally, the reviewability of HHS's action is especially clear here given courts' "'pragmatic' approach … to finality." *Hawkes*, 578 U.S. at 599 (citation omitted)). Although HHS has not yet granted or denied Plaintiffs' NCC applications based on alignment with executive orders, the practical effect of the NCC Notice is to demand that applicants make significant changes to their programs. *See, e.g.*, PI Ex. 7 (PPGNHAIK Decl.) ¶¶ 50–53; PI Ex. 8 (PPCCC Decl.) ¶¶ 41, 43, 47; PI Ex. 9 (PPH Decl.) ¶¶ 50–54, 59; PI Ex. 10 (PPMM Decl.) ¶¶ 43–56; *see also Jackson*, 768 F. Supp. 2d at 45 (evaluating "practical impact on the plaintiff's members seeking permits"). As this Court recognized in *National Urban League*, here the NCC Notice imposes upon Plaintiffs a "lose-lose-lose choice" to "change their programming, risk a false

---

[5] The government misconstrues the purpose for which Plaintiffs cite *Hawkes Co. See* PI Br. 27-28; Opp. 19-20. Plaintiffs rely on the opinion's discussion of *Frozen Food Express*, in which the Supreme Court held that an agency's generally applicable "order specifying which commodities [it] believed were exempt by statute from regulation, and which it believed were not," could be challenged prior to the order's deployment in a particular case. *See Hawkes Co.*, 578 U.S. at 599-600 (discussing *Frozen Food Express v. United States*, 351 U.S. 40 (1956)). That principle directly applies here.

certification, or forgo the federal funds." *Nat'l Urb. League*, 2025 WL 1275613, at *11. This government-imposed Hobson's choice and the resulting harm suffered by Plaintiffs exist regardless whether their applications are accepted or rejected. *See supra*, at 2-7. Because HHS's action has legal and practical effect now, there is no bar to review.

### B.  The NCC Notice Does Not Reflect a Decision Committed to Agency Discretion

Under the APA, there is "a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 807 (D.C. Cir. 1983) (quoting *NRDC, Inc. v. SEC*, 606 F.2d 1031, 1043 (D.C. Cir. 1979)). "The exception for agency action 'committed to agency discretion by law' is a 'very narrow' one, reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).

As the government concedes (Opp. 22), courts—including in this District—have uniformly found TPP Program criteria and funding decisions reviewable under the APA. *See, e.g.*, *Planned Parenthood of Greater Wash. & N. Idaho*, 946 F.3d at 1108-13  (holding that TPP Program award criteria were reviewable and contrary to law); *Multnomah County v. Azar*, 340 F. Supp. 3d 1046, 1061-62, 1069-70 (D. Or. 2018) (same); *Healthy Futures of Tex. v. HHS*, 315 F. Supp. 3d 339, 348 (D.D.C. 2018) (holding that terminations of TPP Program awards were reviewable and arbitrary and capricious); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657-61 (D. Md. 2018) (same); *King County v. Azar*, 320 F. Supp. 3d 1167, 1175-77 (W.D. Wash. 2018) (same); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76-84 (D.D.C. 2018) (same); *Planned Parenthood of New York City, Inc. v. HHS*, 337 F. Supp. 3d 308, 324-26, 331-41 (S.D.N.Y. 2018) (holding that TPP

Program award criteria were reviewable, contrary to law, and arbitrary and capricious). This case is no different. Like in *Planned Parenthood of New York City*, "Defendants point to *no* statutory language … that evinces Congressional intent to insulate [award criteria] from judicial review," 337 F. Supp. 3d at 324; much less make the "clear showing" of nonreviewability that D.C. Circuit precedent requires, *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 807.[6]

Nonetheless, the government advances the faulty theory that all "grant-award decisions are presumptively unreviewable." Opp. 21. That assertion flouts decades of precedent applying the APA's "strong presumption" of reviewability in challenges to federal funding criteria. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). And it conflicts with a host of cases reviewing agency funding decisions on the merits. *See, e.g.*, *S. Educ. Found. v. Dep't of Educ.*, No. 25-cv-1079, 2025 WL 1453047, at *1 (D.D.C. May 21, 2025) (education grants); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025) (USAID grants), *appeal dismissed*, No. 25-5046 (D.C. Cir. Feb. 26, 2025), *stay denied*, No. 24A831 (U.S. Mar. 5, 2025); *AID Atlanta, Inc. v. HHS*, 340 F. Supp. 3d 1, 4 (D.D.C. 2018) (CDC grants).

