UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER NEW YORK et al.,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES et al.,<br><br>      *Defendants*. | Civil Action No. 25-1334 (TJK) |

**MEMORANDUM OPINION**

Plaintiffs are five Planned Parenthood affiliates that receive grants and operate projects as part of the U.S. Department of Health and Human Services' Teen Pregnancy Prevention Program. As they prepared to file their annual continuing-funding applications, Defendants promulgated new guidance governing those applications. Plaintiffs argue that this new guidance violates their due-process rights and contravenes the Administrative Procedure Act, so they sued and moved for a preliminary injunction. To succeed on such a motion, Plaintiffs must show that they will imminently suffer irreparable harm absent an injunction. But none will face irreparable harm for at least another few months. So while the Court will order the parties to meet, confer, and jointly propose an expedited briefing schedule for future proceedings on the merits, it does not find that there is a need for preliminary equitable relief now. Thus, the Court will deny Plaintiffs' motion without prejudice.

**I.**     **Background**

Since 2010, Congress has appropriated funds for "making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce

teen pregnancy." Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). This appropriation, known as the Teen Pregnancy Prevention ("TPP") Program, requires the U.S. Department of Health and Human Services ("HHS") to fund two types of programs. *See* ECF No. 8-6 ¶¶ 7, 22; Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024). The first—Tier 1 programs—must "replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671; ECF No. 8-6 ¶ 22. And the second—Tier 2 programs—"develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." 138 Stat. at 671; ECF No. 8-6 ¶ 22.

In 2023, HHS issued a Notice of Funding Opportunity ("NOFO"), entitled "Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services," soliciting applications for Tier 1 TPP projects. ECF No. 8-2 at 2–3. These projects were to last for five years—from July 1, 2023, to June 30, 2028—and "serve communities and populations with the greatest needs and facing significant disparities to advance equity in adolescent health through the replication of evidence-based teen pregnancy prevention programs (EBPs) and services." *Id.*; ECF No. 8-7 ¶ 16. HHS accepted Plaintiffs—five Planned Parenthood affiliates—to operate several such projects.[1]

But HHS does not hand out all five years' worth of funding at the beginning. Instead, for years two through five, applicants must submit a non-competing continuation ("NCC") award application each year for continued funding, which HHS conditions "on availability of funds,

---

[1] ECF No. 8-7 ¶¶ 13–16; ECF No. 8-8 ¶¶ 10–13; ECF No. 8-9 ¶¶ 20–24; ECF No. 8-10 ¶¶ 10–13; ECF No. 8-11 ¶¶ 8–11.

satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." ECF No. 8-2 at 58. These applications are no small things. They must include "a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." *Id.* So to help program participants complete their annual applications, HHS promised to provide "[s]pecific guidance" each year "well in advance of the application due date." *Id.*

Funding for the current program year is set to expire on June 30, 2025. ECF No. 8-6 ¶ 30. So HHS issued its yearly guidance in January 2025, required participants to apply for continued funding by April 15, 2025, ECF No. 8-5 at 2, and is set to rule on those applications by June 30, 2025, ECF No. 16 at 19. Plaintiffs claim that this guidance "resembled the information received from prior years." *E.g.*, ECF No. 8-7 ¶ 40. But then, on March 31, 2025, HHS superseded that initial guidance with new guidance (the "NCC Notice"). *Id.* ¶ 43; ECF No. 8-3 (the NCC Notice).

While much of the NCC Notice mirrors the earlier guidance, it also differs in some ways. *Compare* ECF No. 8-3, *with* ECF No. 8-5. Among other things, the NCC Notice includes several references to "Presidential Executive Orders" that were not included in the earlier guidance. *E.g.*, ECF No. 8-3 at 4. For example, the NCC Notice says that HHS "will review" applications to ensure that "NOFO expectations are being met, to the extent aligned with Presidential Executive Orders." *Id.* It also provides that "[r]ecipients are expected to review and be aware of current Presidential Executive Orders" and "are encouraged to revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders." *Id.* at 5. It then identifies five Executive Orders that "may be of most relevance to the work of the TPP program." *Id.*; *see also id.* at 6 (listing Executive Orders).