The government principally relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993), and a handful of cases of applying it. But those decisions make clear that when Congress requires that an agency fund a particular program, the agency's implementation of that statutory mandate is subject to APA review. *Lincoln* involved an agency's decision to stop allocating funds under a lump-sum appropriation to a program that the relevant appropriations statute "did not so much as mention."

---

[6] Ignoring the "consensus view" that TPP Program determinations are judicially reviewable, *Healthy Futures of Tex.*, 315 F. Supp. 3d at 348, the government contends that *Policy & Research* means that *only* TPP Program termination regulations provide a judicially manageable standard. *See* Opp. 22. But the court there had no reason to evaluate statutory program requirements because the plaintiffs asserted a challenge only under agency regulations. *See* Motion for Preliminary Injunction at 25-26, *Pol'y & Rsch., LLC v. HHS*, No. 18-cv-346 (D.D.C. Feb. 23, 2018).

*Id.* at 193-94. Relying on principles of appropriations law, the Court explained that "where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds," it reserves the allocation of funds to agency discretion. *Id.* at 192 (quotation marks omitted). But "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 193. The D.C. Circuit's decision in *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), on which the government relies, illustrates exactly that distinction. Although the court concluded that the allocation of funds appropriated for agricultural assistance "in a manner determined appropriate by the Secretary" was committed to agency discretion, it held that another appropriation for a program to compensate dairy farmers for "economic losses incurred during 1999" sufficed to permit judicial review. *Id.* at 751-52.

Far from providing "sparse guidance," Opp. 21, Congress's directives governing the TPP Program are clearer and more specific than those the D.C. Circuit has held provide manageable standards in other cases. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 101 (D.C. Cir. 2021) (collecting examples of even "permissive language" the D.C. Circuit has determined enabled APA review). Under the Further Consolidated Appropriations Act of 2024, Congress directed that specified appropriations "shall be for making competitive contracts and grants to public and private entities to fund *medically accurate* and age appropriate programs that reduce teen pregnancy," of which after administrative expenses "75 percent shall be for *replicating programs that have been proven effective* through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Pub. L. No. 118-47, 138 Stat. 460, 671 (emphasis added). Medical accuracy and replication of proven programs are clear-cut statutory standards—standards that the NCC Notice's alignment requirements contravene. *See Planned Parenthood of New York City*, 337 F. Supp. 3d at 332-35 (assessing the "ordinary meaning" of

those terms and determining that agency's TPP Program criteria contravened them (quoting *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018)); *see also infra*, at 17. Congress thus "has not left the Secretary with 'unbounded' discretion" as required to preclude APA review. *Shawnee Tribe*, 984 F.3d at 101 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)).

The government is also mistaken (Opp. 22) that language in the NOFO stating that HHS will award funds in the "best interests of the government" insulates award criteria from judicial review. If accepted, that position would subordinate the APA's judicial review provisions—as well as the TPP Program's statutory requirements—to the agency's ipse dixit. No court has ever accepted the argument that an agency may displace judicial review simply by asserting that it will make decisions on a discretionary basis. To the contrary, the D.C. Circuit has expressly held that a grant program's statutory requirements supply a "'judicially manageable standard'" even where another *statutory* provision affords the agency discretion to "allocate funds 'in such manner as [the agency] determines appropriate.'" *Shawnee Tribe*, 984 F.3d at 100 (quoting *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (first quotation), and 42 U.S.C. § 801 (second quotation)). So long as there is some "law to apply," APA review is available. *Id.* (quoting *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020)). TPP Program requirements—which Congress defined in clear and mandatory terms—fall nowhere close to that line.

### C. The NCC Notice is Unlawful

#### 1. Plaintiffs Are Likely to Succeed on All Their APA Claims

##### a. Contrary to Law, Arbitrary, and Capricious

The government devotes less than two pages to addressing the merits of Plaintiffs' APA claims, and does not cite a single case in support of their position. Opp. 23-24. Plaintiffs, on the other hand, have plainly established that the NCC Notice violates the APA because it is (1) contrary to law; and (2) arbitrary and capricious. PI Br. 27-37.