In addition, the NCC Notice outlines potential changes applicants may need to make in

their TPP "project narratives" and "work plans"—two required application sections—to receive funds. As for their project narratives, the NCC Notice notes that "[s]uccessful applications will include" a "[d]escription of changes made to align with Executive Orders, if applicable." ECF No. 8-3 at 6. It adds that applicants should "[p]rovide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders, if applicable, including the steps taken to review the project and identify the modifications proposed." *Id.* And it lists changes applicants may consider: "selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc." *Id.* Applicants are also expected to "[p]rovide a brief summary of any proposed substantial changes," "including any proposed changes in scope to align the project with Presidential Executive Orders." *Id.* at 6 (emphasis omitted).

Next, regarding their TPP work plans, the NCC Notice requires applicants to "address the expectations outlined in the original NOFO, to the extent aligned with Presidential Executive Orders," and "clearly indicate in the work plan any changes made to align their project with Executive Orders." ECF No. 8-3 at 7. It then directs applicants to a table that "outlines the updated NOFO expectations to demonstrate alignment with Presidential Executive Orders." *Id.*; *see also id.* at 7–8 tbl.1. That table also hyperlinks to "[u]pdated guidance on NOFO expectations" that "reflect alignment with Presidential Executive Orders." *Id.* at 7–8 tbl.1; *see also* ECF No. 1 ¶ 78. And that guidance "provides a deep dive into each of the expectations of this grant program . . . to provide a clear blueprint to recipients" and "support them in achieving the overall goal of the program." ECF No. 8-4 at 2.

Finally, the NCC Notice states that "[r]ecipients are expected to align program materials with Presidential Executive Orders" and "submit program materials to [HHS] for review." ECF

4

No. 8-3 at 16.

After receiving the NCC Notice, Plaintiffs began "review[ing] [their] existing project scope[s], work plan[s], and program materials to evaluate how to respond." *E.g.*, ECF No. 8-7 ¶ 46. Each claims that it "was unable to determine what the federal government would find to be compliant and noncompliant based on the terms of the new notice."[2]

From there, Plaintiffs responded differently to the NCC Notice. Two—Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky ("PPGNHAIK") and Planned Parenthood Mar Monte ("PPMM")—decided that, even applying the NCC Notice "as best as [they] understood" it, they could not modify their "programs or corresponding content . . . without abandoning the stated goals of the original NOFO, the organization[s'] mission[s], [the] project[s'] goal[s], and the ability to continue to replicate to scale [evidence-based teen pregnancy prevention programs] with fidelity and quality." ECF No. 8-8 ¶¶ 47, 53; ECF No. 8-11 ¶ 43. So neither changed its projects. Still, PPGNHAIK prepared and submitted a continuing-funding application by the April 15 deadline, with the caveat that it believed the NCC Notice to be unlawful and that it was submitting its application "under protest" and was "in no way certifying alignment with the new 'EO requirements.'" ECF No. 8-8 ¶ 54.[3] PPMM, on the other hand, declined to do even that, determining that it would "not submit" what it saw as "a futile application." ECF No. 8-11 ¶ 57.

As for the other three, each determined that it could make at least some changes to its projects and submitted applications by the April 15 deadline to that effect. Planned Parenthood of

---

[2] ECF No. 8-7 ¶ 48; ECF No. 8-8 ¶ 40; ECF No. 8-9 ¶¶ 37, 40; ECF No. 8-10 ¶ 45; ECF No. 8-11 ¶ 42.

[3] Under the NOFO, Plaintiffs had to certify compliance "with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program." ECF No. 8-8 ¶ 57; ECF No. 8-2 at 63.

Greater New York ("PPGNY"), for example, "made minor edits to the Program Narrative, Work Plan, Logic Model, Needs Assessment, and Budget Narrative language to note site types, site names, and site locations, rather than specific populations included in the original application." ECF No. 8-7 ¶ 50.  It could "make these minor changes because [it] determined these changes would not meaningfully impact PPGNY's ability to continue [its project] with fidelity." *Id.* ¶ 51.  Similarly, Planned Parenthood California Central Coast ("PPCCC") "made some changes in an attempt to respond to the Notice," such as "remov[ing] what [it] understood to be language on the gender and cultural ideologies from the program materials." ECF No. 8-9 ¶ 41.  And Planned Parenthood of the Heartland ("PPH") "made minor modifications to the facilitator guidance part of the TPP programming, such as redacting words like 'gender,' from the manual." ECF No. 8-10 ¶ 59.  Beyond that, "the only modification PPH made was to remove the Spanish language lesson plans." *Id.*  But it "did not make any substantive changes to its program materials," and it concluded that it "was able to make these changes because it determined that these changes would not meaningfully impact PPH's ability to continue its TPP project with fidelity." *Id.*

Still, PPGNY, PPCCC, and PPH assert that they remained unsure if their TPP projects would comply with the NCC Notice.  So each submitted its application without "certifying alignment with the new 'EO requirements' promulgated in the March 2025 update received on March 31, 2025." ECF No. 8-7 ¶ 59; ECF No. 8-9 ¶ 42; ECF No. 8-10 ¶ 60.