16

*First*, the NCC Notice is contrary to law because it clashes with the program's statutory and regulatory requirements, which require faithful "replicat[ion]" of "medically accurate," evidence-based models. PI Br. 28-32. The government asserts (Opp. 23)—without any factual support—that the NCC Notice does not require grantees to change their programs in a manner that contravenes Congress's directives for the TPP Program. That argument fails as a matter of fact and law. The government does not address, much less dispute, the extensive factual material cited in Plaintiffs' opening brief, including declarations from both grantees and an expert on evidence-based public health policy, demonstrating specific conflicts between statutory program requirements and new requirements in the NCC Notice. *See, e.g.,* PI Br. 28 (citing PI Ex. 5 (Kantor Decl.) ¶ 20(b)); *id.* at 30-33 (citing PI Ex. 6 (PPGNY Decl.) ¶ 52-53; PI Ex. 7 (PPGNHAIK Decl.) ¶¶ 44, 47, 49; PI Ex. 9 (PPH Decl.) ¶¶ 48-50). And the government ignores case law in which courts have specifically held that requirements to substantially change a TPP Program violate the replication requirement Congress has imposed for evidence-based programs. *See* PI Br. 30; *Planned Parenthood of Greater Wash.*, 946 F.3d at 1113 ("[T]he 2018 Tier 1 [NOA] would incorrectly permit grants for programs not proven effective, contrary to the TPPP"); *Planned Parenthood of New York City, Inc.*, 337 F. Supp. 3d at 331-37 ("Defendants have violated their statutory obligation to select model 'programs' 'proven effective through rigorous evaluation.'"); *Multnomah County*, 340 F. Supp. 3d at 1067-68 (vacating 2018 Tier 1 Funding Announcement as "not in accordance with law" because "HHS … ignore[d] the qualifier that the programs 'must be proven effective by rigorous evaluation.'").

*Second*, the NCC Notice is arbitrary and capricious because it is: (1) neither reasonable nor reasonably explained; (2) constitutes an unexplained change in position; and (3) so vague that it fails to provide parties with fair notice of what it requires. PI Br. 33-37. The government devotes

a single paragraph to the arbitrary and capricious claims (Opp. 24), in which it briefly asserts that the NCC Notice was not an unexplained change in the agency's position and that Plaintiffs did not lack fair notice. Again, the government cites no case law or factual material whatsoever for this position. It claims that the NOFO's requirement for "certification of compliance with executive orders governing financial assistance awards," combined with the Notice of Award language referencing *compliance* with executive orders, was sufficient notice. *Id.* But it is undisputed that the NOFO and Notice of Award did not require "alignment" with executive orders, including the five specific executive orders highlighted, none of which require action by private parties. Simply put, those five orders impose no direct obligations on TPP Program recipients for them to comply with. *See supra*, at 9-10. Requiring "alignment" with those orders now is something new.

As to vagueness more broadly, the government's only answer is that their instructions were already vague, pointing to terms in the standard award agreement that do not regulate the NCC application process here.[7] *See* Opp. 16. The government does not attempt to define the term "alignment," nor demonstrate that any one of the wide-ranging executive orders might guide Plaintiffs' NCC applications. *See* PI Br. 23-25. And it fails to respond to the risk of arbitrary enforcement now that HHS may "deny applications for arbitrary and discriminatory reasons in the name of failure to 'align' programs with Executive Orders." PI Br. 27. In sum, there is little doubt that the NCC Notice provides no discernable standard for determining what constitutes "alignment" with 140+ executive orders (many of which are vague themselves) under the circumstances here—particularly where any version of "alignment" would seemingly contradict the statutory mission of the program at issue. As detailed in Plaintiffs' opening brief, an agency

---

[7] Plaintiffs interpret the award agreement language cited by the government to mirror the NOFO language requiring compliance with the narrower set of "federal laws, executive orders, regulations, and public policies *governing financial assistance awards*." PI Ex. 1 at 63.

requirement that is so vague that it fails to provide regulated parties fair notice of what is required is per se arbitrary and capricious. PI Br. 36. The government does not contend otherwise.