As mentioned, HHS plans to act on Plaintiffs' applications by June 30, 2025. ECF No. 16 at 19.  Before it could do so, Plaintiffs sued, alleging that the NCC Notice violates their Fifth Amendment due-process rights, contradicts the statute establishing the TPP Program, and is arbitrary, capricious, and ultra vires. ECF No. 1 ¶¶ 153–200.  They then moved for a preliminary injunction, ECF No. 8, and the Court held a hearing on the motion on June 4, 2025.  In response

6

to this motion, HHS acted to mitigate the possible impact of the June 30 deadline by promising to hold the funds for Plaintiffs' TPP projects "in obligation" for them until August 31, 2025, or until it decides to fund them, whichever is earlier. ECF No. 16-2 ¶ 3.

## II.     Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). Thus, "failure to show a likelihood of irreparable harm" is, "standing alone, sufficient to defeat the motion." *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 96 (D.D.C. 2020) (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "The party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up). In other words, "[t]he movant must provide proof . . . indicating that the harm is certain to occur in the near future." *Id.* Furthermore, "the movant must show that the alleged harm will *directly result* from the action which the movant seeks to enjoin." *Id.* (emphasis added). Finally, the injury must be truly "irreparable"—i.e., "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

7

**III.     Analysis**

Plaintiffs claim that they are suffering irreparable harm now—and will continue to do so, without immediate preliminary relief, when their current funding runs out on June 30, 2025. And though they largely focus on the harms that will purportedly befall them should HHS deny their continuing-funding applications, they also argue that the NCC Notice will continue to irreparably harm them even if HHS *approves* their applications. Thus, they say, irreparable harm to them will continue either way. At least at this stage, the Court disagrees. If HHS grants Plaintiffs' applications, they will not suffer irreparable harm at all. And if HHS denies their applications, they will not suffer irreparable harm such that injunctive relief is required until at least August 31, because Defendants have agreed to hold their funding in obligation for them until then.

**A.     Plaintiffs Will Not Suffer Irreparable Harm If HHS Grants Their Applications**

As noted, HHS has not yet acted on any of Plaintiffs' applications for continued funding. ECF No. 16 at 16. But Plaintiffs argue that the NCC Notice is causing them irreparable harm now and will continue to do so even if HHS grants their applications. The Court disagrees.

First, Plaintiffs say that they are suffering a "concrete and certain" harm because the NCC Notice forced them into a "lose-lose-lose choice" by requiring them to "change their programming, risk a false certification, or forgo the federal funds or contract." ECF No. 20 at 10 (quoting *Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613, at * 11 (D.D.C. May 2, 2025)). But even assuming the NCC Notice imposed such harm on Plaintiffs before the April 15 application deadline, that deadline has passed. Before they filed suit, Plaintiffs chose how to respond to the NCC Notice: three elected to change their programming, one chose to change nothing, and one decided not to even apply. Thus, Plaintiffs are not facing any forward-looking forced choice, so the threat of such a choice cannot by itself be the cause of any irreparable harm. And for reasons explained elsewhere, whatever harms Plaintiffs may suffer as a downstream result of the choice

each made, those harms are not irreparable, at least not until August 31.

Plaintiffs also claim that PPGNY, PPCCC, and PPH will suffer irreparable harm if their applications are granted in their current forms because they "have already made changes to their programs in response to the unlawful notice." ECF No. 20 at 12. But to warrant injunctive relief, the harm complained of must be "great," *Wis. Gas Co.*, 758 F.2d at 674, meaning it must be of "considerable magnitude," *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014). None of the three comes close to making such a showing. Indeed, both PPGNY and PPH called their changes "minor" and determined that they "would not meaningfully impact" either's ability to adequately carry out its TPP project the way it wants. ECF No. 8-7 ¶¶ 50–51; ECF No. 8-10 ¶ 59. And PPCCC characterized the extent and impact of its changes as minimal, as well. For example, it says it made only "*some* changes in an attempt to respond to the Notice," like removing certain language from program materials. ECF No. 8-9 ¶ 41 (emphasis added). None of this is the stuff of irreparable harm.