### b. The NCC Notice is Unconstitutionally Vague

The NCC Notice's "alignment" requirement is also unconstitutionally vague. As discussed above, the government barely addresses vagueness. Instead, it posits (Opp. 12-13) that the unconstitutional vagueness doctrine does not apply at all in cases where the government confers a benefit. As a threshold matter, the Court need not reach this issue because the NCC Notice's vagueness violates the APA regardless of whether Plaintiffs hold any constitutionally protected interest. *See supra*, at 18-19. In any event, the government's argument fails because it runs headlong into cases like *Karem v. Trump*, which held that due process requires fair notice before imposing penalties on private parties, including by terminating even discretionary benefits. 960 F.3d 656, 664 (D.C. Cir. 2020) (White House press pass). Indeed, at least one court has recently enjoined grant terms requiring adherence to executive orders—including some of those identified in the NCC notice—on the ground that those conditions were "likely void for vagueness." *King County v. Turner*, 2025 WL 1331488, at *1; *see* Motion for Temporary Restraining Order at 6-7, *King County v. Turner*, No. 25-cv-814 (W.D. Wash. May 5, 2025).

The government cites *National Urban League* for the proposition that grants cannot create a property interest. *See* Opp. 15. But the plaintiffs there contended that a property interest arose merely from the fact that they held government contracts. *Nat'l Urb. League v. Trump*, 2025 WL 1275613, at *18; *see also id.* (explaining that plaintiffs "barely contend[ed] that they do have a protected property interest"). A property interest in a government contract or grant exists, however, when "independent legal rules" such as "applicable federal regulations" "commit the government

19

to protecting the rights created by [a] contract." *Toxco, Inc. v. Chu*, 801 F. Supp. 2d 1, 9 (D.D.C.

2011); *see also Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 677 n.9 (7th Cir. 1987)

Here, HHS had already prescribed a rule under which it "will" grant NCC applications,

which fund projects that Plaintiffs have developed over years with a legitimate expectation that

funding will continue. *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 41 (D.C. Cir. 2015); *see* PI Ex. 1,

at 18 (stating that the agency "*will* fund awards in annual increments" (emphasis added)). For

"[e]ach year of the approved period of performance," the agency "*will* award continuation funding

based on four factors: "[1] availability of funds, [2] satisfactory progress of the project, [3] grants

management compliance, . . . and [4] continued best interests of the government." PI Ex. 1, at 58

(emphasis added). Plaintiffs thus have "a legitimate claim of entitlement" to NCC funding if they

satisfy these criteria. *Peacock*, 794 F.3d at 41; *see also Oregon v. FCC*, 102 F.3d 583, 585 (D.C.

Cir. 1996) (holding that the "well-settled rule" that an agency must "follow its own regulations"

rendered abrupt changes to grant application requirements unlawful).[8] By imposing additional

terms inconsistent with Congress's directives—a mere fifteen days before NCC applications were

due—HHS violated Plaintiffs' due process rights.

### 2. Plaintiffs are Likely to Succeed on Their Ultra Vires Claim

Plaintiffs have demonstrated that the government imposed requirements that are plainly

irreconcilable with Congress's instructions in the relevant appropriations statutes. *See* PI Br. 37-

---

[8] Plaintiffs' claim to a property interest in NCC funding is buttressed by the fact that HHS has a "consistent practice" of awarding continuation funding when applicants meet the necessary criteria—a fact undisputed in the record. *Tarpeh-Doe v. United States*, 904 F.2d 719, 724 (D.C. Cir. 1990); *see, e.g.*, PI Ex. 6 (PPGNY Decl.) ¶ 12; PI Ex. 7 (PPGNHAIK Decl.) ¶¶ 8–15; PI Ex. 9 (PPH Decl.) ¶¶ 8–13, 59; PI Ex. 10 (PPMM Decl.) ¶¶ 7–11.

38. The government argues that it has not violated any "specific and unambiguous" statutory directive prohibiting the agency from substituting its own priorities for those of Congress. Opp. 24 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Yet the government fails to grapple at all with Congress's "specific command" that the relevant funding to "reduce teen pregnancy … shall be for replicating programs that have been proven effective through rigorous evaluation." Further Consolidated Appropriations Act of 2024, 138 Stat. at 671. Congress expressed, with unusual clarity, that programs should be based on scientific evidence and insulated from political tides. Instead of following the unambiguous directive to replicate programs scientifically proven to reduce teen pregnancy, HHS decided to evaluate applications based on alignment related to "Gender Ideology Extremism," "Ending Radical Indoctrination" in schools, "Ending Radical and Wasteful Government DEI Programs and Preferencing," and a list of other priorities unrelated to proven effectiveness. *See* NCC Notice at 4-5; PI Br. 24-26; *see also County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531–32 (N.D. Cal. 2017) (finding that Executive Branch's "attempt to place new conditions on federal funds [was] an improper attempt to wield Congress's exclusive spending power"); *PFLAG, Inc. v. Trump*, No. 25-cv-337-BAH, 2025 WL 685124, at *14-24 (D. Md. Mar. 4, 2025) (finding officials' actions *ultra vires* because they "condition[ed] grant funding on conditions not prescribed by Congress"). Because the statute "plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). Plaintiffs

are thus likely to succeed on their claims that HHS has acted beyond its authority.[9]