That said, PPCCC claims that it will still suffer harm if its application is "granted in its current form" because it will have to "divert resources from prior aspects of [its] TPP Program" to implement "a new" project to replace an older project that HHS had "inexplicabl[y] remov[ed]" from its list of pre-approved projects. ECF No. 8-9 ¶ 47. But that change and its attendant harms are unrelated to the NCC Notice. While PPCCC declared that "[i]n reviewing [the NCC] Notice, [it] realized that . . . HHS had eliminated" one of PPCCC's projects "from its roster of pre-approved evidence-based programs," the NCC Notice itself did no such thing. ECF No. 8-9 ¶ 37. Instead, that list is established through the TPP Evidence Review Protocol ("TPPER"). ECF No. 8-9 ¶ 20; ECF No. 8-6 ¶ 45. But Plaintiffs do not challenge any changes to the TPPER or its list of approved programs in their complaint, much less in the pending motion. And nothing in the

9

NCC Notice itself suggests that the removal of PPCCC's project from the list of approved programs resulted from the NCC Notice. *See* ECF No. 8-3. Indeed, it is hard to see how it could, since the NCC Notice guides TPP Program participants "on the preparation of submission of [their] non-competing continuation (NCC) award application[s]" and does not directly instruct HHS to do anything regarding the TPPER. *Id.* at 4. Thus, this asserted harm did not "directly result from the action which the movant seeks to enjoin," and so preliminary relief cannot remedy any such harm. *Wis. Gas Co.*, 758 F.2d at 674.

Undeterred, Plaintiffs point to *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), and argue that their proposed changes will "lock[]" them "into program materials that do not fully serve their mission." ECF No. 20 at 13.[4] So they claim that, "[a]bsent an injunction now, 'there can be no do over and no redress.'" ECF No. 20 at 13 (quoting *League of Women Voters*, 838 F.3d at 9). This case is no help to them, either. There, the Circuit noted that injury can result when "new obstacles unquestionably make it more difficult for [parties] to accomplish their primary mission." *League of Women Voters*, 838 F.3d at 9. But the rest of the opinion shows that not just any obstacle will do to show *irreparable* harm.

First, as the Circuit noted, the asserted harm must be "great." *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). There, the plaintiffs' "primary mission [was] registering voters," and the challenged action caused "the number of voters successfully registered at League drives [to] plummet," with some "counties suspend[ing] all registration efforts." *Id.* In other words, in that case, unlike here for the reasons described above, the plaintiffs showed that

---

[4] Plaintiffs also point to this Court's recent opinion in *National Urban League v. Trump* for the proposition that "change[s] [to] programming" are "'real' and nonspeculative harm[s]." ECF No. 20 at 13 (quoting 2025 WL 1275613, at * 11). True enough. But the problem for Plaintiffs is that the cited passages discuss harm for standing purposes, not the higher standard for irreparable harm. *See Nat'l Urb. League*, 2025 WL 1275613, at * 11.

the challenged action had a concrete and dramatic effect on their core mission. Second, to qualify as irreparable harm, the injury must also be beyond remediation. And in *League of Women Voters,* the Circuit was presented with a rapidly approaching "hard deadline for meaningful injunctive relief" in the form of deadlines to register voters for the upcoming election. *Id.* at 7. Thus, the Circuit held, the harm to the plaintiffs was "irreparable because after the registration deadlines for the November election pass[ed], 'there [could] be no do over and no redress.'" *Id.* at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). Not so here. Plaintiffs identify no imminent deadline after which, assuming HHS grants their applications, the Court will be unable to grant them relief by ordering that their TPP projects be restored to their pre-NCC Notice forms. Instead, all they point to is the June 30 date when their funding runs out. ECF No. 21 at 12. But that is not at all like the deadline in *League of Women Voters*, after which "no redress" was possible. 838 F.3d at 9 (quotation omitted).