## III.    The Court Should Issue Plaintiffs' Requested Relief

### A.  The Balance of Equities and Public Interest Weigh Heavily In Plaintiffs' Favor

The public interest and balance of equities overwhelmingly favor a preliminary injunction. The government fails to substantively respond to Plaintiffs' arguments or to contest at all the catastrophic impacts that terminating Plaintiffs' TPP Program grants would have on them and on the communities they serve. And the government does not, and cannot, explain how continuing to administer funding consistent with the criteria HHS has used for over a decade would cause any harm to the government or the public. It would not.

"'[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,] … pay[ing] particular regard for the public consequences' that would result in granting the relief sought." *S. Educ. Found.*, 2025 WL 1453047, at *17 (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). Here, the "public consequences" of denying an injunction will impact not only Plaintiffs, but also the thousands of youth from historically underserved communities who rely on TPP programs to deliver medically accurate, current, and high-quality sexual and reproductive health education. *See* PI Ex. 6 (PPGNY Decl.) ¶¶ 68-69; PI Ex. 7 (PPGNHAIK Decl.) ¶¶ 58-62; PI Ex. 8 (PPCCC Decl.) ¶ 55; PI Ex. 9 (PPH Decl.) ¶¶ 66-71; PI Ex. 10 (PPMM Decl.) ¶¶ 58-60; *see also* PI Br. 12-13. Without these programs, youth and their families will lose access to those critical resources. This in turn will have long-term effects on health outcomes, a fact the government does not dispute. *See* PI Ex. 8 (PPCC Decl.) ¶ 11; *see also* PI Ex. 5 (Kantor Decl.) ¶ 17.

---

[9] The government finally argues (Opp. 25) that ultra vires review is unavailable here because "an alternative remedial forum exists" (while failing to identify such a forum), apparently conceding that ultra vires review is available if none of Plaintiffs' other claims would support relief.

Conversely, the burden the government proffers boils down to potential administrative hassle, at most. *See* Opp. 25-26 (arguing that granting Plaintiffs' motion "would upend HHS's ongoing consideration of applications for the upcoming year"). But the government fails to explain *how* granting Plaintiffs' motion would even do so, or why those unspecified burdens would tip the balance of equities in its favor.[10] Moreover, to the extent HHS's "ongoing consideration of applications" is underway, it is based on unlawful criteria and "the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks omitted). Indeed, awarding *preliminary* relief will minimize the burdens on nonparties by ensuring HHS administers the TPP Program in an orderly and uniform fashion, rather than needing to reopen applications already decided if the NCC Notice is vacated on final judgment.

### B.  Relief Akin to Vacatur in its Scope and Effect is Appropriate

The Court should reject the government's invitation to limit any preliminary relief to "grants involving Plaintiffs specifically." Opp. 26. Doubtless there are cases where such "narrowly tailored" (Opp. 26) relief is appropriate. But for two interrelated reasons, this is no such case.

*First*, to avoid needless disruption to the TPP Program, preliminary relief in this case should have the same scope and effect as that available on final judgment. The government does not dispute that, if Plaintiffs prevail on the merits, the APA requires vacatur of the NCC Notice, relief that necessarily affects the rights of non-party grantees. *See* 5 U.S.C. § 706 ("reviewing court *shall*" "hold unlawful and set aside agency action" (emphasis added)); *Corner Post, Inc. v. Bd. of*

---

[10] *Trump v. Wilcox*, No. 24A966, 2025 WL 1464804, at *1 (U.S. May 22, 2025) is inapposite. The "disruptive effect" the Supreme Court identified was not "on government operations," as the government characterizes it (Opp. 26), but rather on "the repeated removal and reinstatement of [executive] officers during the pendency of th[e] litigation," 2025 WL 146480, at *1.

*Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) (explaining that the APA by its terms requires vacatur of unlawful agency action). The APA likewise makes clear that even preliminary remedies should be program-wide. Under Section 705, a reviewing court may "postpone the effective date of an agency action"—essentially vacatur on an interim basis. Because any final remedy would reach all applications of the unlawful NCC Notice, no sound reason exists to impose a two-track application process at this stage.