For all these reasons, Plaintiffs have not shown that they are suffering irreparable harm now or will do so if HHS grants their pending funding applications.[5]

### B.  Plaintiffs Will Not Suffer Irreparable Harm If HHS Denies Their Applications, at Least Until August 31

Plaintiffs' next and main argument is that it is virtually certain that Defendants will deny their continuing-funding applications, which will purportedly result in immediate and irreparable injuries to their finances, missions, reputations, and communities. But even assuming that HHS will deny their applications because of their failure to comply with the NCC Notice and therefore withhold funding—at least until the Court orders otherwise—Plaintiffs have not shown "that there

---

[5] Plaintiffs also briefly imply that they will be irreparably harmed because "the NCC Notice's certification requirements . . . expose them to the risk of penalties so long as the NCC Notice remains in effect." ECF No. 20 at 11. But none of them certified compliance with the NCC Notice, so they have not shown that the risk of any such harm is likely.

11

is a clear and *present* need for equitable relief to prevent irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674 (emphasis added) (quotation and internal quotation marks omitted). While Plaintiffs may face a risk of irreparable harm a couple of months down the road, they have not shown that the Court needs to act *now* to prevent those injuries.

### 1. A Temporary Loss of Recoverable Funding Is Not Irreparable Harm, and Plaintiffs' Loss Is Recoverable Until at Least August 31

To begin, Plaintiffs' finances will not be irreparably harmed if HHS temporarily denies their funding. "Recoverable monetary loss may constitute irreparable harm *only* where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674 (emphasis added). As Plaintiffs concede, they will not "totally shut down" absent an injunction. ECF No. 21 at 19. So their continued existence does not depend on the uninterrupted continuation of their TPP funding. And because no Plaintiff's "very existence" is at stake, a temporary, remediable loss of funding is not an irreparable harm. *Wis. Gas Co.*, 758 F.2d at 674.

Plaintiffs' responses are unavailing. For example, they claim that their asserted monetary losses are not truly recoverable because they cannot afford to front their program costs and hope for reimbursement on the backend. ECF No. 20 at 13–14. But the Court struggles to see why this makes the losses irrecoverable. Even if HHS denies Plaintiffs' funding applications, it has promised to hold over $4 million (representing the approximate amount it would cost to fund all five Plaintiffs for the next year of the program) for them until at least August 31. ECF No. 16-2 ¶ 3. And it has further promised that, should Plaintiffs prevail here and HHS award them funding, it will "backdate[]" those funds "to the beginning of the budget period (July 1)." *Id.* So this is not a case in which "[i]t will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits." *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982). Because the funds Plaintiffs seek from HHS will be reserved

for them for at least the next two months, those funds are "[r]ecoverable" at least until then, and the default rule that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business" applies. *Wis. Gas Co.*, 758 F.2d at 674. As discussed, the Court will order the parties to propose an expedited briefing schedule for further proceedings on the merits and will endeavor to resolve the merits before August 31.

Next, Plaintiffs argue that they need not show that their businesses will shut down; on their telling, it is enough to show that their TPP projects, and much of their other education programming, will be shuttered without continuous funding.[6] But this argument runs headlong into the logic undergirding the Circuit's bright-line rule. "Ordinarily, 'economic loss does not, in and of itself, constitute irreparable harm' . . . because in most circumstances financial harms can be remedied through subsequent legal action." *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (quoting *Wis. Gas Co.*, 758 F.2d at 674). That rule falls away only "where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation and internal quotation marks omitted). And unless the movant's business is existentially threatened, there is often little reason to fear that it will be unable to reclaim funds that would otherwise be recoverable. Here, there is no reason to doubt that Plaintiffs will continue to exist, even absent injunctive relief, so there is no reason to doubt that they will be able to recover funding owed them should they succeed on the merits before August 31. Thus, there is no risk of imminent irreparable harm that the Court must act now to prevent.

---

[6] Defendants posit that Plaintiffs may not need to shut down their projects if funding lapses because, should Plaintiffs succeed on the merits, HHS will backdate Plaintiffs' awards to July 1. But Plaintiffs declare that they cannot afford to fund their projects on a deficit like this. ECF No. 20 at 14. The Court thus assumes that a denial of funding will require Plaintiffs to, at least temporarily, pause their projects.