Failing to grant program-wide preliminary relief would also significantly prejudice non-parties, both because it would leave their applications in legal limbo and because their rights are likely to be affected by vacatur on final judgment. That concern is a powerful and appropriate reason to tailor the scope of preliminary relief to the scope of probable final relief. *See North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (court should consider "what is necessary, what is fair, and what is workable" (cleaned up)); *see also Florida v. HHS*, 19 F.4th 1271, 1282 (11th Cir. 2021) (similar); *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (similar). Especially in the sensitive area of grantmaking, where the sudden vacatur of the unlawful NCC Notice could mean that non-parties suddenly find their grants in jeopardy when the unlawful NCC Notice ultimately is set aside, preliminary relief that avoids that result is necessary and appropriate.[11]

---

[11] The court may wish to consolidate Plaintiffs' motion for a preliminary injunction with a full consideration of the merits under Rule 65(a)(2) of the Federal Rules of Civil Procedure to conserve judicial resources and minimize disputes pertaining to the appropriateness of preliminary relief. *See* Fed. R. Civ. P. 65(a)(2). If the Court finds that the NCC Notice is unlawful, vacatur would be the default remedy on final judgment, which would obviate any need to decide issues of irreparable harm or the scope of a preliminary injunction. And because the issues here are purely legal with no further factual development required, there is no practical obstacle to following that course.

**IV.    The Court Should Require At Most a Nominal Injunction Bond**

Finally, the Court should require no or at most a nominal injunction bond. "Courts in this Circuit have found [Rule 65(c)] 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up) (quoting *DSE, Inc. v. United States,* 169 F.3d 21, 33 (D.C. Cir. 1999)). In particular, "courts have held that security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action." *NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *see, e.g.*, *S. Educ. Found.*, 2025 WL 1453047, at *18 ($100 bond); *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-946, 2025 WL 1187730, at *64 (D.D.C. Apr. 24, 2025) (no bond); *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 1131412, at *21 (D.D.C. Apr. 16, 2025) (no bond); *Associated Press v. Budowich*, No. 25-cv-532, 2025 WL 1039572, at *19 (D.D.C. Apr. 8, 2025) (no bond).

That is plainly the case here, where Plaintiffs are non-profits that depend substantially on the threatened TPP Program funding to support their operations. *See* PI Ex. 6 (PPGNY Decl.) ¶¶ 1, 68; PI Ex. 7 (PPGNHAIK Decl.) ¶¶ 1, 58-61; PI Ex. 8 (PPCCC Decl.) ¶¶ 50-51; PI Ex. 9 (PPH Decl.) ¶¶ 1, 71; PI Ex. 10 (PPMM Decl.) ¶¶ 58-60. For its part, the government offers no explanation of how the Court should quantify the purported "cost and disruption" associated with reopening the application period for grant applications that remain pending with the agency.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion.

Dated: June 3, 2025                    Respectfully submitted,

                                       By:    /s/ Andrew Tutt
                                              Drew A. Harker (DC Bar # 412527)
                                              Andrew T. Tutt (DC Bar # 1026916)
                                              Daniel Yablon (DC Bar # 90022490)
                                              ARNOLD & PORTER KAYE SCHOLER LLP
                                              601 Massachusetts Avenue, NW
                                              Washington, DC 20001
                                              (202) 942-5000
                                              draw.harker@arnoldporter.com
                                              andrew.tutt@arnoldporter.com
                                              daniel.yablon@arnoldporter.com

                                              Emily Nestler (DC Bar # 973886)
                                              PLANNED PARENTHOOD FEDERATION OF
                                              AMERICA
                                              1100 Vermont Avenue NW
                                              Washington, DC 20005
                                              (202) 973-4800
                                              emily.nestler@ppfa.org

                                              Valentina De Fex *(pro hac vice)*
                                              Kyla Eastling *(pro hac vice)*
                                              PLANNED PARENTHOOD FEDERATION OF
                                              AMERICA
                                              123 William Street, Floor 9
                                              New York, NY 10038
                                              valentina.defex@ppfa.org
                                              kyla.eastling@ppfa.org

                                              *Attorneys for Plaintiffs*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2025, the foregoing reply in support of motion for preliminary injunction was served via ECF to all counsel of record.

*/s/ Andrew Tutt*
Andrew Tutt

*Counsel for Plaintiffs*

27