13

The cases Plaintiffs cite do not alter this conclusion. For example, the court in *Climate United Fund v. Citibank, N.A.* held that "when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn." No. 25-cv-698, 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025). But that case proves the Court's point: irreparable harm occurs when the "existence" of "an *organization*" depends on continued funding. *Id.* (emphasis added). And Plaintiffs' other cases get them no further. Unlike here, both involved monetary loss that was *unrecoverable*. *See Express One Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992) (noting that the plaintiff need not show an existential threat to its business in light of "the *non-recoverable* monetary loss present in this case" (emphasis added)); *McGregor Printing Corp. v. Kemp*, No. 91-cv-3255, 1992 WL 118794 (D.D.C. May 14, 1992) ("[T]he *irretrievable* monetary loss to McGregor in combination with the loss in employment to its employees constitutes a sufficient showing of irreparable harm . . . ." (emphasis added)). While those cases may come into play two months from now, they have little salience now.

Additionally, at the motion hearing, the Court asked Plaintiffs for their "best authority" that an existential risk to a segment of a party's business, rather than a risk to the existence of the party itself, constitutes irreparable harm in the context of otherwise recoverable losses. ECF No. 21 at 22. Plaintiffs cited *Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021), and argued that it shows that a threat to a program is sufficient even if the party bringing the suit is not itself at risk, ECF No. 21 at 23. But that case did not even discuss irreparable harm. Instead, the Government there "d[id] not challenge the Tribe's claim that it will suffer irreparable harm," so the Circuit "focuse[d]" its "analysis . . . on the three remaining [preliminary-injunction] factors." *Shawnee Tribe*, 984 F.3d at 102. Thus, that case does not come close to upending other Circuit precedent

14

holding that "[r]ecoverable monetary loss may constitute irreparable harm *only* where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674 (emphasis added).

Because Plaintiffs' continued existence is not on the line absent immediate injunctive relief, the ultimately recoverable loss of funds at issue here is not irreparable. So even if HHS denies Plaintiffs' applications and they are forced to temporarily shutter their TPP projects, that harm can be remedied, at least until August 31, and does not warrant immediate injunctive relief.[7]

### 2. A Temporary Obstacle to Plaintiffs' Mission of Providing Evidence-Based Education Programming Is Not Irreparable Harm

To get around the inadequacy of their economic-harm argument, Plaintiffs turn again to *League of Women Voters*. They argue that their mission "includes providing evidence-based programming that is effective within the communities they serve and fostering relationships in those communities." ECF No. 8-1 at 50. And they note that even a temporary denial of funding creates "obstacles" to advancing that mission. *Id.* (quoting *League of Women Voters*, 837 F.3d at 9). For example, they assert that they will be forced "to shut down their projects altogether midstream" and "lay off most or all of the staff that administer their TPP programs." *Id.* So, they conclude, they face irreparable harm absent an injunction.

To be sure, this asserted harm is more acute than the harm discussed above in connection with *League of Women Voters* if their applications are granted. But a temporary cessation of

---

[7] In one sentence, Plaintiffs argue that "losing TPP funds will force Plaintiffs to terminate ongoing contracts prematurely, leaving them to pay penalties and still remain liable for covering costs of partial deliveries." ECF No. 8-1 at 49. Even assuming these would be irrecoverable monetary injuries, Plaintiffs still provide little to no factual support for this argument. They do not, for example, provide any evidence about the nature or amount of these penalties, or even when they might accrue. So the Court cannot assess whether "that future economic injury will be 'certain,' 'great,' and 'actual,'" much less imminent. *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (quoting *Wis. Gas Co.*, 758 F.2d at 674).

15

Plaintiffs' TPP projects is still not irreparable harm to Plaintiffs' broader mission. Again, *League of Women Voters* addressed an unusual situation where, absent immediate relief, the plaintiffs could *never* advance their time-sensitive primary mission of "registering voters" before the 2016 election. *League of Women Voters*, 837 F.3d at 9. Here, Plaintiffs do not explain why temporarily pausing programming linked to their TPP projects or even temporarily laying off staff will make it such that "there can be no do over and no redress." *Id.* (quotation omitted). They do not, for example, claim that "it will be virtually impossible" for Plaintiffs to rehire their employees or "to recruit replacements." *See Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025) (quotation omitted). Nor do they explain why a temporary pause or reduction in education programming would be irreversible. So even if Plaintiffs must temporarily shut down their TPP projects in response to denied funding, they have not borne their burden to show that any harm to their mission is "irreparable" or "beyond remediation," especially if they receive those funds by August 31. *League of Women Voters*, 837 F.3d at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

### 3. Plaintiffs' Asserted Risk of Reputational Harm Is Speculative

Next, Plaintiffs argue that a temporary denial of funding and closure of their TPP projects "will erode Plaintiffs' 'goodwill, reputation, and relationships with employees, partners, [and] sub-contractors.'" ECF No. 8-1 at 50 (quoting *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400, 2025 WL 485324, at *3 n.2 (D.D.C. Feb. 13, 2025)). "Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019). "To satisfy this standard, however, the plaintiff must make a showing that is 'concrete and corroborated, not merely speculative.'" *Id.* at 104 (quoting *Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006)).

Plaintiffs have not met this standard. They claim that, if they cancel their projects prematurely, their communities will lose trust in them and hesitate to work with them in the future.[8] PPGNY, for example, notes the "potential unwillingness" partners may have to work with it "on other current projects or future projects." ECF No. 8-7 ¶ 67. But on this record—and as reflected by the word "potential"—this asserted reputational injury is speculative. And absent evidence that Plaintiffs' community members "will fault" *them* for *HHS*'s possible decision to terminate their funding, claims of reputational injury are insufficient. *See Verma v. USCIS*, No. 20-cv-3419, 2020 WL 7495286, at *12 (D.D.C. Dec. 18, 2020). Plaintiffs have "adduced no [such] evidence." *Id.* Indeed, on the facts here, there is no logical reason why Plaintiffs' employees, partners, or subcontractors would blame *them* if their TPP projects do not continue.

PPGNHAIK presents the best case for reputational injury, but it too comes up short. In its declaration, it states that its "relationship with the community in Hawaiʻi is already strained" as "[m]any potential partners are reluctant to work with PPGNHAIK due to prior experiences of [it] and other organizations building community engagement and then abruptly stopping programming when finances become unavailable." ECF No. 8-8 ¶ 64. But PPGNHAIK does not explain whether those other situations involved circumstances as here where community members would logically blame HHS, not PPGNHAIK, for premature cancellation. Nor does it discuss whether those scenarios involved only *temporary* pauses in programming, such as would happen here if Plaintiffs ultimately prevail on the merits. So no Plaintiff, including PPGNHAIK, has established that any potential reputational harm is sufficiently "concrete and corroborated, not merely speculative." *Atlas Air, Inc.*, 280 F. Supp. 3d 59 at 104 (quoting *Trudeau*, 384 F. Supp. 2d at 297).

---

[8] Only three Plaintiffs—PPGNY, PPGNHAIK, and PPCCC—assert this theory of reputational harm. ECF No. 8-7 ¶ 67; ECF No. 8-8 ¶¶ 63–64; ECF No. 8-9 ¶ 55.

### 4.  Plaintiffs Cannot Rely on Harms to Third Parties

Finally, Plaintiffs argue that even the temporary cancellation of their projects will harm their communities and "contribute to the historic exclusion and neglect that indisputably have contributed to the disproportionate rates of unintended teen pregnancy and STI rates within" the groups targeted by Plaintiffs' TPP projects. ECF No. 8-1 at 50. While the Court is sympathetic to these concerns and would consider them in balancing the equities, they have no role to play in determining whether *Plaintiffs* themselves will suffer irreparable harm absent an injunction now. "A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 24 (emphasis added). So "[t]his argument fails because it shows irreparable harm not to [Plaintiffs], but to third parties." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012).

\*   \*   \*

In sum, Plaintiffs view themselves backed into a corner, facing irreparable harm whether or not their continuing-funding applications for their TPP projects are granted. The Court disagrees. If Plaintiffs' applications are granted, their asserted harms are neither so great nor irreparable that injunctive relief is required. And if they are denied, given HHS's representations about holding the relevant funds, the Court will still be able to grant effective relief down the road, at least until August 31. Either way, the Court cannot say that, right now, Plaintiffs' asserted harms are "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674 (quotation and internal quotation marks omitted). Thus, it will deny Plaintiffs' motion without prejudice.

### IV.  Conclusion

For all the above reasons, the Court will deny without prejudice Plaintiffs' Motion for Preliminary Injunction. The Court will also order the parties to meet, confer, and jointly propose, by

July 2, 2025, an expedited briefing schedule for future proceedings that allows the Court to resolve the merits by August 31, 2025, or a later date until which HHS agrees to hold funds for Plaintiffs' TPP projects in obligation for them.

    A separate order will issue.

/s/ Timothy J. Kelly<br>
TIMOTHY J. KELLY<br>
United States District Judge

Date: June 26, 2025